# EXHIBIT A

**Audit:** The budget line item for Audit for the CHDC Head Start/Early Head Start close out budget is $30,000. This amount is expected to support the CHDC unified audit for fiscal year of July 1, 2002 - June 30, 2003 and the time period of July 1, 2003 - to the end of the close out period.

As the CHDC unified audits identified above will not be a program specific audit for Head Start and Early Head, the unified audits will include a complete and through review of the CHDC internal control system, a Head Start and Early Head Start client eligibility compliance review, and all other audit requirements as stated in A-133.

During fiscal year 2002/2003, CHDC was required by ACF to perform a program specific audit for the Head Start and Early Head Start programs. At the request of ACF, the amount of the budget line for the program specific audit was established at $25,000.

CHDC01303

# EXHIBIT B

FILE COPY

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CALIFORNIA HUMAN DEVELOPMENT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Case No. 05-1029C<br>(Judge Williams) |

**PLAINTIFF'S RULE 26(A)(1) INITIAL DISCLOSURES**

Pursuant to Rule 26(a)(1) of the Rules of the Court of Federal Claims ("RCFC"), plaintiff, California Human Development Corporation (hereinafter "CHDC"), provides the following initial disclosures to defendant:

A. The following witnesses may have discoverable information and may be relied upon by plaintiff in this matter:

1. Chris Paige, Deputy CEO/ Operations Director CHD. Mr. Paige will testify to elements of the extraordinary closing costs at issue in this case, the underlying events and the agreement to have them fairly compensated. Mr. Paige may be contacted through plaintiff's counsel in this matter. If further information is need, please contact counsel and that information will be provided promptly.

2. Yolanda Rinaldo, a former Board member. She was very involved in both the communications with ACF and in attending meetings we had here at the office regarding remedial measures to improve the operations at the Woodland site where Headstart was located. Ms. Rinaldo will testify to elements of the extraordinary closing costs at issue in this case, the underlying events and the agreement to have them fairly compensated. Ms.

Rinaldo may be contacted through plaintiff's counsel in this matter. If further information is need, please contact counsel and that information will be provided promptly.

3. Sylvie Vatinelle: She worked extensively with this program on different issues regarding ACF. Ms. Vatinelle will testify to elements of the extraordinary closing costs at issue in this case, the underlying events and the agreement to have them fairly compensated. Ms. Vatinelle may be contacted through plaintiff's counsel in this matter. If further information is need, please contact counsel and that information will be provided promptly.

4. Harvey Aytch is a CHDC Board Member. Mr. Aytch will testify to elements of the extraordinary closing costs at issue in this case, the underlying events and the agreement to have them fairly compensated. Mr. Aytch may be contacted through plaintiff's counsel in this matter. If further information is need, please contact counsel and that information will be provided promptly.

5. Jose Bernardo is a CHDC Board Member. Mr. Bernardo will testify to elements of the extraordinary closing costs at issue in this case, the underlying events and the agreement to have them fairly compensated. Mr. Bernardo may be contacted through plaintiff's counsel in this matter. If further information is need, please contact counsel and that information will be provided promptly.

6. George Ortiz is a Former President/CEO. Mr. Ortiz will testify to elements of the extraordinary closing costs at issue in this case, the underlying events and the agreement to have them fairly compensated. Mr. Ortiz may be contacted through plaintiff's counsel in this matter. If further information is need, please contact counsel and that information will be provided promptly.

7. Andrew Haugh is a Former CFO CHDC. Mr. Haugh will testify to

elements of the extraordinary closing costs at issue in this case, the underlying events and the agreement to have them fairly compensated. Mr. Haugh may be contacted through plaintiff's counsel in this matter. If further information is need, please contact counsel and that information will be provided promptly.

8. Irma Cordova is a Deputy CEO/Administration CHDC. Ms. Cordova will testify to elements of the extraordinary closing costs at issue in this case, the underlying events and the agreement to have them fairly compensated. Ms. Cordova may be contacted through plaintiff's counsel in this matter. If further information is need, please contact counsel and that information will be provided promptly.

9. Kevin Flores is in the Fiscal Department of CHDC. Mr. Kevin Flores will testify to elements of the extraordinary closing costs at issue in this case, the underlying events and the agreement to have them fairly compensated. Mr. Kevin Flores may be contacted through plaintiff's counsel in this matter. If further information is need, please contact counsel and that information will be provided promptly.

10. Maria Cruz is in the Fiscal Department of CHDC. Ms. Cruz will testify to elements of the extraordinary closing costs at issue in this case, the underlying events and the agreement to have them fairly compensated. Ms. Cruz may be contacted through plaintiff's counsel in this matter. If further information is need, please contact counsel and that information will be provided promptly.

11. Robert Scharf is an attorney for CHDC. Mr. Scharf will testify to elements of the extraordinary closing costs at issue in this case, the underlying events and the agreement to have them fairly compensated. Mr. Scharf may be contacted through plaintiff's counsel in this matter. If further information is need, please contact counsel and that information

will be provided promptly.

12. Lou Flores is an attorney for CHDC. Mr. Lou Flores will testify to elements of the extraordinary closing costs at issue in this case, the underlying events and the agreement to have them fairly compensated. Mr. Lou Flores may be contacted through plaintiff's counsel in this matter. If further information is need, please contact counsel and that information will be provided promptly.

13. Jerry Gomez – ACF. Mr. Gomez will testify to elements of the extraordinary closing costs at issue in this case, the underlying events and the agreement to have them fairly compensated. Mr. Gomez may be contacted through plaintiff's counsel in this matter. If further information is need, please contact counsel and that information will be provided promptly.

15. Martin Tom – Grant officer ACF. Mr. Tom will testify to elements of the extraordinary closing costs at issue in this case, the underlying events and the agreement to have them fairly compensated. Mr. Tom may be contacted through plaintiff's counsel in this matter. If further information is need, please contact counsel and that information will be provided promptly.

16. Maria Forte – Program officer ACF. Ms. Forte will testify to elements of the extraordinary closing costs at issue in this case, the underlying events and the agreement to have them fairly compensated. Ms. Forte may be contacted through plaintiff's counsel in this matter. If further information is need, please contact counsel and that information will be provided promptly.

17. Paulene Graham – Fiscal officer ACF. Ms. Graham will testify to elements of the extraordinary closing costs at issue in this case, the underlying events and the

agreement to have them fairly compensated. Ms. Graham may be contacted through plaintiff's counsel in this matter. If further information is need, please contact counsel and that information will be provided promptly.

B. The following documents and things may be relied upon by plaintiff in this matter:

1. All documents that have been produced to you over this course of this litigation from CHDC, including all documents produced on July 21, 2006 and November 13, 2006.

DATED: November 13, 2006

Respectfully submitted,
California Human Development Corporation

By:__________________________
One of its Attorneys

Steven D. Cundra (D.C. Bar No. 374074)
Amy E. Gluck (D.C. Bar No. 453525)
Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.
1120 20th Street, N.W.
Suite 700, North Building
Washington, D.C. 20036
Telephone (202) 973-1200
Facsimile (202) 973-1212

**ATTORNEYS FOR PLAINTIFF,**

**CALIFORNIA HUMAN DEVELOPMENT CORPORATION**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of November, 2006, I caused to be sent by messenger a copy of the foregoing "PLAINTIFF'S RULE 26(a)(1) INITIAL DISCLOSURES' to the following:

Jeffrey S. Pease
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Sarah Watson, Legal Assistant
**HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON, P.C.**
1120 20th Street, NW
North Building, 7th Floor
Washington, D.C. 20036
(202) 973-1200
(202) 973-1212 (fax)

# EXHIBIT C

# California Human Development Corporation v. United States of America
# No. 05-1029C (Fed. Cl.)

## Plaintiff's List of Privileged or Protected Documents Withheld from Production of Initial Disclosures

## July 26, 2006

| No. | Date | Author | Recipient(s) | Document Type | Subject Matter | Privilege Claim |
|---|---|---|---|---|---|---|
| 1. | Sept. 15, 04 | Chris Paige | Steven Cundra | Letter | CHDC HS Closeout | Attorney Client |
| 2. | Sept. 16, 04 | Chris Paige | Steve Cundra | Electronic Mail | Email conversation re CHDC and HS closeout | Attorney Client |
| 3. | Sept. 17, 04 | Chris Paige | Steve Cundra | Electronic Mail | Email conversation thread regarding CHDC/ACF HS matter | Attorney Client |
| 4. | Sept. 17, 04 | Steven Cundra | Chris Paige | Electronic Mail | Email conversation thread regarding CHDC/ACF HS matter | Attorney Client |
| 5. | Sept 20, 04 | Chris Paige and Irma Cordova | Steve Cundra | Facsimile | Fax cover sheet re CHDC/ACF HS matter | Attorney Client |
| 6. | Sept 21, 04 | Chris Paige | Lee Foley and Steve Cundra | Electronic Mail | CHDC HS Close Out Costs | Attorney Client |
| 7. | Jan 21, 05 | Chris Paige | Lee Foley and Steve Cundra | Facsimile | CHDC's appeal of ACF's closeout grant award | Attorney Client |
| 8. | March 3, 05 | Chris Paige | Louis Flores, Steve Cundra, Mike Micciche, and Irma Cordova | Electronic Mail | ACF Request for Mediation | Attorney Client |

| | | | | | | |
|---|---|---|---|---|---|---|
| 9. | March 4, 05 | Chris Paige | Steve Cundra | Electronic Mail | Email conversations thread regarding key legal files | Attorney Client |
| 10. | March 5, 05 | Louis Flores | Steve Cundra, Mike Micciche, Chris Paige and Irma Cordova | Memorandum | ACF mediation | Attorney Client, Work-Product |
| 11. | March 7, 05 | Louis Flores | Steve Cundra | Electronic Mail | Email conversations thread re ACF Appeal | Attorney Client, Work-Product |
| 12. | March 8, 05 | Louis Flores | Steve Cundra, Mike Micciche, Chris Paige and Irma Cordova | Memorandum | ACF Mediation | Attorney Client, Work-Product |
| 13. | March 9, 05 | Louis Flores | Steve Cundra, Chris Paige, Irma Cordova, Mike Micciche and Robert Scharf | Electronic Mail | ACF Mediation | Attorney Client, Work-Product |
| 14. | April 1, 05 | Chris Paige | Steve Cundra | Electronic Mail | Email conversations thread re CHDC/ACF | Attorney Client |
| 15. | June 2, 05 | Chris Paige | Steve Cundra, Lee Foley and Mike Micciche | Electronic Mail | Email conversations thread re CHDC's request for Mediation | Attorney Client |
| 16 | June 2, 05 | Steve Cundra | Chris Paige | Electronic Mail | Email conversations thread re CHDC's request for Mediation | Attorney Client |
| 17. | June 2, 05 | Chris Paige | Steve Cundra | Electronic Mail | Email conversations thread re CHDC's request for Mediation | Attorney Client |
| 18. | July 26, 05 | Chris Paige | Steve Cundra | Electronic Mail | Email conversations thread re CHDC/ACF | Attorney Client |
| 19. | July 31, 05 | Steve Cundra | Chris Paige | Electronic Mail | Email conversations thread re CHDC/ACF | Attorney Client |
| 20. | Aug. 1, 05 | Christ Paige | Steve Cundra | Electronic Mail | Email conversations thread re CHDC/ACF | Attorney Client |

| | | | | | | |
|---|---|---|---|---|---|---|
| 21. | Unknown | Unknown | Unknown | Legal research | Legal research re Departmental Appeal Board | Work Product |
| 22. | Unknown | Unknown | Unknown | Legal research | Legal research re contracts and costs | Work Product |
| 23. | Unknown | Unknown | Unknown | Legal research | Legal research re grants | Work Product |
| 24. | Unknown | Unknown | Unknown | Legal research | Legal research re government property and grants | Work Product |
| 25. | Unknown | Unknown | Unknown | Legal research | Legal research re government property | Work Product |
| 26. | Unknown | Unknown | Unknown | Legal research | Legal research re government contracts | Work Product |
| 27. | Sept. 15, 04 | Steve Cundra | Unknown | Handwritten notes | Attorney notes re Close-Out costs | Work Product |
| 28. | Sept 20, 04 | Steve Cundra | Unknown | Handwritten notes | Attorney notes re Close-Out costs | Work Product |
| 29. | Sept. 20, 04 | Steve Cundra | Unknown | Handwritten notes | Attorney notes re the grant and grant closeout | Work Product |
| 30. | Sept. 23, 04 | Steve Cundra | Unknown | Handwritten notes | Attorney notes re admin. appeal | Work Product |

# EXHIBIT D

**CALIFORNIA HUMAN DEVELOPMENT CORPORATION**
**FORM 424 BUDGET -- Regular Close Out**
**HEAD START AND EARLY HEAD START CLOSEOUT**

PROPOSED BUDGET VS. ACTUAL AWA

**CLOSE OUT PERIOD:**

**FROM:** 9/1/2003
**TO:** 6/30/2004

INSURANCE TRANSFERS

| OBJECT CLASS CATEGORIES | BUDGET | ACF GRANT |
|---|---|---|
| SALARIES | $42,973.22 | $50,206.00 |
| FRINGE BENEFITS | $7,232.94 | $13,515.00 |
| TRAVEL | $0.00 | |
| EQUIPMENT | $0.00 | |
| SUPPLIES | $800.00 | |
| CONTRACTUAL | $0.00 | |
| OTHER | $128,029.71 | $73,811.00 |
| TOTAL DIRECT CHARGES | **$179,035.88** | **$137,532.00** |
| INDIRECT CHARGES | **$17,903.59** | $0.00 |
| **TOTALS** | **$196,939.47** | **$137,532.00** |

| COMBINED data for consolidatec |
|---|
| **OBJECT CLASS CATEGORIES** |
| SALARIES |
| FRINGE BENEFITS |
| TRAVEL |
| EQUIPMENT |
| SUPPLIES |
| CONTRACTUAL |
| OTHER |
| TOTAL DIRECT CHARGES |
| INDIRECT CHARGES |
| **TOTALS** |

**CALIFORNIA HUMAN DEVELOPMENT CORPORATION**
**FORM 424 BUDGET -- Extraordinary Close Out**
**HEAD START AND EARLY HEAD START CLOSEOUT**

**CLOSE OUT PERIOD:**

**FROM:** 9/1/2003
**TO:** 6/30/2004

| OBJECT CLASS CATEGORIES | BUDGET |
|---|---|
| SALARIES | |
| FRINGE BENEFITS | |
| TRAVEL | |
| EQUIPMENT | |
| SUPPLIES | |
| CONTRACTUAL | |
| CONSTRUCTION | |
| **OTHER -- To Date** | |
| Unreimbursed Construction | $91,388.31 |
| Lease Assignment and Lien Legal and mediation | $73,875.07 |
| HR Settlements | $67,148.00 |
| **Sub Total OTHER -- To Date** | **$232,411** |
| **OTHER -- Contingent** | |
| Lease Assignment and Lien Legal | $10,000.00 |
| Ticon Lien | $141,647.00 |
| Appraisal | $20,000.00 |
| Krahling Lease Buyout | $60,248.00 |
| HR Settlements | $20,279.00 |
| **Sub Total OTHER -- Contingent** | **$252,174.00** |
| TOTAL DIRECT CHARGES | **$484,585** |
| INDIRECT CHARGES | $0 |
| **TOTALS** | **$484,585** |

FEDERAL REQUST **$681,525**

**DETAIL ON OTHER FOR CLOSEOUT AWARD**

| |
|---|
| OCCUPANCY |
| POSTAGE |
| COMMUNICATIONS |
| INSURANCE |
| AUDIT |
| ATTORNEY FEES |
| TREJO ATTORNEY |
| MORAN ATTORNEY |
| MORAN SETTLEMENT |
| DEDUCTION |

MAN DEVELOPMENT CORP
FER

8/31/2003

**SALARY CALCULATION**

| Job Title | Employee Last Name | Employee First Name | Status | Dept. | Hire Date | Emp Type | % Time To Close out | % time Non Close Out | Hourly Rate | Annual Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| Administrative Officer | KINNEY | THERESA | | ADMIN | 06/12/85 | RF | 10% | 90% | $21.46 | $4,463.68 |
| Receptionist | OLVERA | OLVERA, MARIA J | | ADMIN | 12/01/99 | RF | 0% | 100% | $10.50 | $0.00 |
| President/CEO | ORTIZ | GEORGE L | | ADMIN | 10/15/87 | RF | 20% | 80% | $50.29 | $20,920.64 |
| Communications Officer | PEREZ-CORDOVA | IRMA L | | COM | 12/09/02 | RF | 0% | 100% | $33.03 | $0.00 |
| Accountant | ALLRED | ROBERT | | FISCAL | 01/10/03 | RF | 0% | 0% | $17.40 | $0.00 |
| Payroll Unit Leader | BORIS | PAULA | | FISCAL | 05/13/91 | RF | 0% | 100% | $17.24 | $0.00 |
| Deputy CFO | BRUSSEAU | RICK | | FISCAL | 03/03/03 | RF | 15% | 85% | $23.80 | $7,425.00 |
| Accountant | CRUZ | MARIA | | FISCAL | 02/06/80 | RF | 20% | 80% | $17.40 | $7,238.40 |
| AP Unit Leader | PALACIOS | LUISA | | FISCAL | 08/30/90 | RF | 20% | 80% | $17.24 | $7,171.84 |
| Acting CFO | FLORES | KEVIN | | FISCAL | 09/28/88 | RF | 20% | 80% | $31.70 | $13,188.03 |
| HR Assistant | SOULIE | JESSICA | | HR | 12/18/00 | RF | 25% | 75% | $12.16 | $6,323.20 |
| HR Director | WREN | LINDA D | | HR | 04/17/79 | RF | 10% | 90% | $31.01 | $8,450.08 |
| Network Administrator | CZARNECKI | MATTHEW | | IT | 05/07/85 | RF | 0% | 100% | $27.76 | $0.00 |
| CSBG Coordinator | DE LA CRUZ | SYLVIE | | OPS/DEV | 02/15/01 | RF | 25% | 75% | $17.11 | $8,897.20 |
| Operations Field Representative | EMBER | SALLY SF | | OPS/DEV | 09/19/02 | RF | 0% | 100% | $20.22 | $0.00 |
| Vice President | PAIGE | CHRIS | | OPS/DEV | 01/21/76 | RF | 25% | 75% | $42.00 | $21,840.00 |
| Risk Manager | VINCENT | PATRICIA | | RISK/MG | 08/01/02 | RF | 50% | 50% | $24.04 | $25,001.60 |
| | | | | | | RF | 2.4 | 13.6 | | $82,078.07 |
| | | | | | | | 15.00% | 16.0 | | |

% of staff time to HR and EHS close out → 15.00%

Total FTE's → 16.0

**FRINGE BENEFIT CALCULATION →**

| Employee Last Name | Pac Care HMO | Annual Cost | Pac Care PPO | Annual Cost | Kaiser | Annual Cost | Dental | Annual Cost | Vision | Annual Cost | LIFE INS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| KINNEY | $182.17 | $2,186.04 | | $0.00 | | $0.00 | $14.65 | $175.80 | $4.04 | $48.48 | |
| OLVERA | | $0.00 | | $0.00 | $308.66 | $3,703.92 | $22.50 | $270.00 | $4.04 | $48.48 | |
| ORTIZ | | $0.00 | | $0.00 | $308.66 | $3,703.92 | $22.50 | $270.00 | $4.04 | $48.48 | |
| PEREZ-CORDOVA | | $0.00 | | $0.00 | $308.66 | $3,703.92 | $22.50 | $270.00 | $4.04 | $48.48 | |
| ALLRED | $300.53 | $3,606.36 | | $0.00 | | $0.00 | $22.50 | $270.00 | $4.04 | $48.48 | |
| BORIS | | $0.00 | | $0.00 | $407.45 | $4,889.40 | $31.95 | $383.40 | $5.43 | $65.16 | |
| BRUSSEAU | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $0.00 | |
| CRUZ | | $0.00 | | $0.00 | $407.45 | $4,889.40 | $31.95 | $383.40 | $5.43 | $65.16 | |
| PALACIOS | | $0.00 | | $0.00 | | $0.00 | $59.25 | $711.00 | $5.43 | $65.16 | |
| FLORES | | $0.00 | | $0.00 | $407.45 | $4,889.40 | $22.50 | $270.00 | $4.04 | $48.48 | |
| SOULIE | | $0.00 | | $0.00 | $190.19 | $2,282.28 | $14.65 | $175.80 | $2.48 | $29.76 | |
| WREN | $182.17 | $2,186.04 | | $0.00 | | $0.00 | $14.65 | $175.80 | $2.48 | $29.76 | |
| CZARNECKI | | $0.00 | $424.87 | $5,098.44 | | $0.00 | $22.50 | $270.00 | $4.04 | $48.48 | |
| DE LA CRUZ | | $0.00 | | $0.00 | $407.45 | $4,889.40 | $31.95 | $383.40 | $5.43 | $65.16 | |
| EMBER | | $0.00 | $257.86 | $3,094.32 | | $0.00 | $14.65 | $175.80 | $2.48 | $29.76 | |
| PAIGE | | $0.00 | $424.87 | $5,098.44 | | $0.00 | $78.01 | $912.12 | $4.04 | $48.48 | |
| VINCENT | | $0.00 | | $0.00 | $308.66 | $3,703.92 | $22.50 | $270.00 | $4.04 | $48.48 | |

**MONTHLY PREMIUM COSTS**

| | TOTAL | EMPL CO-PAY | CHDC COST | CHDC ANNUAL COST |
|---|---|---|---|---|
| KPC1 | $237.74 | $47.55 | $190.19 | $2,282.28 |
| KPC2 | $474.68 | $166.02 | $308.66 | $3,703.92 |
| KPC3 | $671.76 | $264.31 | $407.45 | $4,889.40 |
| PCH1 | $227.71 | $45.54 | $182.17 | $2,186.04 |
| PCH2 | $464.43 | $163.90 | $300.53 | $3,606.36 |
| PCH3 | $682.40 | $272.89 | $409.51 | $4,914.12 |
| PCP1 | $322.32 | $64.46 | $257.86 | $3,094.32 |
| PCP2 | $656.34 | $231.47 | $424.87 | $5,098.44 |
| PCP3 | $956.04 | $381.32 | $574.72 | $6,896.64 |
| | | | $0.00 | |
| VIS1 | $3.10 | $0.62 | $2.48 | $29.76 |
| VIS2 | $6.22 | $2.18 | $4.04 | $48.48 |
| VIS3 | $9.01 | $3.58 | $5.43 | $65.16 |
| DENT DMO 1 | $18.31 | $3.66 | $14.65 | $175.80 |
| DENT DMO 2 | $34.01 | $11.51 | $22.50 | $270.00 |
| DEN DMO FM | $52.91 | $20.96 | $31.95 | $383.40 |
| DEN PPO 1 | $39.59 | $24.94 | $14.65 | $175.80 |
| DEN PPO 2 | $78.01 | $55.51 | $22.50 | $270.00 |
| DEN PPO FM | $114.81 | $55.56 | $59.25 | $711.00 |
| ALL1 | $77.60 | | | |

| Annual Cost | LTD | Annual Cost | WCOMP CODE | WCOMP RATE | Wk Comp Annual Cost | Unemployment | Ins Total Cost | Total Employee Salary | Total Employee Fringe | | Four Month Cost @1/3 of Annual Cost | | TOTAL Budget |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $246.40 | YES | $290.14 | | 2.50% | $111.59 | $378.00 | $2,946.85 | $4,463.68 | $294.69 | RF | $1,487.89 | Salaries | $1,487.89 |
| $241.11 | | $141.96 | | 2.50% | $0.00 | $378.00 | $4,405.47 | $0.00 | $0.00 | RF | $0.00 | Salaries | $0.00 |
| $1,154.82 | | $679.92 | | 2.50% | $523.02 | $378.00 | $5,857.14 | $20,920.64 | $1,171.43 | RF | $6,973.55 | Salaries | $6,973.55 |
| $758.47 | | $446.57 | | 2.50% | $0.00 | $378.00 | $5,227.44 | $0.00 | $0.00 | RF | $0.00 | Salaries | $0.00 |
| $399.56 | | $235.25 | | 2.50% | $0.00 | $378.00 | $4,559.65 | $0.00 | $0.00 | RF | $0.00 | Salaries | $0.00 |
| $395.89 | | $233.08 | | 2.50% | $0.00 | $378.00 | $5,966.93 | $0.00 | $0.00 | RF | $0.00 | Salaries | $0.00 |
| $546.48 | | $321.75 | | 2.50% | $185.63 | $378.00 | $868.23 | $7,425.00 | $130.23 | RF | $2,475.00 | Salaries | $2,475.00 |
| $399.56 | | $235.25 | | 2.50% | $180.96 | $378.00 | $5,972.77 | $7,238.40 | $1,194.55 | RF | $2,412.80 | Salaries | $2,412.80 |
| $395.89 | | $233.08 | | 2.50% | $179.30 | $378.00 | $1,405.13 | $7,171.84 | $281.03 | RF | $2,390.61 | Salaries | $2,390.61 |
| $727.98 | | $428.61 | | 2.50% | $329.70 | $378.00 | $6,364.47 | $13,188.03 | $1,272.89 | RF | $4,396.01 | Salaries | $4,396.01 |
| $279.23 | | $164.40 | | 2.50% | $158.08 | $378.00 | $2,931.48 | $6,323.20 | $732.87 | RF | $2,107.73 | Salaries | $2,107.73 |
| $712.09 | | $419.26 | | 2.50% | $161.25 | $378.00 | $3,522.94 | $6,450.08 | $352.29 | RF | $2,150.03 | Salaries | $2,150.03 |
| $637.46 | | $375.32 | | 2.50% | $0.00 | $378.00 | $6,429.69 | $0.00 | $0.00 | RF | $0.00 | Salaries | $0.00 |
| $392.90 | | $231.33 | | 2.50% | $222.43 | $378.00 | $5,962.19 | $8,897.20 | $1,490.55 | RF | $2,965.73 | Salaries | $2,965.73 |
| $464.32 | | $273.37 | | 2.50% | $0.00 | $378.00 | $4,037.57 | $0.00 | $0.00 | RF | $0.00 | Salaries | $0.00 |
| $984.45 | | $567.84 | | 2.50% | $546.00 | $378.00 | $7,591.33 | $21,840.00 | $1,897.83 | RF | $7,280.00 | Salaries | $7,280.00 |
| $552.04 | | $325.02 | | 2.50% | $625.04 | $378.00 | $4,899.46 | $25,001.60 | $2,449.73 | RF | $8,333.87 | Salaries | $8,333.87 |
| | | | | | $0.00 | $378.00 | $0.00 | $0.00 | $0.00 | 0 | $0.00 | Salaries | $0.00 |
| | | | | | $5,222.99 | $6,804.00 | $78,948.75 | $128,919.67 | ######### | | | | |

| | | | |
|---|---|---|---|
| RF | Total | Salary | $42,973.22 |
| RP | | | $0.00 |
| TF | | | $0.00 |
| TP | | | $0.00 |
| Insurance | | | $1,878.02 |
| Workers Comp | 2.70% | | $1,160.28 |
| FICA @6.2% | 6.20% | | $ 2,664.34 |
| FICA MED @1.45% | 1.45% | | $ 623.11 |
| Unemployment | 2.4 FTE's | | $ 907.20 |
| SUB TOTAL | | | $7,232.94 |
| GRAND TOTAL WAGES AND FRINGE | | | $50,206.17 |

**VOLUME**

| | | |
|---|---|---|
| Monthly Volume = Hrly Pay | | |
| LTD 2X | X 2080/12 | Max 4501 |
| LTD 4X | X 2080/12 | Max 4501 |
| LI 2X | X 4160 | Max 300K |
| LI 4X | X 8320 | Max 300K |

**PREMIUM**

| | | |
|---|---|---|
| Monthly Volume = Hrly Pay | | |
| LTD 2X | X .0065 | Max 29.26 |
| LTD 4X | X .0065 | Max 29.26 |
| Annual Volume = Hrly Pay | | |
| LI 2X | X .00023 | Max 69.00 |
| LI 4X | X .00023 | Max 69.00 |

**CALIFORNIA HUMAN DEVELOPMENT CORPORATION**
**FORM 424 BUDGET**
**HEAD START AND EARLY HEAD START CLOSEOUT**

## DETAIL FOR OTHER COSTS

| | | | |
|---|---|---|---|
| OCCUPANCY | $9,000.00 | [redacted] | 6924 |
| POSTAGE AND SHIPPING | $945.00 | | 945 |
| COMMUNICATIONS | $1,440.00 | | 1378 |
| PRINTING AND DUPLICATION | $500.00 | | |
| PROFESSIONAL SERVICES | $2,250.00 | | |
| INSURANCE | $2,600.00 | | 1140 |
| LEGAL | | | |
| EQUIPMENT LEASE BUYOUTS | $51,970.61 | | |
| HEAD START REQUEST 11 | $1,454.08 | | |
| EARLY HEAD START REQUEST 11 | $1,807.81 | | |
| SPRINT CELL PHONES | $5,462.21 | | |
| COPIER MAINTENANCE AGREEMENT | $5,600.00 | [redacted] | |
| UNRECONCILED INSURANCE | $15,000.00 | | 13515 |
| AUDIT | $30,000.00 | | 30000 |
| **TOTAL OTHER COSTS** | **$128,029.71** | | **$53,902** |

**Detail For Lease Buyout (**

| ITEM |
|---|
| Copiers & Equipment |
| Copiers & Equipment |

**Costs**

| VENDOR | MONTHS REMAINING | COST PER MONTH | TOTAL COST |
|---|---|---|---|
| Toshiba | 53 | 593 | $45,861.48 |
| Wells Fargo | 53 | 77 | $6,109.13 |
| | | | **$51,970.61** |

Extraordinary Close Out Costs

| | | | |
|---|---|---|---|
| Axiom Engineering | $10,610 | | |
| Community Playground | $1,500 | | |
| Dave Buchignani | $19,929 | | |
| Dura Fence Corporation | $4,204 | | |
| Ernest Heine & Associates | $4,623 | | |
| Louis F. Flores, Attorney at Law | $2,556 | | |
| Phillip Huff Engineering | $750 | | |
| Sierra Asphalt | $2,869 | | |
| Ticon Construction | $35,857 | | |
| Walsh Construction | $8,490 | | |
| Ticon Construction Lien Settlement | $141,647 | | |
| Ticon Construction Lien Defense | | | |
| Lou Flores to date | $13,568 | | |
| Bob Scharf to date | $59,608 | | |
| Mediation Costs for Ticon Settlement | $700 | | |
| Lou Flores Anticipated | $5,000 | | |
| Bob Scharf Anticipated | $5,000 | | |
| HR Settlements | | | $3,273.00 |
| Lilia Moran | $37,427 | | $18,571.00 |
| Karen Trejo Expenses to date | $29,721 | | |
| Karen Trejo Contingency | $20,279 | | |
| Appraisal | $20,000 | | |
| CHDC Real Property Interest in Lincoln Street and other properties | Unknown | | |
| Lease Buyout for the Matmor site -- Krahling lease | $60,248 | | |
| Total: | $484,585 | | $21,844 |

# EXHIBIT E

**THE SCHARF LAW FIRM**

3161 Cameron Park Drive, Suite 210
Cameron Park, CA 95682
(530) 677-2423
Fax 677-7423
E-mail rwslaw@directcon.net

April 29, 2004

Mr. Paul B. Johnson
Assistant Regional Counsel
Office of the General Counsel
U.S. Department of Health & Human Services
50 United Nations Plaza, Room 420
San Francisco, CA 94102

RE: California Human Development Corporation

Dear Mr. Johnson:

This letter is in follow-up to California Human Development Corporation's ("CHDC") meeting with you (ACF) on April 22, 2004.

The purpose of this letter is to summarize some, but not all of CHDC's legal contentions to entitlement for compensation. This letter focuses on the management and construction of the Woodland Head Start grant for construction of the classrooms, and the lingering intangibles arising from that relationship and the Kraeling lease. The balance of CHDC's closeout requests are not addressed here because those issues have been covered in other submissions. [1]

## I

## SUMMARY OF THE LEGAL CONTENTIONS

CHDC believes that during its tenure as a grant recipient it improved the Woodland Head Start school and when the property was ordered assigned to CDI, a taking under the Fifth Amendment and the CFR occurred which requires the United States to compensate CHDC for its interest in the property. Moreover, during the management of this asset CHDC incurred expenses to defend and preserve the federal interest in this property prior to and subsequent to the taking (in fact

[1] The continuing property management and/or trustee responsibilities are briefly discussed in this letter, and CHDC requests letters of instructions from ACF as to its desires for the continued management or disposition of these intangibles.

those expenses are ongoing because of the lingering intangibles) and CHDC needs to be reimbursed for the United States's share of those expenses.

The United States is required to compensate CHDC for these property interests and expenses pursuant to:
1) 45 CFR 74.37 for indemnity and reimbursement
2) 45 CFR Sections 74.32(3), 74.34(h), 74.35(a), and 74.36(d)
3) 45 CFR 74.71
4) the Fifth Amendment of the United States Constitution.

These remedies are cumulative and sought in the alternative. CHDC acknowledges that to the extent that compensation is made under one of these remedies CHDC may not then seek a double recovery - which is not its intent.

## II

## HISTORICAL BACKGROUND

CHDC and ACF's relationship began in the 1990s when ACF invited CHDC to apply for management of one of the Head Start programs in Northern California. Under CHDC's management the programs awarded to CHDC expanded.

As the Head Start programs expanded CHDC hired new employees, increased its management and overhead, and acquired real and personal property. Anticipating the long term need for more school facilities CHDC applied to ACF for a grant to develop its own campus but this did not come to pass.
Prior to locating the Head Start program at its present location in Woodland (the "Lincoln" site),[2] CHDC had leased space at the Holy Rosary Catholic school in Woodland. Unfortunately Holy Rosary later took the lease over because the Church intended to reuse the space for its own students. CHDC had until June 2001 to find alternative space. CHDC employed a real estate broker to locate a new site, but after an exhaustive search CHDC was unable to locate any space large enough to house the existing programs.

The Lincoln site's existing structures were inadequate, however, the site was large enough for expansion. So CHDC secured a lease for the Lincoln site and contacted ACF. It was learned however that there was not enough time to get a grant for design and planning, do the design and planning, and then get a grant for construction, and complete construction all before June 2001. Seeing no other alternative, CHDC explored the turn key builder concept. CHDC solicited proposals but received only two bid proposals. One was non-responsive, and other was from West Coast Relocatable, Inc. ("West Coast").

West Coast's turn key proposal did not include every developer cost. It only included the design and construction of the building. The proposal *excluded costs such as building impact fees, and the design and construction of utilities to the building, and utility connection fees.* West Coast's

[2] The Head Start school has a Lincoln Avenue address.

proposal terms were supplied to ACF when the development grant was awarded.

CHDC requested more funds than were ultimately awarded. And although the grant was less than requested, it was believed that basic classrooms could be built within the award.
Although West Coast's contract did not include certain developer costs, such as utility hook-ups, CHDC thought that it could still complete the building for the budget. This belief was based on communications with the contractor, West Coast. For example, electrical development costs were excluded from West Coast's contract, but West Coast had told CHDC that it estimated that the electrical development costs would be about $3,000. CHDC had anticipated this sum in planning. [ Later it turned out that this estimate was too low. ]

Time was of the essence so CHDC contracted with West Coast in December 2000, expecting a completed building by June 2001.

The following recitation of events is based upon what CHDC knew at the time the events unfolded (i.e., through CHDC's eyes). The footnotes supply additional information that was only learned after the fact during subsequent investigations after occupancy of the new school:

1. When CHDC signed the contract with West Coast in December 2000, CHDC believed West Coast was a competent *licensed contractor.* [3]
2. By May 2001 West Coast told CHDC that the building would be completed before August 2001.
3. Sometime between May and September 2001 CHDC was allowed to hold over at Holy Rosary so CHDC did not need the Lincoln site until December 2001.
4. Not until June or July 2001 did CHDC first learn that West Coast's contractor's license had been suspended. [4]
5. When CHDC asked West Coast told CHDC that its license had been temporarily suspended but that it expected to have its license reinstated imminently. [5]

---

[3] In December 2000, West Coast's license was active and in good standing with the State of California, and its company history included many public school projects.

[4] In February 2001 the State of California suspended West Coast's license for unsatisfied judgments.

[5] West Coast's license was reinstated in September 2001.

6. Not until July 2001 did CHDC first learn that Ticon Construction, Inc. was employed as a subcontractor to West Coast. [6]
7. Sometime between May and August 2001 CHDC first learned that *the building permit would not be granted until certain mandatory developer fees were paid* to the City of Woodland.[7] CHDC paid those fees because they were not included in West Coast's contract and they were necessary and mandatory.
8. Also CHDC was told that the City of Woodland *required* that the building *be fire sprinkled and the cost was not in West Coast's contract.* CHDC agreed to this cost because it was a necessity. The permit would not be issued without the sprinklers, the construction would be stopped, and the school could not be occupied without the sprinklers.

---

[6] West Coast has contracted with Ticon in May 2001 for all site construction.

[7] West Coast's contract excluded all such fees, however, CHDC did not know what those undifferentiated fees would be, if at all, until faced with them.

9. West Coast told CHDC that extra costs were needed to bring electrical power to the new building. West Coast's contract did not include the cost of developing the electrical power. After attending a meeting attended by representatives of Pacific Gas & Electric, West Coast, Ticon and an electrical subcontractor West Coast represented to CHDC that the power design alternatives had been considered and that West Coast recommended approval of the lower cost alternative. CHDC relied on West Coast and agreed on the belief that the design was adequate and it would save money. [8]
10. On or about September 2001 the anticipated completion of the school was believed to be about December 2001; which would enable CHDC to maintain uninterrupted Head Start programs in Woodland. [9]
11. Around September 2001 Ticon requested that its payments be made by joint check, in other words that CHDC's payments to West Coast be made jointly to West Coast and Ticon to secure Ticon's payment. CHDC made joint check payments. [10]
12. Beginning about September 2001 CHDC employed an independent construction consultant to advise CHDC regarding the progress of the work and the payment applications being made by the contractors.
13. After the school was first occupied unexpected electrical outages raise concerns. [11]
14. At the same time CHDC was being pressed by West Coast and its subcontractor, Ticon, to make progress payments.
15. CHDC's construction consultant recommended that CHDC get professional legal help.
16. So CHDC consulted Louis Flores (its corporate counsel - an attorney with two degrees in electrical engineering) to direct this investigation.
17. CHDC also consulted Robert Scharf (an attorney with two degrees in engineering, a

[8] West Coast had employed an architect Bickel Underwood who had employed an electrical designer, Creative Building Systems, Inc.. Prior to recommending that CHDC approve the lower cost alternative, West Coast had communicated with Creative Building Systems, Inc. about the design requirements.

[9] In fact the school was substantially completed in time for the Spring 2002 session. The school obtained an occupancy permit, but not a final inspection.

[10] In civil litigation Ticon alleged under oath that it would have refused to continue constructing the building as of September 2001 had CHDC not agreed to the joint check payments.

[11] CHDC with its construction manager's assistance inquired into the causes of these outages.

professional engineering license, and with more than 15 years experience in construction law) to advise CHDC.

18. On advice of counsel, CHDC withheld all further payments to the contractors until its investigations were satisfactorily completed.
19. On the advice of counsel, CHDC hired independent electrical and heating ventilation and air-conditioning consultants to investigate and advise.
20. By April 2002 CHDC's counsel had obtained technical reports that indicated that the electrical power supply (the utility development design for the electricity to the building) was under designed and that although the heating ventilation and air conditioning systems were functioning there were latent design deficiencies with the air conditioning system.
21. Ticon recorded and filed a mechanic's lien action for approximately $175,000.
22. CHDC incurred legal fees and court costs in defending the mechanic's and contract claims, and in defending and indemnifying *the landlords of the trust property.* [12]
23. CHDC incurred legal and expert witness fees and court costs prosecuting claims against West Coast and others arising out of the actions and construction.
24. CHDC notified ACF of the litigation and invited ACF to intervene and protect its own interests and participate in settlement, but ACF did not respond.
25. On advice of counsel CHDC settled the lien and compensation claims of Ticon and the claims of CHDC against Creative Building Systems and John Youmans and Navante, Inc. CHDC was able to obtain a consent judgment from West Coast for $385,000. (This debt instrument is considered, at least in part, an intangible asset of Head Start, which needs to assumed, assigned, abandoned, sold, abandoned or otherwise disposed of by ACF). [13]
26. On advice of counsel, CHDC has filed a cross-action against James Bickel and Bickel Underwood and other fictitiously named cross-defendants to protect the ACF and Head Start's intangible interests in any claims against those entities arising out of the management of the trust and the construction of the Lincoln site. [14]
27. Concurrently, effective September 1, 2003, CHDC at ACF's commands assigned the Lincoln site and the improvements to that lease to CDI.
28. At the same time CDI took possession of the Head Start program which was located at the Kraeling site, which is under lease to CHDC, but CDI abandoned the site and refused to take an assignment of the lease.

## III

[12] CHDC was contractually obligated to defend and indemnify the landlord's from any mechanic's liens and suits. CHDC incurred the legal expense of critical discovery and pleading and motion practice to file a summary judgment motion to exculpate the landlords and their real estate interests from the lien claims, and later CHDC paid the landlords for their separate legal fees incurred.

[13] CHDC's Board of Directors has not made a final decision as to what CHDC will do with its interest in this asset at this time, and is requesting from ACF letters of instruction as to ACF's intentions as to the future disposition of ACF's and Head Start's interest in this asset. ACF's and Head Start's rights in this intangible are considered to be intangibles still in possession of CHDC as trustee.

[14] See footnote 14. CHDC's Board of Directors has not made a final decision as to what CHDC will do with its interest in this asset at this time, and is requesting from ACF letters of instruction as to ACF's intentions as to the future disposition of ACF's and Head Start's interests in these assets.

## ANALYSIS OF THE SEPARATE LEGAL ENTITLEMENTS

Overlapping regulations, statutes, general laws and remedies are concurrently invoked.

From CHDC's perspective ACF has obligations to promptly pay all undisputed claims, and to negotiate in good faith with any disputed claims. Matters that cannot be resolved because of ongoing relationships must be resolved later as well. Therefore, unless ACF and CHDC can promptly resolve all issues and relationships then the law requires a phased resolution of the pending matters between CHDC and ACF.
CHDC contends that a partial but not a global resolution of these claims, assets and liabilities is not incompatible, but rather anticipated by the law. 45 CFR 74.72 expressly states:

> *(a) The close out of an award does not affect any of the following:*
>
> ...
>
> *(4) Property management requirements in Secs. 74.31-74.37.*
>
> ...
>
> *(5) After closeout of an award, a relationship created under an award may be modified or ended in whole or in part with the consent of the HHS awarding agency and the recipient, provided the responsibilities of the recipient referred to in Sec. 74.72(a), including those for property management as applicable, are considered and provisions made for continuing responsibilities of the recipient, as appropriate.*

### A REGULATORY TAKING, 45 CFR 74.31-74.37

The Code of Federal Regulations 45 CFR Secs. 74.31-74.37 appear to be a regulatory restatement of existing condemnation law. That whenever property that was jointly acquired with both private and federal property is "taken", the proportionate private interest taken must be compensated at fair market value.

The property CHDC refers to is its proportionate interest the lease to the Lincoln site and the improvements to that lease.

In this case the assignment of the Lincoln site lease to CDI at ACF's commands was the taking. (See 45 CFR 74.32 (3) - "The recipient may be directed to transfer title to the property to the Federal Government or to an eligible third party provided that, in such cases, the recipient shall be entitled to compensation for its attributable percentage of the current fair market value of the property"; Sec. 74.34 (g) & (h) for compensation for "equipment"; Sec. 74.36 (d) which cross-references 74.34 (g) & (h) for compensation for "intangible property").

CHDC is of the preliminary belief that the measure of its proportionate share in the lease is equivalent value of the management and overhead expenses expended to development the site, and its out of pocket and incurred liabilities in doing so. Conversely, ACF's proportionate interest is measured by its cash investment in the site by way of development grants already funded.

The fair market value of the property interest taken is discussed in the FIFTH AMENDMENT section that follows. And CHDC's right to legal fees and expenses to enforce this regulatory right are covered under by the Equal Access to Justice Act and CHDC believes that its legal fees, experts, appraisal, engineering and other expenses are all recoverable under 42 USC 4654(c).

**B CLOSEOUT COMPENSATION, 45 CFR 74.71**

From CHDC's perspective "closeout" is a comprehensive concept. 45 CFR 74.71 has been triggered because ACF has elected to terminate CHDC's relationship on several fronts. The regulatory takings are expressly called by cross-reference to Secs. 74.31 through 74.37, which have been discussed earlier.

Closeout however is only necessary as to those relationships concluded, and by definition does not apply to those relationships still open. (45 CFR 74.72).

In this case, specifically with respect to the unresolved intangible assets, CHDC is still requesting letters of instruction as to what ACF wants to do with its and Head Starts's interests in those assets.

**C FIFTH AMENDMENT TAKING**

Separate and apart from the CFR, CHDC is entitled under the Fifth Amendment to be fully compensated for its property interests taken.

***Damages Under The Fifth Amendment***

The measure of compensation is what a willing buyer would pay for the transferable interest. In the case of a lease, the value of the improvements, and the length of the lease may be material to a willing buyer. It is not automatic that the improvements have no value to a buyer simply because the improvements were made to a lease. *(Almota Farmers Elevator & Warehouse Co. v United States (1973) 409 U.S. 470).*

In this case there were no other comparable school facilities on the market, CHDC had to develop this school. The lease was for 20 years at favorable terms. Even had Head Start elected to cease operations in Woodland, the lease was a transferable asset to someone else, either outright, or by subleasing the property.

CHDC believes, but needs an appraisal to verify, that the value of the transferable value of the improvements alone possibly equals or exceeds the money expended and incurred on the improvements.

CHDC also believes that the transferable value of the lease alone could be worth tens of thousands of dollars. This belief is bolstered by the fact that when CDI took assignment of the lease in September 2001 CDI voluntarily agreed to increase the lease payments by about $12,000

annually; more than CHDC was obligated to pay under the lease. Over the remaining term of the lease, about 16 years, this cash flow difference exceeds $190,000.

CHDC's transferable interest in the lease was considerable.

CHDC also possesses or possessed a trustees lien in the Lincoln lease and improvements to secure its trustees right to indemnity and reimbursement, as discussed in the next section.

CHDC is still exploring the implications of the assignment. If however CHDC's trustee's lien were found to have been "taken" when the property was ordered transferred to CDI, then under 45 CFR 74.34 this intangible must be compensated.

CHDC believes that its legal fees, experts, appraisal, engineering and other expenses are all recoverable under 42 USC 4654(c).

## D 45 CFR 74.37, INDEMNITY AND REIMBURSEMENT (TRUST)

Under the Code of Federal Regulations an express trust and trustee relationship was certainly created as to any property acquired with federal funds that were intended for use by Head Start. "Real property, equipment, intangible property and debt instruments that are acquired or improved with Federal funds shall be held in trust ... " ( 45 CFR 74.37 ).

A summary of the law of trusts is beyond the scope of this letter, but certain relevant aspects of the law of trusts needs highlighting. Property held in trust is held by and in the name of the trustee. In fact the CFR expressly states this intent. (45 CFR 74.32 (a) - "Title to real property shall vest in the recipient..."; Sec. 74.34 (a) -"Title to equipment..."; Sec. 74.36 (d) - "Title to intangible property ...").

This is not to say however that the trustee of property acquired with federal funds can do anything it pleases. The trustee is subject to the express or implied obligations of the trust. In this case the trust created was to use the property for Head Start. That CHDC used the grant funds for Head Start is not disputed.

CHDC contends that as trustee when Ticon and West Coast and others sued CHDC and the sought to foreclose liens against its and ACF's and Head Start's beneficial interests, as trustee CHDC was obligated to defend and preserve the property.

That ACF when asked to participate in the litigation to protect its own interest chose not to, is not the final word on this important matter.

In its role as trustee and "in its fiduciary capacity [CHDC] would be obliged to adopt the stance it believed to be in the beneficiary's best interest, not necessarily the position espoused by the beneficiary itself. *Cf.* Restatement (Second) of Trusts §§ 176, Comment *a* (1957) ("[I]t is the duty of the trustee to exercise such care and skill to preserve the trust property as a man of ordinary prudence would exercise in dealing with his own property. . . .")." *(Department of the Interior v Klammath Water Users Protective Association (2001) 532 U.S. 1, 14).*

CHDC contends that it exercised ordinary prudence when it defended and prosecuted the related litigation. No matter how much money was granted and spent for the construction of the school those improvements could not be "used" for Head Start if the liens were allowed to go to foreclosure. Foreclosure meant that losing the lease and improvements to the highest bidder at judicial sale.

But by creating the trust the United States has consented to and is subject to the law of trusts. (*United States v White Mountain Apache Tribe*, 123 S.Ct. 1126, 537 U.S. 465, 155 L.Ed.2d 40 ). And "the trustee is entitled to indemnity out of the trust estate for expenses properly incurred by him in the administration of the trust" *(U.S. v White Mountain, lead opinion footnote 4, citing Restatement (Second) of Trusts Sec. 244).*

The Restatement (Second) of Trusts comments (b) states that "if the trustee properly incurs a liability in the administration of the trust, he is entitled to indemnity out of the trust estate either by way of exoneration, that is by using trust property in discharging the liability so that he will not be compelled to use his own individual property in discharging it, or by way of reimbursement, that is if he has used his individual property in discharging liability, by repaying himself out of the trust property."

The Restatement (Second) of Trusts comment (c) also states that to the extent to which the trustee is entitled to indemnity, he has a security interest in the trust property. "Ordinarily the trustee, being entitled to indemnity and having a lien thereon the trust property, is entitled to take such steps as may be appropriate for his indemnity and will not be compelled to wait for the realization of his indemnity, unless to give him immediate indemnity would substantially impair the purposes of the trust."

When ACF refused to support the litigation CHDC incurred liabilities out of necessity to protect the trust. To the extent that CHDC used any grant funds for that purpose, that action was privileged because CHDC was free to use the grant funds to pay for these necessities. In other words "[use] trust property in discharging the liability so that he will not be compelled to use his own individual property in discharging it".

The grant funds unfortunately were limited, and before the project was completed and the litigation concluded the original grant funds were depleted. At that historical turning point, the grant funds having been depleted, CHDC was forced to spend its own funds to the extent that it could, and to the extent that it could not pay immediately it incurred liabilities to defend and protect the trust.

This subsequent deficiency gives rise to the present demand for indemnity and reimbursement. And to the extent that the CHDC has not been compensated it possesses a trustees lien against the trust to secure that indemnity.

In summary, by creating the trust and trustee relationship under the CFR the United States created an express and/or implied contract subject to the law of trusts, and the United States consented to CHDC's indemnity and lien rights against the trust property. CHDC as trustee,

must be indemnified from the trust property held in trust - which in this instance is the property formally held but transferred to CDI at the command of the United States. And this indemnity claim is secured by a lien against the trust property. [15]

The duty to indemnify and reimburse the trustee is a continuing duty which exists while the trustee serves as trustee and survives after the trustee is removed. Therefore ACF owed this duty when CHDC notified ACF of the pending lawsuits and necessary expenses. The right to indemnity and reimbursement accrues when the liability is incurred. That ACF may have chosen to deny a prospective need is somewhat irrelevant because the duty to indemnify and reimburse generally accrues when the liability is incurred not before. In other words, when CHDC requested funds for expenses that it foresaw and expected to incur but had not yet been incurred the duty to indemnify and reimburse was not ripe. Now that CHDC has incurred these liabilities the right has ripened. Indemnity includes interest and finance charges on these liabilities, as well as the trustees legal expenses in enforcing this indemnity.

*CHDC however recognizes that all of the litigation expenses incurred were not incurred solely for the benefit of the federal interest and Head Start. The same effort also benefitted CHDC's interests. CHDC believes that the trust estate is obligated to reimburse CHDC for its* ***proportionate share*** *of the litigation expenses.*

CHDC believes that whatever legal fees and expenses were incurred in exercising these remedies are recoverable under trust principals and the Equal Access to Justice Act.

---

[15] CHDC suspects that its trustee's lien may still exist against the trust property, i.e., the Lincoln site. The assignment ordered by the United States to assign the property over to CDI as replacement trustee merely transferred the trust estate - which is charged with the trustee's lien. (Liens against private property are valid notwithstanding the property may be owned by the United States sometime in the future. *(Armstrong v United States (1960) S.Ct. 4197*; the United States immunity against liens has never been extended beyond property actually owned by the United States). *Arguendo,* assuming that the assignment ordered by the United States expunged CHDC's trustee's lien - then its lien was "taken"under the Fifth Amendment - and compensation is due for the value of the lien.

[CHDC also wishes to point out that in the event that a trier of fact were to somehow find that the payments for the extra capital improvements (See THE NECESSARY ADDITIONAL COSTS), were advanced and incurred by CHDC as trustee rather than as a private property owner, the result is essentially the same. The only prudent course of action was for the trustee to advance the funds to ensure that the school opened on schedule for the lowest cost possible. Under this scenario CHDC was privileged to use the grant funds for these purposes directly, or to reimburse itself. And to the extent the grant funds were insufficient then CHDC as trustee is secured with a lien against the property for the liabilities and costs that it incurred in its own name for the benefit of the trust. And if when the assignment of the Lincoln lease occurred that lien was somehow taken as well, then compensation for the taking of that lien under Fifth Amendment is now required.]

## IV
## CHDC'S ACTIONS WERE PRUDENT

It has been inferred that CHDC acted without prudence and should have terminated West Coast when it first learned that it has its contractors license suspended, and then proceeded to finish the school construction with another contractor. It has also been inferred that CHDC should never have expended funds for improvements not included in the grant and/or not approved by ACF in advance.
If this inference is not accurate then CHDC's comments that follow are moot. However, if they are not moot, then CHDC wishes to explain its view of this concern.

First and foremost, CHDC acquired the Lincoln site as its private property. It later improved the site with its own property which was CHDC's separate property. When CHDC used federal grant funds to further improve the property the acceptance of grant funds did not result in a taking of CHDC's property. Rather it only granted ACF and Head Start a beneficial trust interest coupled with a remainder interest in the trust interest only - at ACF's future election. Because the federal interest was so intertwined with CHDC's separate interest ACF ordered the entirety assigned to CDI for public use, which was a classic condemnation event. Condemnation under the Fifth Amendment can be by civil action or negotiation. The material matter is the taking not the procedure.

So, CHDC made the choice when ACF chose to not make further investments to invest in the property separately. In a "takings" the property owners motives to invest in its own property are irrelevant. Nevertheless, there were many objective factors that support the reasonableness of CHDC's decision to advance the funds necessary to ensure that the school opened on time to avoid disrupting service include the following:

29. West Coast's contract under California law was not illegal per se. Although West Coast could not bring suit in court for compensation for work performed without a license, it could keep payments received. The legality of the contract following suspension of the license was unclear. And although the contract may have been voidable at CHDC's

election, practical considerations made that election disfavored under the circumstances.[16]

30. West Coast represented that its license suspension was only temporary.
31. Terminating West Coast in July 2001 would have certainly resulted in a delay of completion, at greater cost. [17]
32. Disruption of service was certain. The building even if completed by another contractor would not have completed before the Holy Rosary lease expired. CHDC knew of no other space available from which to operate Head Start.

---

[16] If it is any consolation to ACF, in order to vigorously defend the trust interests, CHDC raised as an affirmative defense the "legality" of West Coast's contract. The State Court did not find that defense persuasive enough for summary motion. So CHDC would have to incur the cost of trial and possibly an appeal to test that defense. It is unclear that the defense, as to Ticon, would have been upheld on appeal. (See *MW Erectors, Inc. v. Neiderhauser Ornamental & Metal Works Co., Inc. (2004) 115 Cal. App. 4th 512*, and *Golden Eagle Ins. Co. v First Nationwide Financial Corp. (1994) 26 Cal.App.4th 160*).

[17] Completing the work with another contractor posed significant unknown risks, keeping in mind West Coast previously was the only responsive bidder for the work. Unknown additional costs could include: additional design, management, price escalations, loss of competitive subcontractor costs, increased bids due the risks of latent problems, unabsorbed overhead for administering a program without a school, staff salaries and benefits paid to retain staff during the delay and/or unemployment costs if staff was terminated.

33. Whereas, in July 2001 West Coast was still promising completion of the project on time and for the most part within budget.
34. The additional costs were unavoidable necessities. (See the following section entitled THE NECESSARY ADDITIONAL COSTS). Therefore, CHDC incurred the additional liabilities to keep the project on schedule to disrupting service and to avoid the risks mentioned above.

To the extent that ACF has any concerns that CHDC failed to follow the CFR in any other respect in the management of this contract, CHDC contends that even if technical deviations occurred, Head Start and ACF were never harmed. Ultimately, ACF and Head Start acquired the lease and the building free of any liens other than CHDC's claims for compensation. Moreover, ACF is estopped by its own conduct in the oversight of this grant and contract. Refer to the following section entitled ACF FAILED TO FOLLOW ITS OWN REGULATIONS - ESTOPPEL.

## V
## THE NECESSARY ADDITIONAL COSTS

### *The Unanticipated But Necessary Developer Costs*

Under other federal building programs, including those of HUD, it is customary for the United States to fund design services (up front), and to fund professional management services such as construction management if needed (during construction), to protect the recipient and the federal interests in the project. In this instance, for reasons unknown to CHDC, ACF was unable to concurrently supply a grant for design services at the same time it awarded construction costs. Time did not allow CHDC to phase the grants.

West Coast's proposal excluded development fees. Without professional assistance CHDC was unaware that the City of Woodland would charge special fees for the right to build the new school and other unforeseen technical requirements and costs. CHDC was only first presented with a demand for these fees long after the grant was awarded and months before the needed occupancy. When faced with the consequences of not paying the fees CHDC reasonably advanced the fees to secure the building permit.

### *The Unanticipated But Necessary Fire Sprinkler Costs*

CHDC agreed to pay for the cost of fire sprinklers because sprinklers were represented to be mandatory conditions to the City of Woodland, and the costs were not included in West Coast's contract.

### *The Necessary Construction Management Costs*

After West Coast's performance raised concern CHDC hired a licensed contractor to review the situation to protect CHDC and Head Start.

*The Necessary Electrical Costs*

It was always known that CHDC had to pay to have electricity brought to the building. CHDC was lead to believe that cost was only about $3,000, but that advice proved wrong. The building would not function without electricity so this was a necessity. On the best advice available at the time CHDC approved the extra costs because to not do so would have stopped construction and disrupted Head Start. As it turned out experts later told CHDC that the power system was substandard, and so CHDC sued the alleged electrical designers in the litigation. [18]

*The Subsequent Electrical & Heating and Cooling Design Costs*

After the school was first occupied unexpected intermittent electrical outages raise concerns at the same time that the CHDC was being asked by West Coast and its subcontractor, Ticon, to make progress payments. CHDC's personal construction consultant hired maintenance contractors to trouble shoot, and he also recommended that CHDC get professional legal help. Electrical and heating and cooling professionals were hired to investigate and they identified deficiencies and made written recommendations for corrective action. CHDC followed that professional advice.

*The Necessary Legal Costs*

CHDC consulted Louis Flores (its corporate counsel - an attorney with two degrees in electrical engineering) to direct this investigation. CHDC was referred to consult Robert Scharf (an attorney with two degrees in engineering, a professional engineering license, and with more than 15 years experience in construction law).

Ticon recorded and filed a mechanic's lien action for approximately $175,000. This action threatened a judicial sale of the lease and improvements to satisfy the lien. So CHDC incurred legal fees and court costs to defend the mechanic's and contract claims against CHDC *and the trust property*. CHDC was also compelled to and indemnified *the landlords of the trust property* to avoid losing the lease. In conjunction with this lawsuit CHDC incurred legal and expert witness fees and court costs prosecuting claims against West Coast and others arising out of the actions and construction defects.

CHDC notified ACF of the litigation and invited ACF to intervene and protect its own interests but ACF did not respond. So CHDC fulfilled its fiduciary duties without the counsel and assistance of ACF. In fulfilling those responsibilities, on the advice of counsel, CHDC settled

[18] Creative Building Systems was later sued by CHDC as a cross-defendant in the Ticon litigation. Creative Building Systems contributed $20,000 to the settlement which benefitted CHDC and the trust.

the lien and compensation claims of Ticon and the claims of CHDC against Creative Building Systems and John Youmans and Navante, Inc. CHDC obtained a consent judgment from West Coast for $385,000. (This debt instrument is considered, at least in part, an intangible asset of Head Start, which needs to assumed, assigned, abandoned, sold, abandoned or otherwise disposed of by ACF).

On advice of counsel, CHDC has also filed a cross-action against James Bickel and Bickel Underwood and other fictitiously named cross-defendants to protect the ACF and Head Start's intangible interests in any claims against those entities arising out of the management of the trust and the construction of the Lincoln site. These claims are pending but unresolved.

***The Necessary Design and Construction Expert Costs***

On advice of counsel, CHDC withheld all further payments to the contractors until its investigations were satisfactorily completed. On the advice of counsel CHDC hired independent electrical and heating ventilation and air conditioning consultants to investigate and advise. Following the sudden death of its construction manager, on advice of counsel CHDC retained a contractor to investigate and document the state of construction. By April 2002 CHDC's counsel had obtained technical reports that indicated that status of the construction and the state of the electrical systems (the utility development design for the electricity to the building although functioning most of the time was under designed for full utilization), and the heating ventilation and air conditioning systems (although facially functioning also contained design deficiencies).

In fulfilling its duties to the occupants, CHDC modified the occupancy use of the building to work around the deficiencies pending corrections.

In summary, because of CHDC's prudent actions and private investment in the property CHDC successfully surmounted funding deficiencies for necessities of the school which resulted in uninterrupted service to Head Start and which preserved (and probably increased the value) of the federal interest. Moreover, because of CHDC's prudent actions and litigation expenses CHDC protected and preserved (and probably increased the value) of the federal interest.

Had CHDC taken the advice of some to terminate the contractor and not defend the litigation, Head Start would have lost the lease, the improvements, Head Start would probably have been interrupted and the overall costs of operating the programs would have been increased for no benefit.

## VI
## ACF FAILED TO FOLLOW ITS OWN REGULATIONS - ESTOPPEL

ACF contends that CHDC did not have in its contract with West Coast provisions required by 49 CFR Part 74 Appendix A. 49 CFR Part 74 incorporates the reporting regulations are set forth in 29 CFR Part 3 and 29 CFR Part 5 . 29 CFR Part 5, §§ 5.6(a)(1) provides *(a)(1) It shall be the responsibility of the Federal agency to ascertain whether the clauses required by Sec. 5.5 have been inserted in the contracts subject to the labor standards provisions of the Acts contained in Sec. 5.1. Agencies which do not directly enter into such contracts shall promulgate the*

*necessary regulations or procedures to require the recipient of the Federal assistance to insert in its contracts the provisions of Sec. 5.5. **No payment, advance, grant, loan, or guarantee of funds shall be approved by the Federal agency unless the agency insures that the clauses required by Sec. 5.5 and the appropriate wage determination of the Secretary of Labor are contained in such contracts. Furthermore, no payment, advance, grant, loan, or guarantee of funds shall be approved by the Federal agency after the beginning of construction unless there is on file with the agency a certification by the contractor that the contractor and its subcontractors have complied with the provisions of Sec. 5.5 or unless there is on file with the agency a certification by the contractor that there is a substantial dispute with respect to the required provisions.** (Emphasis Added)*

The emphasized portion of section 29 CFR Part 5, §§ 5.6(a)(1) places affirmative responsibilities on ACF. The record does not show that ACF complied with the emphasized section of the regulation. ACF had the mandated responsibility to not approve a contract which did not contain the language required by 49 CFR Part 74. ACF failed to carry out this responsibility. ACF approved the contract and the grant to CHDC for the construction. Secondly, after beginning of construction, ACF had the mandated responsibility to insure that the contractor"s certification was on file with ACF. This ACF did not do. Further ACF should not have paid, advanced or guaranteed funds until it had a contract which included the required contract clause and until a certification by the contractor certifying compliance with the required provisions were in its file. ""It is firmly settled that a party seeking to raise estoppel against the sovereign must, at the very least, demonstrate that government agents have been guilty of affirmative misconduct. See *Drozd v. INS*, 155 F.3d 81, 90 (2d Cir. 1998); *Linkous v. United States*, 142 F.3d 271, 277-78 (5th Cir. 1998); *Frillz, Inc. v. Lader*, 104 F.3d 515, 518 (1st Cir.), cert. denied, 118 S. Ct. 59 (1997); see also *OPM*, 496 U.S. at 421-22; see generally Kenneth Culp Davis & Richard J. Pierce, Jr., 2 Administrative Law Treatise §§ 13.1, at 232 (3d ed. 1994)"", *Dantran Inc. v. U. S. Department of Labor*, 171 F.3d 58, ___ 5 Wage & Hour Cas.2d (BNA) 334, 1999.C01.42122.

## VII
## CONTINUING RELATIONSHIP - TANGIBLES & INTANGIBLES

***<u>The Lincoln Site</u>***

***Miscellaneous Legal and Equitable Rights and Liabilities***

CHDC as the owner that contracted for the improvements possesses legal and/or equitable rights in whatever warranties, insurance policies and third party beneficiary rights and claims may exist against the world.

Moreover, a final inspection for the building permit was never obtained because Ticon and West Coast refused to finish the work pending the payment dispute.

The recommended corrections to the electrical systems and heating and cooling systems have not been completed for lack of funding. If the use of the building is not managed correctly then these deficiencies pose a potential risk to the health and safety of the occupants as well as the use of the highest and best use of the building.

CHDC's Board of Directors has not made a final decision as to what CHDC will do with its interest in these claims and rights at this time, and is requesting from ACF instructions as to ACF's intentions as to the future disposition of ACF's and Head Start's interest in these claims and rights, if any. Any of ACF's and Head Start's rights are considered to be intangibles still in possession of CHDC as trustee as these rights have never been assigned or accepted by any other entity. These rights may be jointly owned, and so a decision as to these rights needs to be resolved.

The Ticon's lien claim was settled in December 2003, which has created a liability of about $108,000, plus interest. That debt is included in CHDC's compensation claim to ACF.

***Civil Judgment Against West Coast Relocatables, Inc.***

CHDC has obtained a judgment against West Coast. A copy of that judgment has previously been supplied to ACF.

CHDC through its legal counsel has explored the prospects of trying to enforce this judgment or possibly selling the judgment to another who may be a debtor to West Coast. However, to the extent that ACF and Head Start may possess an interest in this intangible, CHDC's Board of Directors has not made a final decision as to what CHDC will do with its interest in these claims and rights at this time, and is requesting from ACF instructions as to ACF's intentions as to the future disposition of ACF's and Head Start's interest in these claims and rights, if any. Any of ACF's and Head Start's rights in this judgment are considered to be intangibles still in possession of CHDC as trustee.

***Unresolved Claims Against Bickel Underwood and Others***

CHDC through its legal counsel has explored the prospects of trying to enforce claims against the architectural designer of the Lincoln building for electrical and/or heating ventilation and air conditioning defects and others. Out of precaution to avoid the passing of any possible statutes of limitations, CHDC has filed suit against these individuals and entities in State Court, but has not served or followed up on these claims.

If these claims are not pursued by May 30, 2004, counsel for CHDC is inclined to abandon the claims for lack of funding.

To the extent that ACF and Head Start may possess an interest in this intangible, CHDC's Board of Directors has not made a final decision as pursuing these claims further pending instructions from ACF's intentions as to the future disposition of ACF's and Head Start's interest in these claims and rights, if any. Any of ACF's and Head Start's rights in these claims are considered to be intangibles still in possession of CHDC as trustee.

***<u>The Kraehling Lease</u>***

***Miscellaneous Legal and Equitable Rights***

CHDC as the lessee who contracted possesses legal and/or equitable rights in rights and claims may exist against the world for any causes arising out of this lease.

***Legal Liabilities***

CHDC is still signatory to a lease on the Kraehling property, and subject to claims for back rent.

Under California law of Tenant and Landlord, statute, upon breech of the lease agreement by a tenant, a landlord has a right of action for damages in the amount of each unpaid installment, plus interest at a lawful rate specified in the lease or if none specified at the legal rate of interest, of rent from the time of abandonment to the time of the award, judgement by the court. This award of damages is subject to the rule of mitigating damages. Damages after the time of the award can be for future rents and is dependant on the same rules as those for the damages up to the time of award. Additionally a lessor can recover any other amount necessary to compensate the lessor for all the detriment proximately caused by the lessee''s obligation to perform its obligations. Breach of the implied warranty of habitability has not yet been held by California''s courts as a lessee defense in commercial leases, although the modern trend in the courts is to recognize the implied covenants in a lease as concurrent conditions of the lease. Thus courts, in this emerging trend, may uphold a lessee''s act in abandonment of a lease when the landlord''s implied obligation to provide leased property that meets health and safety standards. This may be more applicable when such an implied promise is a significant inducement in the making of the lease.The abandonment of the Kraehling lease on the basis of the commercial lease not being habitable is not yet recognized by the California courts. Nevertheless the court may well recognize that a landlord not meeting his implied obligation to provide commercial property that meets health and safety standards may provide justification for abandonment.What a court will do in this area will almost be driven by the facts of the case and the actions of CDT in addressing the problem. To CHDC's best belief, CDI did not make any attempt to accept any assignment of the Kraehling lease from CHDC. The following chronology is from CHDC''s records as CDI had minimal contact with CHDC. In an email dated 9/2/03, CDI addressed the Kraehling exception and advised the need for a lease with Buren W. Kraehling and Bernice R. Kraehling, lease holders of 475 Matmor Road, Woodland, CA., (Kraehling) and supplied a copy of the proposed lease. CHDC received written correspondence from Kraehling advising that Kraehling was not in agreement with the proposed CDI lease assignment. Kraehling had given CDI a one-month assignment until Mr. Kraehling returned from a hospital visit that had previously been scheduled. In an email dated 9/4/02, CDI notified CHDC that Kraehling''s signature was not needed on the lease. Mr. Flores prepared a lease assignment of the Kraehling lease that was faxed to Belinda Rinker (Rinker), identified as CDI's attorney. Ms. Rinker contacted Mr. Flores by telephone and they discussed the lease assignment. Ms. Rinker advised that CHDC's use of a period of six-month de-funding clause to terminate a lease was too long a period for CDI and that a three-month period would be acceptable to CDI. She further advised any lease assignment should carry mutual indemnification clause protecting both lessees. She agreed to and did email to Mr. Flores the wording she felt was appropriate for a lease assignment. Following Mr. Kraehling release from the hospital, Mr. Flores discussed the Kraehling lease with Mr. Kraehling. They agreed that the Kraehling lease did not carry a de-funding clause but that it did contain an agreement too not unreasonably withhold an assignment of the lease. Mr. Flores then prepared an amended lease assignment containing the

indemnification language provide by Rinker and sent copies of the amended lease to both Kraehling and Rinker. The draft amendment did not contain a de-funding clause as Mr. Kraehling would not agree to a de-funding clause.Mr. Kraehling, by telephone advised Mr. Flores that the terms of the amended lease assignment had his approval. Rinker did not immediately reply. After a series of written communications from Mr. Flores to Ms. Rinker, copies of which went to all interested persons, including ACF and which, incidentally went unanswered, Ms. Rinker finally replied that she wished to negotiate directly with Mr. Kraehling if he was not represented by Mr. Flores. Mr. Flores supplied her with Mr. Kraehling's address and telephone number. Copies of the correspondence from Flores to Belinda Rinker were copied to ACF. CHDC received information that Mr. Kraehling had approached CDI''s Head Start staff and had ordered Head Start to vacate the building. Mr. Flores contacted Mr. Kraehling who advised he had no contact or conversation with the Head Start staff and that he had not asked Head Start to vacate the building. Mr. Flores immediately wrote Ms. Rinker of this turn of events. However, no response was made by Ms. Rinker. In a telephone conversation in early October, Mr. Kraehling informed Mr. Flores that he had received the October rent from CDI, but that he, Mr. Kraehling had been contacted once by Ms. Rinker and his efforts to further contact Ms, Rinker directly had not been fruitful. Kraehling also made efforts to contact CDI directly but had been unable to do so. In early October, when ACF finally became involved and brought the lease issues to a head, Mr. Flores in an email to Belinda Rinker advised her of the personnel who would be negotiating the leases. There was no response from CDI. CHDC asked ACF for information concerning the Kraehling lease. ACF responded and, even though it had been copied in correspondence between CHDC and CDI, asked why the Kraehling lease had not been part of the discussions between CDI and CHDC. The simple answer is that CDI did not respond at any time to CHDC''s correspondence. The information possessed by CHDC is that sometime before November 10, 2003, CDI, alleging safety of the children, advised Mr. Kraehling that they were moving out of the premises and Kraehling advised CHDC of this occurrence on 11/14/03.

## VIII
## CONCLUSION

CHDC believes that during its tenure as a grant recipient it improved the Woodland Head Start school and when the property was ordered assigned to CDI, a taking occurred which requires the United States to compensate CHDC for its interest in the property. The measure of that interest is still unknown until there is an accounting between CHDC and ACF as to their joint investments in the property and an appraisal is conducted as to the fair market value of the property.

Moreover, during the management of this asset CHDC incurred expenses to defend and preserve the federal interest in this property prior to and subsequent to the taking (in fact those expenses are ongoing because of the lingering intangibles) and CHDC needs to be reimbursed for the United States's share of those expenses. Again, the allocation and measure of the final compensation depends in part on a negotiated agreement as to the proportionate interests of the other.

And a complete closeout cannot occur until the lingering intangibles are disposed of as well.

Mr. Johnson, this concludes CHDC's briefing at this time. As expressed verbally at the meeting on 22 April, this briefing would be preliminary. Any supporting or contrary authorities or

information that ACF has in its possession, CHDC would like to receive in response. A response is not only requested but expected in the spirit of good faith.

If I or anyone else can be of further help please feel free to contract me at any time.

Very truly yours,

Robert W. Scharf

cc: California Human Development Corporation
Louis Flores, Attorney at Law

LEGAL BRIEF TO JOHNSON 4-28-04 (2).DOC