IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CALIFORNIA HUMAN DEVELOPMENT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) | No. 05-1029C<br>(Judge Williams) |

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), the United States respectfully requests that this Court enter summary judgment in its favor. Plaintiff California Human Development Corporation ("CHDC") alleges that the Administration for Children and Families ("ACF") agreed to pay all excess construction and other costs relating to a Head Start/Early Head Start facility if CHDC relinquished the program. Complaint, ¶ 4. CHDC's allegations are not supported by any evidence and are contradicted by the statements of CHDC's own staff. The United States is, therefore, entitled to summary judgment in its favor. In support of our motion, we rely upon this brief, our proposed findings of uncontroverted fact, and the appendix attached to this brief.

STATEMENT OF THE ISSUES

1. Whether summary judgment is appropriate where there are no facts in dispute that are material to the Court's resolution of plaintiff's claim because even the testimony of plaintiff recognizes that the Government never agreed to pay the construction and other costs contained in

plaintiff's claim.

2. Whether summary judgment is appropriate where plaintiff alleges its voluntary relinquishment of the Head Start/Early Head Start program, in return for ACF's agreement not to issue a disallowance, resulted in a taking.

STATEMENT OF THE CASE

CHDC filed its complaint on September 23, 2005. In its complaint, CHDC alleges that the Government agreed to pay various previously unpaid construction and other costs related to a Head Start/Early Head Start facility being constructed by CHDC. Complaint, ¶ 4. CHDC further alleges that the Government breached its agreement by failing to pay these construction and other costs resulting in damages to CHDC in excess of $500,000. Complaint, ¶ 7. CHDC now seeks in excess of $500,000 in damages plus interest, costs and attorney fees. Id.

STATEMENT OF MATERIAL FACTS

CHDC and the defendant entered into a contract to construct a Head Start/Early Head Start facility at 626 Lincoln Street in Woodland, California. Complaint, ¶ 3. During the construction of the facility, CHDC spent funds in excess of the amount of the original grant. A31:9-15.[1] CHDC attempted to obtain reimbursement from the Government for these excess costs, but the requests were denied. Complaint, ¶ 6. For example, the Government previously denied requests for funds to pay for: (1) development fees for off-site electrical power; (2) installation of a fire sprinkler system; (3) installation of a concrete pad for a playground for the children; (4) installation of a chain link fence; (5) a report of unfinished construction items necessary to obtain an occupancy permit; and (6) funds used for hiring a construction supervisor.

---

[1] "A__" refers to a page in the appendix attached to this motion.

None of these items were included in the original construction grant and all were denied when requested because CHDC paid for these items without first obtaining the required prior approval from ACF. A22-24. CHDC also sought payment to investigate and provide plans to correct electrical supply deficiencies as well as heating, ventilation and air conditioning ("HVAC") deficiencies. A24-25. CHDC also sought funds to pay a settlement that it reached with a subcontractor that placed a lien on the facility for lack of payment.[2] A26. In addition, all of the items claimed by CHDC were incurred prior to the relinquishment discussions between the parties and prior to the close out period. A3; A40:24-41:12

In July of 2003, CHDC decided to relinquish the Head Start/Early Head Start program. In return for CHDC's agreement to relinquish the program, the Government agreed not to issue approximately $1 million in disallowances,[3] but instead issued a close out grant covering "reasonable and necessary" close out costs. CHDC's relinquishment of the Head Start/Early Head Start program is discussed in a series of letters between the plaintiff and defendant. A9-10.

In a letter dated July 24, 2003 and signed by Jerry Gomez and Martin Tom, the Government stated that:

> if CHDC formally relinquishes its grants, ACF will not issue or in any other manner pursue the disallowances . . . nor will a termination proceeding be required . . . All matters relating to the transfer of the grants will then be addressed
> in a close out period. All reasonable and necessary close out costs will be fairly negotiated and charged to a close out grant, and all issues relating to the transfer

---

[2] CHDC also seeks additional payments related to settlements with two former employees which ACF partially reimbursed as part of the close out grant.

[3] While disallowance procedures offer several opportunities for comment and appeal by the grantee, "[u]ltimately, if [the grantee receives] a final disallowance . . . that would be money that would be owed back to the federal government." A43:9-12.

> of facility title, licenses, leases, lien claims, and other transfer issues, will also be negotiated and resolved in the ordinary course of the close out.

A9.

On July 25, 2003, CHDC responded with a letter signed by Jose Bernardo basically accepting the Government's offer[4] and agreeing to relinquish the Head Start and Early Head Start programs.[5] A10.

CHDC then submitted a request for ordinary closing costs of $196,939 and $484,585 in extraordinary closing costs for a total request of $681,525, which is the subject of this lawsuit. A17. Of these claims, there is no dispute that the Government paid CHDC a total close out amount of $137,532 which includes $104,108 in ordinary close out costs and $33,424 in extraordinary close out costs. A7; A36:1-2; A37:3-15.

## SUMMARY OF THE ARGUMENT

The Court should grant summary judgment in the Government's favor because any agreement between the Government and plaintiff regarding the payment of closing costs required that the costs be incurred during the closing period and relate to the transfer of the Head Start/Early Head Start programs that plaintiff voluntarily relinquished. Any obligation of the

---

[4] CHDC acknowledges that the Government's letter of July 24, 2003, is "a pretty good summary of what [ACF and CHDC] agreed to." A45:24-25. A51:7-12 (former CHDC Chairman Jose Bernardo refers to this letter as the "close out agreement.")

[5] CHDC's letter stated in part that on July 25, 2003, CHDC's Board of Directors voted "to relinquish the Head Start and Early Head Start grants." A10. The letter also included a quote from the Government's letter of July 24, 2003 stating that "'All reasonable and necessary close out costs will be fairly negotiated and charged to a close out grant, and all issues related to the transfer of the facility, title, licenses, leases, lien claims and other transfer issues' will also be negotiated and resolved fairly." A10.

Government to CHDC was further limited by language in the correspondence between the parties which only required the government to fairly negotiate the closing costs, which the Government did.

Lastly, while plaintiff has not expressly alleged a takings claim in its complaint, CHDC is not entitled to any damages pursuant to a takings claim because it entered into an agreement with the Government to voluntarily relinquish the Head Start/Early Head Start program. As a result, CHDC is limited to, at most, a breach of contract remedy.

## ARGUMENT

### I. Summary Judgment Standards

Summary judgment is appropriate when the record shows that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir. 2005) (citing RCFC 56(c)). A factual issue is "genuine" only if the Court could find for the party opposing summary judgment and "material" only if the issue could affect the judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The mechanism of summary judgment is "designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting FRCP 1). Resolving a dispute via summary judgment is appropriate in contract interpretation cases, which turn upon questions of law. Varilease Technology Group, Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002).

The moving party bears the burden of showing that no genuine issues of material fact preclude summary judgment. Celotex Corp., 477 U.S. at 323. All justifiable inferences should be drawn in favor of the nonmovant. Anderson, 477 U.S. at 255. Nevertheless, the party

opposing summary judgment must show an evidentiary conflict on the record. American Airlines, Inc. v. United States, 204 F.3d 1103, 1112 (Fed. Cir. 2000). Factually unsupported argument is insufficient to defeat a motion for summary judgment. Id.

II. CHDC's Contract Claim Is Meritless

A. The Plain Language Of The Parties' Correspondence Is Unambiguous

Contract interpretation is a question of law. Interstate Gen. Gov't Contractors v. Stone, 980 F.2d 1433, 1434 (Fed. Cir. 1992). Contract interpretation begins with the plain language of the agreement. Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc). If that language is "clear and unambiguous," this Court gives the terms of a contract their "plain and ordinary meaning." McAbee Const. Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996). Absent ambiguity, the Court does not resort to extrinsic evidence to aid in interpretation because doing so would cast "a long shadow of uncertainty over all transactions" and contracts. Id. Further, when interpreting a contract, the Court gives meaning to all of the contract's provisions. M.A. Mortenson Co. v. Brownlee, 363 F.3d 1203, 1206 (Fed. Cir. 2004).

To recover from the United States, plaintiff must show that it entered into either an express contract or an implied-in-fact contract with the United States. Pasco Enterprises v. United States, 13 Cl. Ct. 302, 305 (1987). Here, the parties agreed that CHDC would relinquish the Head Start/Early Head Start program and in return for the Government's agreement not to issue a draft disallowance letter.[6] The Government also agreed to the payment of "reasonable

[6] CHDC's Deputy Chief Executive Officer of Programs, Christopher Paige, testified that "the Board members had received an offer from ACF to relinquish the Head Start program and, in return, ACF would not pursue, I'll call them potential disallowances which were contained in a draft disallowance letter . . . ." A32:17-21.

and necessary close out costs" as memorialized in a letter from the Government stating:

> All matters relating to the transfer of the grants will then be addressed in a close out period. All reasonable and necessary close out costs will be fairly negotiated and charged to a close out grant, and all issues relating to the transfer of facility title, licenses, leases, lien claims, and other transfer issues, will also be negotiated and resolved in the ordinary course of the close out.

A9 (emphasis added). In response to the Government's letter, CHDC sent a letter to the Government accepting the Government's offer as stated above. A10. Christopher Paige, who assisted in drafting that letter, confirmed that CHDC's letter "accept[ed] the offer as described by ACF" and acknowledged that the Government's letter "was a pretty good summary of what [ACF and CHDC] agreed to." A33:22-23; A38:12-13; A45:24-25; A51:7-12 (former CHDC Chairman Jose Bernardo referred to the Government's letter as the "close out agreement.") CHDC employees have confirmed that CHDC agreed to relinquish the Head Start program in return for the Government not issuing the draft disallowance. A32:17-21. CHDC further confirmed that both CHDC and the Government would further negotiate any additional compensation. A52:22-25; A53:14-17; A34:23-A35:6; A46:7-10.

The terms of the agreement here are simple and unambiguous. The terms require CHDC to relinquish the Head Start program and in return the Government will not to pursue any possible disallowances or termination proceedings. A9. The Government also agreed that "all matters relating to the transfer of the grants will be addressed in a close out period." A9. (emphasis added). The letter continues by stating that "all reasonable and necessary close out costs will be fairly negotiated and charged to a close out grant, and all issues relating to the transfer of facility title, licenses, leases, lien claims and other transfer issues will also be negotiated and resolved in the ordinary course of a close out." A9 (emphasis added). This

language makes it clear that the Government will only pay costs that are: (1) related to the "transfer of the grants" and (2) that occurred during the close out period.

The Government did what it agreed to do. The Government did not issue the disallowance letter and, it negotiated and paid all reasonable costs relating to the transfer of the Head Start program. A44:18-20 (disallowance letter never issued); A36:2 (ACF paid CHDC $137,000). CHDC is attempting to collect monies that it spent on the Head Start program in excess of the original grant. A31:9-15. These additional funds were spent by CHDC out of its own funds for a variety of reasons, but most of them involve mismanagement or a failure to obtain prior approval. A22-24. CHDC's claim for costs in excess of the original grant is not covered by the plain meaning of the relinquishment correspondence. CHDC's claim is therefore invalid, and the Court should grant this motion for summary judgment.

B. The Costs Claimed By CHDC Were Not Incurred During the Close Out Period

The plain language of the letter states that "matters relating to the transfer of the grants will then be addressed in a close out period." A9. As a result, only transfer costs incurred during the close out period are covered by the close out grant.

CHDC agreed to relinquish the program in its letter of July 25, 2003. CHDC has also acknowledged that the close out period did not begin until September 1, 2003 and ended a year later on August 31, 2004. A42:1-8. All of the extraordinary close out costs that CHDC is seeking to recover in this lawsuit were incurred prior to relinquishment and prior to the start of the close out period. A3; A40:24-A41:12. All of these costs are related to the construction of the Head Start facility and were previously denied by ACF long before CHDC relinquished the program. Id. For example, the Government previously denied requests for funds to pay for:

(1) development fees for off-site electrical power; (2) installation of a fire sprinkler system; (3) installation of a concrete pad for a playground for the children; (4) installation of a chain link fence; (5) a report of unfinished construction items necessary to obtain an occupancy permit; and (6) funds used for hiring a construction supervisor. A22-24. CHDC also sought payment to investigate and provide plans to correct electrical supply deficiencies as well as heating, ventilation and air conditioning ("HVAC") deficiencies. A24-25. CHDC also sought payment of a settlement that it reached with a subcontractor that placed a lien on the facility for lack of payment.[7] A26. All of these extraordinary construction related costs were disapproved by ACF because all of these costs were incurred prior to the beginning of the close out period from September 1, 2003. A3; A40:24-41:5 (Mr. Paige testified that the ACF's primary rationale" for denying the extraordinary close out costs was that they were incurred prior to close out period). CHDC has acknowledged and "largely" agreed that the costs it is claiming in its complaint were incurred prior to the start of the close out period on September 1, 2003. A41:9-12. There is nothing in the agreement that indicates or implies that the Government agreed to pay or even consider costs incurred outside the close out period. As the Government's obligation to pay close out costs relating to the transfer is limited to costs incurred during the close out period and none of the costs claimed by CHDC were incurred during that period, the Government's motion for summary judgment should be granted.

C. The Costs Claimed By CHDC Are Not Related To The Transfer Of The Grants

Similarly, the Government is not obligated to pay any of the extraordinary close out costs

---

[7] CHDC also is seeking additional payments related to settlements with two former employees which ACF partially reimbursed as part of the close out grant.

sought by plaintiff because none of the costs are related to the transfer of the grants. The Government's letter clearly states that only costs "relating to the transfer" of the grants "and other transfer issues" will be included in the close out grant.

All of these costs are related to the construction of the Head Start facility and were previously denied by ACF long before CHDC agreed to relinquish the program. A22-26. The costs sought by CHDC include construction costs (including development fees for off-site electrical power; installation of a fire sprinkler system; installation of a concrete pad for a playground for the children; installation of a chain link fence; a report of unfinished construction items necessary to obtain an occupancy permit; and funds used for hiring a construction supervisor) as well plans to correct electrical supply and HVAC deficiencies, a settlement payment to a subcontractor that placed a lien on the facility for lack of payment and settlement payments to two former employees. A22-26. The Government never agreed to pay any of these costs because all of these costs were incurred long before CHDC's relinquishment of the program and, as a result, none of these costs are in any way related to the transfer of the grants.

As CHDC is seeking payment of extraordinary construction costs that are not related to the transfer of the Head Start/Early Head Start programs, the Government's motion for summary judgment should be granted.

D. At Most, The Agreement Obligated The Government To Fairly Negotiate

At most, the Government agreed that "reasonable and necessary close out costs will be fairly negotiated . . . and [a]ll matters relating to the transfer of the grants . . . and other transfer issues, will also be negotiated and resolved in the ordinary course of the close out." A9. The inclusion of the word "negotiated" which is included in the letter in two locations illustrates that

the Government never agreed to pay any and all transfer costs, but only agreed that it would negotiate with CHDC in an attempt to resolve any issues relating to the transfer costs. See Pacific Gas & Electric Co. v. United States, 3 Cl. Ct. 329, 339 (1983), aff'd, 738 F. 2d 452 (Fed. Cir. 1984)(table) ("Extensive negotiations in which the parties demonstrate hope and intent to reach an agreement are not sufficient.") Nothing in the letter states or implies that the Government agreed to pay cost overruns and other expenses that were caused by CHDC's mismanagement and that the Government previously denied. CHDC further confirmed that both CHDC and the Government would further negotiate any additional compensation. A52:22-25; A53:14-17; A34:23-A35:6; A46:7-10.

CHDC acknowledges that negotiations meant that "there would be meetings; there would be dialogue; . . . there would be back and forth; and there would be resolution, but it would be a resolution within the . . . framework of the agreement." A39:5-9. But again, the framework of the letter makes clear that only costs "relating to the transfer of the grants" incurred during the "close out period" would be paid by the Government. A9. Furthermore, CHDC cannot argue that the extraordinary close out costs are somehow covered by the agreement because there is no way for the Court or anyone else to determine which extraordinary costs are covered and which are not covered. In other words, CHDC is claiming that the Government breached the agreement by failing to pay all of the costs that it believed it was entitled to, but there is no way for the Court to determine which costs are covered by the agreement and which are not because, in addition to being limited to costs relating to the transfer of the grants incurred during the close out period, the agreement further states that the costs will be "fairly negotiated," which does not provide any guidance as to which costs are covered and which are not.

Even CHDC does not contend that the Government agreed to pay all of the extraordinary construction costs that the Government previously denied. When asked whether ACF should pay all of the extraordinary close out costs that CHDC is seeking in this law suit, CHDC's Deputy Chief Executive Officer of Programs, Christopher Paige, testified that he did not expect ACF to pay all of the extraordinary costs claimed, but that based upon the correspondence he expected that ACF would "consider those costs." A47:11-24. When asked if ACF considered the costs, he responded "[b]ased on the correspondence we received there was obviously some consideration . . . I guess that amounts to some kind of consideration, but not the kind of consideration I'd expect based upon the relinquishment correspondence." A48:1-11.

Moreover, the Government met its obligation to fairly negotiate. CHDC submitted a request for ordinary closing costs of $196,939 and $484,585 in extraordinary closing costs for a total request of $681,525. A17. Prior to issuing a decision as to whether to pay the costs claimed by CHDC, in addition to the previous correspondence between the parties, ACF held face to face meeting with CHDC in April of 2004 to attempt to resolve these issues. A39:15-21. Of these amounts, there is no dispute that the Government paid CHDC a total close out cost of $137,532 which includes $104,108 in ordinary close out costs and $33,424 in extraordinary close out costs. A7; A36:1-2; A37:3-15. Therefore, the Government has met any obligation it had to fairly negotiate the close out costs by negotiating with CHDC and ultimately paying CHDC more than $137,000.

III. CHDC's Takings Claim Is Meritless

The Takings Clause of the Fifth Amendment mandates "just compensation" when the Federal Government appropriates private property for "public use." U.S. Const. amend V;

Bernaugh v. United States, 38 Fed. Cl. 538, 542 (1997), aff'd, 168 F.3d 1319 (Fed. Cir. 1998) (table). Before a party may recover compensation pursuant to the Fifth Amendment for a taking, under either a physical invasion (per se) or regulatory taking theory, it must establish a compensable property interest; i.e., a specific interest in physical or intellectual property. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1014 (1992); Kaiser Aetna v. United States, 444 U.S. 164, 179-80 (1979).

The Court of Appeals for the Federal Circuit and its predecessor "has cautioned against commingling takings compensation and contract damages." Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001). "In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." Hughes Communications, 271 F.3d at 1070 (quoting Sun Oil Co. v. United States, 215 Ct. Cl. 716, 769-70, 572 F.2d 786, 818 (1978)); see J.J. Henry Co. v. United States, 188 Ct. Cl. 39, 46, 411 F.2d 1246, 1249 (1969); Transpace Carriers, Inc. v. United States, 27 Fed. Cl. 269, 274 (1992); Marathon Oil Co. v. United States, 16 Cl. Ct. 332, 338-39 (1989).

Remedies for alleged infringement of any rights established contractually generally lie in contract, not the Fifth Amendment, as it is the terms of the contract that govern the parties' respective rights and obligations. Sun Oil, 215 Ct. Cl. at 769-70, 572 F.2d at 818; see Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 703 n.27 (1949) (if there is contract remedy, party cannot pursue takings claim in this Court); Sunrise Village Mobile Home Park, L.C. v. United States, 42 Fed. Cl. 392, 404 (1998) ("if the government's actions allegedly breached a contract, the appropriate remedy is a breach of contract claim, not a claim for compensation pursuant to the Takings Clause"). As noted by the Court, when a party alleges

"an entitlement to compensation created by a contractual arrangement, any right to compensation depends entirely on the enforceability of that agreement." Howard v. United States, 31 Fed. Cl. 297, 315 n.14 (1994) (citing Marathon Oil Co. v. United States, 16 Cl. Ct. 332, 338- 39 (1989) (quoting Sun Oil, 215 Ct. Cl. at 770, 572 F.2d at 818).

While plaintiff does not include a takings claim in its complaint, it has alleged in response to requests for admissions that it contends that a taking occurred when CHDC voluntarily relinquished its Head Start/Early Head Start program.[8] To the extent that plaintiff contends that it can recover under a "takings" claim, it is incorrect. Even assuming that CHDC can establish that the Head Start/Early Head Start grants qualify as a compensable property interest, the Government did not "take" CHDC's property. Rather, CHDC voluntarily entered into an agreement in which it agreed to relinquish the Head Start/Early Head Start grants in exchange for the Government's agreement not to issue a draft disallowance letter. A32:17-21. As a result, plaintiff cannot claim that a taking occurred and is limited to only the available breach of contract remedy, which we have shown above in section II has not been breached and does not provide the damages that plaintiff seeks.

## CONCLUSION

For the reasons given above, the Court should grant defendant's motion for summary judgment.

---

[8] Plaintiff's complaint does not alleged or even mention a takings claim, but in response to the Government's Second Set of Requests for Admissions, Request No. 21, plaintiff responded that it had alleged a takings claim in its complaint and also cited to the parties Joint Preliminary Status Report of March 31, 2006. However, the Joint Preliminary Status Report also does not mention a takings claim.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Bryant G. Snee
BRYANT G. SNEE
Deputy Director

s/ Robert C. Bigler
ROBERT C. BIGLER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L St., NW
Washington, D.C. 20530
Tele: (202) 307-0315
Fax: (202) 514-8624

December 3, 2007

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this _3rd_ day of December 2007, a copy of the foregoing "DEFENDANT'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Robert C. Bigler