# Appendix

DEPARTMENT OF HEALTH & HUMAN SERVICES

Administration for Children & Families

Region IX
50 United Nations Plaza
San Francisco, CA 94102

Refer to:

SEP 2 2 2004

Chris Paige
Interim President/CEO
California Human Development Corporation
3315 Airway Drive
Santa Rosa, California 95403

RECEIVED SEP 2 4 2004

Dear Mr. Paige:

This is to provide the California Human Development Corporation (CHDC) additional details on the final Head Start Program closeout award issued to you on August 27, 2004 (copy enclosed). We are also responding to questions raised by CHDC subsequent to issuance of the award.

Budget Requests, Adjustments, and Approval Amounts

All costs whether categorized as "ordinary or extraordinary," must meet the purpose of closeout awards and be a cost of the grant period ending August 31, 2004. This means that in order to meet the purpose of the closeout grant, the expense must be related to the closure of Head Start operations, represent valid non-cancelable obligations of the closing period, and meet the criteria of Title 45, Code of Federal Regulations (CFR), Part 74.27 (Allowable Costs).

The amount requested, revised and approved for each budget category is shown in the enclosed table. Costs characterized as ordinary for the closeout period were either approved as requested or adjusted and approved per the amount stated in CHDC correspondence dated April 29, 2004.

Partial funding was awarded for extraordinary costs budgeted. You submitted human resources settlements documentation including an insurance policy, invoices and payment information demonstrating that CHDC expended funds during the budget period for the Moran case including settlement costs of $12,930 and $5,641 for attorney fees. Similarly, CHDC expended $3,273 in attorney fees in connection with the Trejo case; but did not expend any funds towards a proposed settlement amount. ACF did not obligate fund towards a settlement amount because the proposed agreement was not finalized and was subject to change. Obligating funds without a final agreement would constitute authorizing a contingency fund, as there was not a valid obligation in existence during the budget period.

Paige
EXHIBIT NO. CC 2
6-20-07

Partial funding was approved for attorney fees related to CHDC's relinquishment and lease assignment activities. A total of $16,030 was documented by invoices provided by Attorneys Flores and Scharf. Our General Counsel's letters of July 7 and August 13, 2004 provided the calculation and basis for approval.

Shortly before ACF made its final award on August 27, 2004, the matter of an unpaid property tax of $4,450 came to our attention. On August 20, 2004 ACF requested that CHDC resolve this tax assessment prior to the completion of closeout. Concurrent with CHDC's efforts to resolve this matter, the property landlord, James Naekel, stated on August 25, 2004 that he would personally pay the Assessor the overdue amount with an expectation of reimbursement during September2004. Since it was not clear whether payment of this outstanding tax would be completed by CHDC or Mr. Naekel before releasing the final award, ACF deducted $4,450 from the closeout award for a net total of $137,532. Subsequently, CHDC stated in an e-mail dated September 2, 2004 that a check was sent to the tax assessor on September 1, 2004 to settle outstanding tax amounts due. CHDC should now resolve the tax fee payment with Mr. Naekel and the Tax Assessor's Office.

Budget Disappprovals

The enclosed table also shows the budget categories and amounts disapproved in full.

Disapproved ordinary closing costs were for copier and cell phone lease buyouts, as well as for indirect costs. We did not approve the two copier lease buyouts totaling $51,970.61 because ACF did not approve funds for equipment in award number 09CH0200/13, amendment 00.

ACF did not approve the cell phone lease buyout of $5,462.31 because CHDC did not provide documentation showing that a valid obligation existed. Based on information from the November 2002 PRISM review, ACF was advised by CHDC that the cell phone lease had been cancelled. As a result, ACF requested on July 14, 2004, that CHDC provide evidence of a valid obligation for this lease. CHDC replied in an August 19, 2004 e-mail that the cell phones were needed for field use at the time the lease was executed. Since CHDC did not satisfy our request for evidence of a valid obligation, ACF did not award the cell phone buyout funds.

ACF did not approve the budget request for indirect costs of $17,903.59. This amount was revised to $16,735 on April 29, 2004. ACF expressed concerns on

July 14, 2004 that CHDC would direct charge some costs covered by its approved indirect cost rate and also charge indirect costs on the amount direct charged. ACF requested through a July 14, 2004 e-mail that CHDC exclude the direct charges from the closeout budget that are also covered by the indirect cost rate. CHDC's August 19, 2004 e-mail reiterated the position that direct costs could be charged to the closeout grant, but did not address the duplicate charges that would result from additionally applying the indirect cost rate to costs covered by the rate. ACF was prepared to approve an appropriate level of indirect costs based on the approved rate, but approved none since the requested adjustment was not made and the correct amount of indirect cost could not be determined.

ACF did not approve extraordinary construction related costs connected with the facility at 626 West Lincoln Street, Woodland, California. All of these costs were prior period costs which may only be assigned to the period in which the cost was incurred [Title 45 Code of Federal Regulations (CFR) Part 74.28, Period of Availability of Funds]. Consequently, none of the costs qualify for closing costs during the budget period of July 1, 2003 through August 31, 2004. In addition, in most if not all cases, ACF specifically denied approval of CHDC budgetary revisions (45 CFR 74.25, Revisions of Budgets) requesting approval of the cost during or subsequent to the budget period in which the cost was incurred.

ACF also did not approve the budget for the Ticon lien settlement, as this cost pertains to CHDC violations of the terms and conditions of the grant. Our General Counsel's letter of July 7, 2004 provides additional bases for the disapproval of this category.

ACF did not approve funds in the amount of $20,000 for the property appraisal of the Woodland facility. An appraisal is not necessary given that CHDC did not own the facility and that ACF exercised its right to transfer the facility to an interim grantee. We also did not approve lease buyout costs ($60,248) associated with the Krahling lease for the Matmor site, because the site was unsuitable for habitation, as outlined in our General Counsel's letter of July 7, 2004.

Final Budget Approval

Your final closeout budget for the period from July 1, 2003 through August 31, 2004 is $137,532. This budget approval is not subject to appeal, as ACF has full authority in determination of the award amount or disposition of unobligated amounts [45 CFR Part 16, Appendix A (C) (a) (1)]. Since CHDC has expended its

own funds in connection with the final closeout award, the funds may be drawn as reimbursement. By charging the Head Start grant and withdrawing the closeout funds, CHDC must follow the terms and conditions of the grant and use the funds for the purpose awarded. CHDC may use these funds for actual costs of each approved category; otherwise the costs may be cause for disallowance. If CHDC does not expect to charge the grant or withdraw the funds, please notify ACF and the funds will be recovered.

If you have any questions, please contact Paulene Graham Fiscal Operations Specialist at (415) 437-8418, or Maria Fort at (415) 437-8445.

Sincerely,

Martin Tom

Martin Tom
Grants Officer

Enclosures

Cc: Board Chair

…N NUMBER: FV 4407

DEPARTMENT OF HEALTH AND HUMAN SERVICES
ADMINISTRATION FOR CHILDREN AND FAMILIES
FINANCIAL ASSISTANCE AWARD

PMS DOCUMENT NUMBER: 09CH0200/14

| | | | |
|---|---|---|---|
| AWARDING OFFICE: Region IX Office for Children and Families | 2. ASSISTANCE TYPE: Discretionary Grant | 3. AWARD NO.: 09CH0200/14 | 4. AMEND. NO.: |
| 5. TYPE OF AWARD: SERVICE | 6. TYPE OF ACTION: Non-competing Continuation | 7. AWARD AUTHORITY: 42 USC 9801 ET SEQ. | |
| 8. BUDGET PERIOD: 09/01/2003 THRU 08/31/2004 | 9. PROJECT PERIOD: INDEFINITE | 10. CAT NO.: 93600 | |

11. RECIPIENT ORGANIZATION:
CALIFORNIA HUMAN DEVELOPMENT CORPORATION
3315 AIRWAY DRIVE
SANTA ROSA CA 95403
George L. Ortiz, President

12. PROJECT / PROGRAM TITLE: HEAD START

| | | |
|---|---|---|
| 13. COUNTY: YOLO | 14. CONGR. DIST: 3 | 15. PRINCIPAL INVESTIGATOR OR PROGRAM DIRECTOR: Regina Canagen, Interim Head Start/Early Head Start Direc |

16. APPROVED BUDGET:

| | | |
|---|---|---|
| Personnel | $ | 50,206 |
| Fringe Benefits | $ | 13,515 |
| Travel | $ | 0 |
| Equipment | $ | 0 |
| Supplies | $ | 0 |
| Contractual | $ | 0 |
| Facilities/Construction | $ | 0 |
| Other | $ | 73,811 |
| Direct Costs | $ | 137,532 |
| Indirect Costs At % of $ | $ | 0 |
| In Kind Contributions | $ | 0 |
| Total Approved Budget(**) | $ | 137,532 |

17. AWARD COMPUTATION:

| | | | |
|---|---|---|---|
| A. NON-FEDERAL SHARE | $ | 34,383 | 20.00 % |
| B. FEDERAL SHARE | $ | 137,532 | 80.00 % |

18. FEDERAL SHARE COMPUTATION:

| | | |
|---|---|---|
| A. TOTAL FEDERAL SHARE | $ | 137,532 |
| B. UNOBLIGATED BALANCE FEDERAL SHARE | $ | |
| C. FED. SHARE AWARDED THIS BUDGET PERIOD | $ | 137,532 |
| 19. AMOUNT AWARDED THIS ACTION: | $ | 137,532 |
| 20. FEDERAL $ AWARDED THIS PROJECT PERIOD: | $ | |

21. AUTHORIZED TREATMENT OF PROGRAM INCOME: DEDUCTIVE

| | | |
|---|---|---|
| 22. APPLICANT EIN: 1-941653023-A1 | 23. PAYEE EIN: P-Y589 | 24. OBJECT CLASS: 41.51 |

25. FINANCIAL INFORMATION:

| ORGN | DOCUMENT NO. | APPROPRIATION | CAN NO. | NEW AMT. | UNOBLIG. | NONFED % |
|---|---|---|---|---|---|---|
| R09 | 09CH020014 | 75-4-1536 | 2004 G094122 | $137,532 | | |

26. REMARKS: (Continued on separate sheets)

Client Population: 319.
This grant is paid by the Payment Management System (PMS) See attached payment info.
Initial expenditure of funds by the grantee constitutes acceptance of this award.
Attached are terms and conditions, reporting requirements, and payment instructions.
This award is subject to HHS regulations codified at 45 CFR 1301, 1302, 1303, 1304, 1305, 1306, 1308, 1309 and 1310.
(**)Reflects only federal share of approved budget.
This grant awards closeout in the amount of $137,532. The final approved amounts are:

Wage and fringe = $50,206

| | |
|---|---|
| 27. SIGNATURE - ACF GRANTS OFFICER Martin L. Tom *Martin Tom* DATE: 8/27/04 | 28. SIGNATURE(S) CERTIFYING FUND AVAILABILITY Martin L. Tom *Martin Tom* 8/26/04 |
| 29. SIGNATURE AND TITLE - PROGRAM OFFICIAL(S) Gerald A. Gomez, Associate Director, Children & Youth Development Unit | DATE: 8/26/2004 |

DGCM-3-785 (Rev. 86)

DEPARTMENT OF HEALTH AND HUMAN SERVICES
ADMINISTRATION FOR CHILDREN AND FAMILIES
FINANCIAL ASSISTANCE AWARD

SAI NUMBER:

PMS DOCUMENT NUMBER: 09CH0200/14

| 1. AWARDING OFFICE: | 2. ASSISTANCE TYPE: | 3. AWARD NO.: | 4. AMEND. NO. |
|---|---|---|---|
| Region IX Office for Children and Families | Discretionary Grant | 09CH0200/14. | |

| 5. TYPE OF AWARD: | 6. TYPE OF ACTION: | 7. AWARD AUTHORITY: |
|---|---|---|
| SERVICE | Non-competing Continuation | 42 USC 9801 ET SEQ. |

| 8. BUDGET PERIOD: | 9. PROJECT PERIOD: | 10. CAT NO.: |
|---|---|---|
| 09/01/2003 THRU 08/31/2004 | 07/01/2002 THRU 08/31/2003 | 93600 |

11. RECIPIENT ORGANIZATION:
CALIFORNIA HUMAN DEVELOPMENT CORPORATION

26. REMARKS: (Continued from previous page)

Occupancy = $6,924
Postage = $945
Communication = $1,378
Insurance = $1,140
Audit = $30,000
Health Insurance employee transfers = $13,515
Attorney fees = $16,030
HR attorney fees and settlements
- Trejo attorney fees = $3,273
- Moran attorney fees = $5,641
- Moran settlement = $12,930

With a deduction of $4,450 from the total for unpaid property taxes.

DGCM-3-785 (Rev. 86)

CHDC Approved Closeout Costs
August 29, 2004

| Category | Request Amount | Revision Date/Amount | Approved Amount |
|---|---|---|---|
| **Ordinary Cost Budget** | | | |
| Wage and fringe | $50,206 | 0 | $50,206 |
| Occupancy | 9,000 | 4/29/04: 6,924 | 6,924 |
| Postage | 945 | 0 | 945 |
| Communications | 1,440 | 4/29/04: 1,378 | 1,378 |
| Insurance | 2,250 | 4/29/04: 1,140 | 1,140 |
| Audit | 30,000 | 0 | 30,000 |
| Health insurance | 15,000 | 4/29/04: 13,515 | 13,515 |
| **Extraordinary Costs** | | | |
| Attorney fees – relinquishment/lease assignment | 73,176 | 0 | 16,030 |
| Settlement-Trejo | 20,000 | 0 | 0 |
| Attorney - Trejo | 20,279 | 0 | 3,273 |
| Settlement/Attorney-Moran | 37,427 | 0 | 5,641<br>12,930 |
| Deduction for Property Tax | | | 4,450 |
| **Total Approved Budget** | | | **$137,532** |
| | | | |
| **Disapproved Budget** | Requested | Revisions | Amount Not Approved |
| Ordinary Cost Budget | | | |
| Copier lease buyout | $51,970.61 | 0 | $51,970.61 |
| Cell phone buyout | 5,462.21 | 0 | 5,462.21 |
| Indirect cost | 17,903.59 | 4/29/04: 16,735 | 16,735 |
| Extraordinary Cost Budget | | | |

| | | | |
|---|---|---|---|
| Woodland facility items 1-10 | 91,388 | | 91,388 |
| Ticon Lien Settlement | 141,647 | | 141,647 |
| Woodland appraisal | 20,000 | | 20,000 |
| Krahling lease buyout | 60,248 | | 60,248 |
| **Total Disapproved Budget** | | | $387,450.82 |

DEPARTMENT OF HEALTH & HUMAN SERVICES

Administration for Children & Families

Region IX
50 United Nations Plaza
San Francisco, CA 94102

Refer to: 09CH0200/09YC0434

July 24, 2003

Mr. Jose Bernardo, Board Chairperson
California Human Development Corporation
229 East 8th Street
Stockton, California 95206

Dear Mr. Bernardo:

Thank you for your letter of July 23, 2003, indicating CHDC's willingness to relinquish its Head Start and Early Head Start grants, on the terms discussed at our meeting on July 14, 2003. As stated at that meeting, if CHDC formally relinquishes its grants, ACF will not issue or in any other manner pursue the disallowances referenced in your letter, nor will a termination proceeding be required. In accordance with our standard procedure, after CHDC's formal relinquishment has been received and accepted by ACF, all matters relating to the transfer of the grants will then be addressed in a close out period. All reasonable and necessary close out costs will be fairly negotiated and charged to a close out grant, and all issues relating to the transfer of facility title, licenses, leases, lien claims, and other transfer issues, will also be negotiated and resolved in the ordinary course of the close out. Of course, CHDC will need to coordinate closely with ACF to provide sufficient details to negotiate the closeout costs, and to effect an orderly transition. Per your request, we will give you a copy of the report on our recent program review when the report is finalized.

Please note that time is of the essence in this matter, inasmuch as the deadline we agreed upon requires that the CHDC Board deliver its formal notice of relinquishment by close of business on Friday, July 25th. Please also keep in mind that if CHDC decides not to relinquish at this time, the disallowance will be issued. Once a disallowance has been formally issued, it becomes an obligation owed to the United States, and cannot be withdrawn at ACF's discretion. Therefore, in the best interest of all concerned, including CHDC, I urge you not to let this opportunity slip away.

Sincerely,

Jerry Gomez
Associate Director
Children and Youth Development Unit

Martin Tom
Martin Tom
Grants Officer
Program Support Unit

Paige
EXHIBIT NO. 1
6-20-07

cc: Executive Director
Policy Council Chairperson

TOTAL P.02

**California Human Development Corporation**

No one leaves with empty hands.

George L. Ortiz, President/Chief Executive Officer

Board of Directors

Jose Bernardo, Chair, San Joaquin County
Jacob Baldev Singh, Vice Chair, Sutter County
Manuel Cabacungan, Secretary, Solano County
Mark Ostrye, Treasurer, Contra Costa County
Harvey Aytch, Solano County
Joe Benatar, Sutter County
Hector Brambila, Napa County
Fr. John Brenkle, Napa County
Toni Curtis, Sacramento County
Bonnie Martinez, Sonoma County
Tania McNeeley, Yolo County
Stacey Miller, Yolo County
Frank Orozco, San Joaquin County
Julie Enriquez Peck, Sacramento County
Eleuterio Perez, Lake County
Lynda Lenier Rinaldo, Sonoma County
Florencio Verano, Solano County

July 25, 2003

Mr. Jerry Gomez
Associate Director, Children and Youth Development Unit
HHS/ACF Region IX
50 United Nations Plaza
San Francisco, California 94102

*Delivered via Facsimile: 415-437-8438*

Dear Mr. Gomez:

The Board of Directors of the California Human Development Corporation received your offer letter of July 24th. The Board of Directors met telephonically on July 25th 2003 and voted by a vote of seven ayes and one abstention to relinquish the Head Start and Early Head Start grants.

CHDC Board of Directors understands, as indicated in our letter of July 23rd, that good faith negotiations will now lead to a resolution of all issues, including, but not limited to, all liabilities related to the audit, mechanics liens, leases, litigation, recovery of close out costs and any possible ACF action that could negatively impact on CHDC. The Board also understands that as per your letter of July 24th "All reasonable and necessary close out costs will be fairly negotiated and charged to a close out grant, and all issues related to the transfer of facility, title, licenses, leases, lien claims and other transfer issues" will also be negotiated and resolved fairly.

Thank you for your courtesies in this matter.

Sincerely,

Jose Bernardo
Chair

cc: CHDC Board Members
Head Start Policy Council
Martin Tom – *Facsimile 415-437-8444*
Maria Fort – *Facsimile 415 –437- 8438*
George L. Ortiz
Louis F. Flores
Yolo County Head Start Director

EXHIBIT NO. K
Page
6-20-07

*Central Office: 3515 Airway Drive, Santa Rosa, CA 95403 - Tel.: 707.523.1155 - Fax: 707.523.3776*

Recycled Paper

| ITEM # | VENDOR NAME | INVOICE AMOUNT | INVOICE NUMBER | INVOICE DATE | CHECK NUMBER | NOTES |
|---|---|---|---|---|---|---|
| 1 | **Axiom Engineering** | 4,841.20 | 2599 | 04/30/02 | 106837 | Service provided: HVAC Code Compliance and |
| | | 540.80 | 2914 | 06/30/02 | 106837 | Corrective Action Report for 626 W. Lincoln Ave., |
| | | 197.60 | 3164 | 08/31/02 | 106837 | Woodland, CA (report attached). |
| | | 4,904.90 | 2752 | 05/31/02 | 269482 | |
| | | 124.80 | 3042 | 07/31/02 | 269482 | |
| | **Total Item #1:** | **$10,609.30** | | | | |
| 2 | **Community Playground** | 1,500.00 | 5846 | 02/14/02 | N/A | Service provided: Concrete pad for playground for 626 W. Lincoln, Woodland, CA |
| | **Total Item #2:** | **$1,500.00** | | | | |
| 3 | **Dave Buchignani (Buchignani & Sons)** | 1,275.00 | | 10/09/01 | 258507 | Service provided: Construction oversight for 626 |
| | | 300.00 | | 10/26/01 | 259185 | W. Lincoln Ave., Woodland, CA (contract |
| | | 1,125.00 | | 10/29/01 | 259185 | attached). |
| | | 4,125.00 | | 11/27/01 | 260153 | |
| | | 2,850.00 | | 06/15/02 | 261845 | |
| | | 2,750.00 | | 01/15/02 | 261846 | |
| | | 1,500.00 | | 01/15/02 | 264470 | |
| | | 1,324.57 | | 01/15/02 | 264486 | |
| | | 4,679.31 | | 06/16/03 | N/A | |
| | **Total Item #3:** | **$19,928.88** | | | | |
| 4 | **Dura Fence Corporation** | 4,204.00 | 2022 | 05/08/02 | 267596 | Service provided: Chain link fencing for 626 W. Lincoln Ave., Woodland, CA |
| | **Total Item #4:** | **$4,204.00** | | | | |
| 5 | **Ernest Heine & Associates** | 2,688.67 | 30205 | 04/01/02 | 270671 | |

Paige
EXHIBIT NO. 2
6-20-07 [initials]

CHDC00448

| ITEM # | VENDOR NAME | INVOICE AMOUNT | INVOICE NUMBER | INVOICE DATE | CHECK NUMBER | NOTES |
|---|---|---|---|---|---|---|
| | | 757.74 | 40210 | 05/01/02 | 270671 | Service provided: Analyzed design and information of orginal and revised blue prints of 626 W. Lincoln Ave., Woodland, CA with reference to the electrical supply to the premises (as installed by Ticon and West Coast Relocatables); determined such supply was sufficient and recommended corrective action. |
| | | 872.97 | 60203 | 10/02/02 | 270671 | |
| | | 302.50 | 110213 | 01/01/02 | N/A | |
| | | 1,768.67 | 60311 | 02/04/04 | N/A | |
| | Total Item #5: | $6,390.55 | | | | |
| 6 | Louis F. Flores, Attorney at Law | 750.00 | 02CHDC3 | 03/01/02 | 267511 | Service provided: Legal counsel for Ticon lien action, HVAC and electrical load supply issues for 626 W. Lincoln Ave., Woodland, CA. |
| | | 2,405.82 | 02CHDC8 | 08/02/02 | 270311 | |
| | | 331.16 | 02CHDC9 | 09/01/02 | 270311 | |
| | | 1,125.00 | 02CHDC4 | 04/01/02 | N/A | |
| | | 350.00 | 03CHDC4 | 04/01/03 | N/A | |
| | Total Item #6: | $4,211.98 | | | | |
| 7 | Phillip Huff Engineering | 750.00 | | 03/05/02 | 267595 | Service provided: Provided preliminary electrical load calculations for 626 W. Lincoln, Woodland, CA. |
| | Total Item #7: | $750.00 | | | | |
| 8 | Sierra Asphalt | 1,344.50 | | 04/01/02 | 263533 | Service provided: As required by City of Woodland for use permit, sealed and striped parking area for 626 W. Lincoln Ave., Woodland, CA. |
| | | 1,524.50 | | 03/26/02 | 264499 | |
| | Total Item #8: | $2,869.00 | | | | |
| 9 | Ticon Construction - West Coast Relocatables | 32,929.00 | | 12/18/01 | 260918 | Service provided: Sprinkler system and cabinet work for 626 W. Lincoln Ave., Woodland, CA. |
| | | 2,928.00 | | 01/28/02 | 261568 | |
| | Total Item #9: | $35,857.00 | | | | |

CHDC00449

Page 2 of 6

Cost Detail CHDC HS Transition Budget G 3-17-05.xls
4/21/2004

| ITEM # | VENDOR NAME | INVOICE AMOUNT | INVOICE NUMBER | INVOICE DATE | CHECK NUMBER | NOTES |
|---|---|---|---|---|---|---|
| 10 | **Walsh Construction** | 8,490.00 | 130299-035 | 04/10/02 | | Service provided: Produced report and punch list identifying incomplete and deficient work completed by Ticon and/or West Coast Relocatables at 626 W. Lincoln Ave., Woodland, CA. |
| | **Total Item #10:** | **$8,490.00** | | | | |
| 11 | **Ticon Construction** | 100,800.00 | Principle | 03/01/04 | | Service provided: Ticon lien action - settlement, principle and interest, for 626 W. Lincoln Ave., Woodland, CA. |
| | | 40,847.00 | Interest | | | |
| | **Total Item #11:** | **$141,647.00** | | | | |
| 12 | **Louis F. Flores, Attorney at Law** | 900.00 | 03CHDC8 | 08/01/03 | N/A | Service provided: Legal counsel for Ticon lien action for 626 W. Lincoln Ave., Woodland, CA. |
| | | 4,275.00 | 03CHDC9 | 09/01/03 | N/A | |
| | | 1,162.50 | 03HS/EHS1 | 10/01/03 | N/A | |
| | | 1,012.50 | 03HS/EHS2 | 11/01/03 | N/A | |
| | | 975.00 | 03HS/EHS3 | 12/01/03 | N/A | |
| | | 2,137.50 | 04HS/EHS1 | 01/02/04 | N/A | |
| | | 1,616.07 | 04HS/EHS2 | 02/01/04 | N/A | |
| | **Total Item #12:** | **$12,078.57** | | | | |
| 13 | **Law Office of Robert W. Scharf** | 4,017.00 | PE: 04-21-04 | 04/21/04 | N/A | Service provided: Legal counsel for Ticon lien action for 626 W. Lincoln Ave., Woodland, CA. |
| | | 4,043.50 | PE: 03-29-04 | 04/21/04 | N/A | |
| | | 5,421.00 | PE: 01-18-04 | 04/21/04 | N/A | |
| | | 4,601.04 | PE: 12-22-03 | 01/06/04 | N/A | |
| | | 2,574.00 | PE: 11-25-03 | 12/03/03 | N/A | |
| | | 1,884.43 | PE: 10-23-03 | 12/03/03 | N/A | |
| | | 2,925.00 | PE: 09-24-03 | 12/03/03 | N/A | |
| | | 5,549.25 | PE: 08-31-03 | 09/02/03 | N/A | |





CHDC00450

| ITEM # | VENDOR NAME | INVOICE AMOUNT | INVOICE NUMBER | INVOICE DATE | CHECK NUMBER | NOTES |
|---|---|---|---|---|---|---|
| | | 5,643.05 | PE: 07-24-03 | 07/24/03 | N/A | |
| | | 2,730.00 | PE: 05-31-03 | 07/24/03 | N/A | |
| | | 7,243.50 | PE: 04-25-03 | 07/24/03 | N/A | |
| | | 2,846.50 | PE: 01-31-03 | 07/24/03 | N/A | |
| | | 4,153.50 | PE: 11-14-02 | 07/24/03 | N/A | |
| | | 4,804.80 | PE: 09-17-02 | 07/24/03 | N/A | |
| | | 1,930.50 | PE: 07-17-02 | 07/24/03 | N/A | |
| | | 1,990.00 | PE: 07-17-02 | 07/24/03 | N/A | |
| | | 2,808.00 | PE: 04-22-02 | 07/24/03 | N/A | |
| | **Total Item #13:** | **$65,165.07** | | | | |
| **14** | **Malovos & Mendoza, LLP** | 400.00 | | 12/30/03 | 107006 | Service provided: Mediation services for Ticon |
| | | 300.00 | | 12/19/03 | 107261 | lient action |
| | **Total Item #14:** | **$700.00** | | | | |
| **N/A** | **Louis F. Flores, Attorney at Law** | 5,000.00 | | | | Estimate of costs of future legal services on behalf of CHDC regarding Head Start & Early Head Start for Yolo County. |
| | **Total:** | **$5,000.00** | | | | |
| **N/A** | **Law Office of Robert W. Scharf** | 5,000.00 | | | | Estimate of costs of future legal services on behalf of CHDC regarding Head Start & Early Head Start for Yolo County. |
| | **Total:** | **$5,000.00** | | | | |
| **15** | **Personnel Greivance of Lilia Moran** | | | | | CHDC was sued by AFSCME on behalf of Lilia Moran. a Head Start employee, for wrongful |

| ITEM # | VENDOR NAME | INVOICE AMOUNT | INVOICE NUMBER | INVOICE DATE | CHECK NUMBER | NOTES |
|---|---|---|---|---|---|---|
| | **Settlement to Lilia Moran** | 15,000.00 | | 07/14/03 | N/A | termination of employment from the Head Start program. CHDC, through the its legal representation (Long & Levitt) assigned by the D&O (Directors & Officers) insurance carrier, chowse to settle the claim rather than pursue further legal action. The deductible for the D&O for CHDC is $50,000.00. |
| | **Long & Levit LLP** | 12,095.10 | 222316 | 03/07/03 | N/A | |
| | | 4,691.31 | 223078 | 05/13/03 | N/A | |
| | | 5,641.16 | 224019 | 08/31/03 | N/A | |
| | **Total Item #15:** | **$37,427.57** | | | | |
| **16** | **Personnel Grievance of Karen Trejo** | 17,953.34 | 222317 | 03/07/03 | N/A | CHDC was sued by Karen Trejo, a Head Start employee, for wrongful termination. The case is not yet settled and is pending further litigation. Again, CHDC has been assigned legal representation, Long & Levit, by the D&O insurance carrier. |
| | **Long & Levit LLP** | 8,494.64 | 223079 | 05/13/03 | N/A | |
| | | 3,272.70 | 223906 | 08/13/03 | N/A | |
| | **Total Item #16:** | **$29,720.68** | | | | |
| **N/A** | **Personnel Grievance of Karen Trejo**<br>**Settlement to Karen Trejo**<br>**Long & Levit LLP** | 20,279.00 | | | | Estimate of settlement costs and attorney fees for personnel action of Karen Trejo |
| | **Total:** | **$20,279.00** | | | | |
| **N/A** | **Property Appraisal Fee** | 20,000.00 | | | | Estimate of property appraisal fee to determine the value of the CHDC real property interest of 626 W. Lincoln Ave., Woodland, CA. |
| | **Total:** | **$20,000.00** | | | | |
| **17** | **Buren W. Krhaling & Bernice R. Krahling** | 17,582.60 | $1,758.26 monthly - Term: | 12/03 - 09/04 | | Buy out of lease for former Head Start class room site at 475 Matmor Rd., Woodland, CA. Rent increase for 2004/2005 and 2005/2006 estimated |
| | | 21,542.20 | $1,795.18 monthly - Term: | 10/04 - | | |

CHDC00452

| ITEM # | VENDOR NAME | INVOICE AMOUNT | INVOICE NUMBER | INVOICE DATE | CHECK NUMBER | NOTES |
|---|---|---|---|---|---|---|
| | | 21,994.55 | 09/05<br>$1,832.88 monthly - Term: 10/05 - 09/06 | | | at 2.1%. |
| | Total Item #17: | $61,119.35 | | | | |
| | GRAND TOTAL: | $492,947.95 | | | | |

CHDC00454

CALIFORNIA HUMAN DEVELOPMENT CORPORATION
FORM 424 BUDGET -- Regular Close Out
HEAD START AND EARLY HEAD START CLOSEOUT

CLOSE OUT PERIOD:

FROM: 9/1/2003
TO: 8/30/2004

| OBJECT CLASS CATEGORIES | | |
|---|---|---|
| SALARIES | $42,973.22 | SCHEDULE A |
| FRINGE BENEFITS | $7,232.94 | SCHEDULE A |
| TRAVEL | $0.00 | |
| EQUIPMENT | $0.00 | |
| SUPPLIES | $800.00 | |
| CONTRACTUAL | $0.00 | |
| OTHER | $128,029.71 | |
| TOTAL DIRECT CHARGES | $179,035.88 | |
| INDIRECT CHARGES | $17,903.59 | |
| TOTALS | $196,939.47 | |

| COMBINED data for consolidated form 424 OBJECT CLASS CATEGORIES | |
|---|---|
| SALARIES | $42,973 |
| FRINGE BENEFITS | $7,233 |
| TRAVEL | $0 |
| EQUIPMENT | $0 |
| SUPPLIES | $800 |
| CONTRACTUAL | $0 |
| OTHER | $612,616 |
| TOTAL DIRECT CHARGES | $663,621 |
| INDIRECT CHARGES | $17,904 |
| TOTALS | $681,525 |

CALIFORNIA HUMAN DEVELOPMENT CORPORATION
FORM 424 BUDGET -- Extraordinary Close Out
HEAD START AND EARLY HEAD START CLOSEOUT

CLOSE OUT PERIOD:

FROM: 9/1/2003
TO: 6/30/2004

| OBJECT CLASS CATEGORIES | |
|---|---|
| SALARIES | |
| FRINGE BENEFITS | |
| TRAVEL | |
| EQUIPMENT | |
| SUPPLIES | |
| CONTRACTUAL | |
| CONSTRUCTION | |
| OTHER -- To Date | |
| Unreimbursed Construction | $91,388.31 |
| Lease Assignment and Lien Legal and mediation | $73,875.07 |
| HR Settlements | $67,148.00 |
| Sub Total OTHER -- To Date | $232,411 |
| OTHER -- Contingent | |
| Lease Assignment and Lien Lega | $10,000.00 |
| Ticon Lien | $141,647.00 |
| Appraisal | $20,000.00 |
| Krahling Lease Buyout | $60,248.00 |
| HR Settlements | $20,279.00 |
| Sub Total OTHER -- Contingent | $252,174.00 |
| TOTAL DIRECT CHARGES | $484,585 |
| INDIRECT CHARGES | $0 |
| TOTALS | $484,585 |
| FEDERAL REQUST | $681,525 |

CHDC00455

**CALIFORNIA HUMAN DEVELOPMENT CORPORATION**
**FORM 424 BUDGET**
**HEAD START AND EARLY HEAD START CLOSEOUT**

**DETAIL FOR OTHER COSTS**

| | | |
|---|---|---|
| OCCUPANCY | $9,000.00 | |
| POSTAGE AND SHIPPING | $945.00 | |
| COMMUNICATIONS | $1,440.00 | |
| PRINTING AND DUPLICATION | $500.00 | |
| PROFESSIONAL SERVICES | $2,250.00 | |
| INSURANCE | $2,600.00 | |
| LEGAL | | |
| EQUIPMENT LEASE BUYOUTS | $51,970.61 | SCHEDULE B-1 |
| HEAD START REQUEST 11 | $1,454.08 | |
| EARLY HEAD START REQUEST 11 | $1,807.81 | |
| SPRINT CELL PHONES | $5,462.21 | SCHEDULE B-2 |
| COPIER MAINTENANCE AGREEMENT | $5,600.00 | |
| UNRECONCILED INSURANCE | $15,000.00 | |
| AUDIT | $30,000.00 | |
| | | |
| **TOTAL OTHER COSTS** | **$128,029.71** | |

10/25/04
Paul

California
Human Development
Corporation

No one leaves with empty hands.

Joe Benatar, Chair Christopher Paige, Interim President/CEO

October 22, 2004

Mr. Marty Tom
Department of Health and Human Services
50 United Nations Plaza, Room 464
San Francisco, CA 94102

Dear Marty:

Enclosed is an appeal, which CHDC submitted to the Departmental Appeals Board on October 21, 2004. I wanted to ensure that you and your office had a copy.

If you have any questions regarding the appeal or if I can assist with any matters referenced in the enclosed documents, please do not hesitate to contact me.

Sincerely,

Christopher Paige
Interim President/CEO

Cc CHDC Board of Directors
Lou Flores
Bob Scharf
Irma Cordova

Paige
EXHIBIT NO. Y
6-22-07

Central Office: 3315 Airway Drive, Santa Rosa, CA 95403 – www.chdcorp.org
Tel.: 707.523.1155 – Fax: 707.523.3776

California
Human Development
Corporation

No one leaves with empty hands.

*Joe Benatar, Chair* *Christopher Paige, Interim President/CEO*

October 20, 2004

Department of Health and Human Services,
Departmental Appeals Board, MS6127,
Appellate Division,
330 Independence Ave., S.W.
Cohen Building, Room G-644
Washington, DC 20201.

**Re:** Close Out HHS/ACF Head Start # 09CH0200/14

To The Appeals Clerk:

At their regularly scheduled meeting held on September 11, 2004, the California Human Development Corporation (CHDC) voted to adopt a resolution directing Chris Paige, Interim CEO, to file an appeal to the HHS/ACF decision on the Close Out process and close out costs awarded for the above referenced Head Start Grant. Attached is a copy of the HHS/ACF final determination letter. Although this letter advises CHDC that the HHS/ACF close out action is not appealable, CHDC respectfully disagrees and files this appeal to be heard by this reviewing body.

**Short Statement of Facts:**

California Human Development Corporation, a longstanding Head Start and Early Head Start grantee, with the support of HHS/ACF Program Improvement Grant entered into a contract with West Coast Relocatables to construct a Head Start/Early Head Start facility located at 626 Lincoln Street in Woodland, California. During the construction of the facility there were unanticipated fees, and additionally the primary contractor WCR lost their contractor's license and therefore subcontracted work to another firm, Ticon Construction, Inc. (Ticon). During the course of construction, CHDC, aware that the PRI grant was insufficient to complete the building, approached HHS/ACF for additionally PRI funds, which were, for the most part denied. Consequently, CHDC, acting as trustee for the benefit of the program, children and parents, had to expend its own resources to bring the building to completion and ensure licensing as a Head Start facility. Near the end of building completion CHDC discovered that some of the work – especially relating to the power supply and heating and air conditioning systems had not been performed adequately. CHDC, therefore, withheld payment to a final invoice from Ticon. Subsequently, Ticon placed a mechanics lien on the building and sued CHDC to recover these funds.

*Central Office: 3315 Airway Drive, Santa Rosa, CA 95403 – www.chdcorp.org*
*Tel.: 707.523.1155 – Fax: 707.523.3776*

On or about June 13, 2003 after a fiscal review of the project HAS/ACF presented, via facsimile, CHDC with an undated document titled, "Draft" Final Audit disallowing a large portion of the expended funds. HHS/ACF offered, however, in July of 2003, to not "issue the disallowance" or in any "other manner pursue the disallowances" if CHDC relinquished the Head Start and Early Head Start Programs.

The CHDC Board of Directors, after receiving additional assurances from HHS/ACF that all reasonable and necessary close out costs would be fairly negotiated and charged to a close out grant, and that all issues relating to the transfer of title. Licenses, leases, liens claims and other transfer costs would be negotiated and resolved in the ordinary course of the close out, relinquished the HS and EHS grants in a letter dated July 25, 2003. The formal close out process began September 1, 2003.

There is a very significant gap between costs, which CHDC feels it is owed as a result of the transfer of the building lease and costs incurred by CHDC to properly close out the program, and ACF's award letter CHDC received on September 24, 2004.

**Therefore, CHDC requests relief based on the following grounds, appeals HHS/ACF final determination pursuant to 45 C.F.R. Part 16.**

A. Paragraph 2,3, and 4 of the final determination letter states; (Begin Quote) "ACF did not approve extraordinary construction related costs connected with the facility at 626 West Lincoln Street, Woodland, California, All of these costs were prior period costs which may only be assigned to the period in which the cost was incurred [Title 45 Code of Federal Regulations (CFR) Part 74.28, Period of Availability of Funds]. Consequently, none of the costs qualify for closing costs during the budget period of July 1, 2003 through August 31, 2004, In addition, in most if not all cases, ACF specifically denied approval of CHDC budgetary revisions (45 CFR 74.25, Revisions of Budgets) requesting approval of the cost during or subsequent to the budget period in which the cost was incurred.

ACF also did not approve the budget for the Ticon lien settlement, as this cost pertains to CHDC Violations of the terms and conditions of the grant. Our General Counsel's letter of July 7, 2004 provides additional bases for the disapproval of this category.

ACF did not approve funds in the amount of $20,000 for the property appraisal of the Woodland facility. An appraisal is not necessary given that CHDC did not own the facility and that ACF exercised its right to transfer the facility to an interim grantee." (End Quote)

1. CHDC's lease is entitled to compensation for its attributable percentage of the current fair market value of the real property (i.e., the share of the leasehold and the improvements to the leasehold of the Head Start Building and improvements constructed by CHDC under **Grant # 09CH020011**). In accordance with 45 C.F.R. Part 74 § 74.32, and 45 C.F.R. § 74.34(c)(3), CHDC transferred its lease and improvements, in accordance to instructions by Department of Human and Health Services/Administration for Children and Families (HHS/ACF) **which includes CHDC's own in-kind share and expenditures for the lease and construction and improvements.** HHS/ACF advised CHDC that it would not proceed with the closeout process until this lease transfer was completed. The grant provided an original amount of $1,013, 900.00 in federal funds and $245,475,00 in matching fees for these construction improvements. The transfer was made notwithstanding the fact that CHDC paid $70,729.88 towards the construction of

the various improvements that were required for the completion of the building and for the health and safety of the Head Start children, families and staff. For example, the grant and the subsequent construction contract did not include off-site electrical power development costs. In addition to these funds, Ticon demanded $172,823.63 in its lien action in court for unpaid improvement and construction costs. The total construction and improvement costs were $1,502,932.51. HHS/ACF denied a close out request of $20,000 to determine the fair market value of the lease and improvements. HHS/ACF **did not conduct any appraisal to determine the fair market value of the improvements**, did not advise CHDC of any determination of any fair market value and summarily dismissed CHDC's claim without providing a factual and legal basis for denial of the claim. CHDC believes that a proper fair market appraisal would determine that the lease and construction and improvements, at a minimum, would have a fair market value of the total cost of the improvements, including the costs involved in the lien action described below, $1,502,932.51, plus the value of appreciation, if any, and less the value of depreciation, if any, over the past three years. CHDC would be entitled to approximately 82.54% of the fair market value of the lease and construction and improvements. CHDC's percentage share includes (if not reimbursed under other remedies) all professional fees incurred in providing and defending title. Contrary to HHS/ACF determination that CHDC did not own the facility, title to the improvements vests in the grantee in accordance with 45 CFR Part 74.34. HHS/ACF has an obligation, pursuant to 45 CFR Part 74.34(c)(3), to pay CHDC its share of the construction and construction and improvements. See also **Brown Magnolia Community Development Corporation**, DAB Decision No. 1917 (2004); **Oakwood Child Development Center, Inc.**, DAB No. 1092 (1989); **Kauai Terminal Ltd. v. Commissioner**, 36 B.T.A. 393 (1937) regarding capitalization of expenditures that produce intangible future; **JJ Case Co. V. United States**, 32 F. Supp. 754 (Ct. Cl. 1940) for capitalization of payments paid another to relinquish a claim to title.

2. The original grant amount approved by HHS did not include the costs for off-site electrical power and **omitted the development fees** required by the city of Woodland, California. CHDC entered into a contract with West Coast Relocatables, Inc (WCR) (general contractor on the improvement construction set forth in paragraph 1 and 2). CHDC tried to obtain an exemption from the city on the basis that this was a federal government building. After an opinion from the Woodland City legal counsel clearly indicating that this type of construction funded by the federal government was **not** exempt, CHDC, out of grant funds, paid the development fees in the amount of $58,000. HHS/ACF did not approve this expenditure because CHDC did not seek prior approval of the payment. OMB A-122 requires that in order to be allowable charges to a grant award, costs must be reasonable for the performance of the grant award and allocable thereto. HHS/ACF has not granted retroactive approval. OMB Circular A-122, Att. A, (A)(1)(a) provides that a request for retroactive approval should be granted, if the approval would have been originally given. See also **East Bay Perinatal Council**, DAB no. 1793 (2001).

3. In the same CHDC - WCR contract, WCR did not include a fire sprinkler system for the building, which is required under California law for buildings constructed for child care operations and Head Start facilities. After construction began, the Woodland City Fire Department advised both WCR and CHDC that it would "red tag" construction, prohibiting further construction, until a building permit was obtained and a fire sprinkler system installed in the building. Out of grant funds, CHDC paid the necessary amount,

[redacted], to have the fire sprinkler system installed in the building. HHS/ACF did not approve this expenditure because CHDC did not seek prior approval of the payment. Again, we seek the guidance of OMB A-122, Att. A, (A)(1)(a) which requires that in order for a charge to be allowably charged against a grant award, costs must be reasonable for the performance of the grant award and allocable thereto. OMB Circular A-122, Att. A, (A)(1)(a) provides that a request for retroactive approval should be granted, if the approval would have been originally given. See also **East Bay Perinatal Council**, DAB no. 1793 (2001).

4. The original **grant did not include funds to provide a concrete pad** for the playground for the children. This playground **is required** in the program. Out of grant funds, CHDC paid the necessary amount, [redacted] to install the concrete pad. HHS/ACF did not approve this expenditure because CHDC did not seek prior approval of the payment. OMB A-122 requires that in order to be allowable charges to a grant award, costs must be reasonable for the performance of the grant award and allocable thereto. HHS/ACF has not approved retroactive approval. OMB Circular A-122, Att. A, (A)(1)(a) provides that a request for retroactive approval should be granted, if the approval would have been originally given. See also **East Bay Perinatal Council**, DAB no. 1793 (2001).

5. The original grant **did not include funds to provide for chain link fence on the property for protection of the children and staff.** Out of grant funds, CHDC paid the necessary amount, [redacted] to install the chain link fence, as this fence was required by both State of California licensing and program regulations. HHS/ACF did not approve this expenditure because CHDC did not seek prior approval of the payment. OMB A-122 requires that in order to be allowable charges to a grant award, costs must be reasonable for the performance of the grant award and allocable thereto. HHS/ACF has not approved retroactive approval. OMB Circular A-122, Att. A, (A)(1)(a) provides that a request for retroactive approval should be granted, if the approval would have been originally given. See also **East Bay Perinatal Council**, DAB no. 1793 (2001).

6. The original grant **did not include funds to provide the necessary paving, sealing and stripping of the parking lot on the property.** These parking lot improvements are required by Woodland City ordinances for this time of construction and improvements. Out of grant funds, CHDC paid the necessary amount, [redacted], to perform the necessary parking lot improvements. These improvements are required before an occupancy permit is issued.

7. For this construction project, before an occupancy permit was issued, **a review of the construction is needed to satisfy the city of the completeness of the project.** Ticon, the subcontractor for the construction and improvements would not conduct this review. CHDC brought another contractor who **provided a report and a punch list of the unfinished needs for the purpose of obtaining a temporary occupancy permit.** Out of grant funds, CHDC paid the necessary amount, [redacted] to have this report and punch list prepared. HHS/ACF did not approve this expenditure because CHDC did not seek prior approval of the payment. OMB A-122 requires that in order to be allowable charges to a grant award, costs must be reasonable for the performance of the grant award and allocable thereto. HHS/ACF has denied retroactive approval. OMB Circular A-122, Att. A, (A)(1)(a) provides that a request for retroactive approval should be

granted, if the approval would have been originally given. See also **East Bay Perinatal Council**, DAB no. 1793 (2001).

8. **ACF did not approve nor subsequently provide for architect fees in the Program Improvement Grant and, therefore, in the CHDC - WCR contract.** CHDC hired a "Clerk of the Works" to oversee the progress and suitability of the construction progress. CHDC paid $[redacted] for the Clerk of the Works out grant without seeking prior approval. When approval was sought, HHS/ACF did not approve nor has retroactive approval been granted. OMB A-122 requires that in order to be allowable charges to a grant award, costs must be reasonable for the performance of the grant award and allocable thereto. HHS/ACF has not granted retroactive approval. OMB Circular A-122, Att. A, (A)(1)(a) provides that a request for retroactive approval should be granted, if the approval would have been originally given. See also **East Bay Perinatal Council**, DAB no. 1793 (2001).

Legal and other professional services are allowable service costs pursuant to OMB Circular A-122, Attachment B, 10(e) and 37. Professional and legal fees were incurred to protect title to the lease and property, and to enforce the construction contract, all of which were reasonable in relation to the program activities and improvement grants. These expenses under generally acceptable accounting principles provided long term and lasting benefits to the leasehold and improvements which should be capitalized and therefore increase CHDC's proportionate share of the leasehold and improvements assigned by HHS/ACF. See **Kauai Terminal Ltd. v. Commissioner**, 36 B.T.A. 393 (1937) regarding capitalization of expenditures that produce intangible future benefits; **JJ Case Co. V. United States**, 32 F. Supp. 754 (Ct. Cl. 1940) for capitalization of payments paid another to relinquish a claim to title.

9. Pursuant to 45 CFR Part 74.37, **CHDC is a trustee for the construction and improvements herein above described.** As trustee, under 45 CFR Part 74.37 and California law, CHDC was required to protect the property for the beneficiaries of the project or program, the health and safety of the Head Start children, families and staff and to insure that the improvements would be available for use as a Head Start facility for the full period of the lease, twenty years. As trustee CHDC, under trustee law, is obligated and authorized to spend the necessary funds to protect and improve the trust property so that the trust purposes were assured. CHDC has to act as a prudent person would act in such actions and did so when it assured the lease was protected for the program and when it assured that the health and safety laws and improvements were finished in order to assure uninterrupted program operation. Moreover, as trustee CHDC has a lien against the assets and is entitled to be reimbursed for advancing these expenditures. In other words, as trustee CHDC's proportionate share is not increased by these expenditures, but rather HHS/ACF is obligated to reimburse CHDC as trustee for these expenses in proportion to the original 80/20 ownership interests. The expenditures claimed are summarized as follows:

a. The Clerk of the Works informed CHDC **that electrical power provided for the construction and improvements was insufficient.** CHDC asked Louis Flores, an attorney with a master's degree in Electrical Engineering to investigate the depth of the problem. The Clerk of the Works contacted a licensed electrical engineer to conduct a preliminary investigation and calculation of the electrical

power required and the electrical power supplied. The licensed electrical engineer's conclusion was that the electrical engineer's conclusion was that the electrical power supplied did not meet the requirements. The funds spent for this assessment were[redacted] Tragically, the clerk of the Works passed away within two days of this determination.

b. For convenience, another licensed electrical engineer **was contacted and requested to provide solution for bringing the supplied power to the required power needs** This electrical engineer provided a complete plan for bringing the electrical power to required needs and incidentally to meet code requirements. The funds required to provide this plan were[redacted]. The funds needed to install the new electrical power system were estimated to be $78,700.

c. The **investigator noted that the HVACs installed were smaller in size than what had originally been set forth in the building plans.** A licensed mechanical engineer was asked to provide an analysis on the adequacy of the HVACs. This engineer's report determined that the HVAC's are not sufficient. The funds required to provide this report were [redacted] The funds needed to install the proper HVACs were estimated to be approximately $35,000.

d. The investigator costs for investigating electrical power deficiencies and HVAC problems and for conferring with the licensed engineers employed were $1,875.

e. On **June 3, 2003, TICON initiated legal action against CHDC to perfect a previously filed lien,** Litigation in Ticon Construction, Inc. vs. James Naekel, et. al. (California Human Development Corporation), Yolo County Superior Court No. CV02-899, asked the court to; (1) award it $172,823.63 for the unpaid construction costs, together with interest provided by law: (2) perfect its lien against the real property, leasehold interest, and the work of improvement. CHDC defended against this action and, in accordance with its lease agreement assisted the landlords in their defense (which was a contract obligation under the lease). CHDC expended legal fees which assisted the landlords in prevailing at trial and were dismissed, which freed their title from the lien claims. Later, in accordance with court rules and procedures, a settlement conference was arranged for the remaining parties. The settlement conference was conducted by an independent mediator, who was selected by the remaining parties in accordance with the rules of court. At the settlement conference, CHDC was represented by four board members, appointed by the full board, together with CHDC's CEO and its legal counsel. The mediation was conducted over the period of one day. In acting as prudent trustee and defending against this action, CHDC spent [redacted]sts.

Pursuant to 45 CFR Part 74.37 and trustee law, **CHDC is entitled to a determination that it acted as a prudent person would have acted in the same circumstances.** [redacted] **of** [redacted]

10. **HHS/ACF denied CHDC's request to pay for the settlement reached between CHDC and Ticon in the aforementioned legal action.** In accordance with court rules and procedures, a settlement conference was arranged for the parties remaining after the issuance of the Summary Judgment motion. The settlement conference was conducted by an independent mediator, who was selected by the remaining parties in accordance with the rules of court. At the settlement conference, four board members, appointed by the full board, together with CHDC's CEO and its legal counsel represented CHDC. The mediation was conducted over the period of one complete day and on all the information presented at the conference, together with the mediators expressed thoughts and on the advice of outside counsel, the attending board members settled the litigation for an amount of $100,800 plus interest at the rate of 10% per annum to be paid in equal monthly payments over a period of twelve years and recommended to the full board that it accept and ratify this settlement, which the full board did at a regularly scheduled meeting. The settlement if allowed to come to full term will be the amount of $141,740. The present amount required to pay the settlement is $96,396.26. CHDC has also paid $3,964.90 in interest in this settlement. This settlement comes within the meaning of OMB Circular A-122, Attachment A, Section 3(a) and **Butler County Children's Center, Inc.**, DAB No. 1106 (1989). HHS/ACF has not conducted the analysis required by OMB Circular 110 and without analysis denied CHDC request for funds to pay this settlement. Again, see **Kauai Terminal Ltd. v. Commissioner**, 36 B.T.A. 393 (1937) regarding capitalization of expenditures that produce intangible future benefits; **JJ Case Co. V. United States**, 32 F. Supp. 754 (Ct. Cl. 1940) for capitalization of payments paid another to relinquish a claim to title. In other words, when these expenditures incurred by CHDC are capitalized the value of the real asset increases and HHS/ACF is required to compensate CHDC in proportion to the proportionate interests.

**B.** Partial Approval for the Employment Litigation of Moran and Trejo settlements as shown in the table "CHDC Approved Closeout Costs, August 29, 2004"

1. **Lilia Moran settlement:** Lilia Moran (Moran), a former employee of CHDC in the Head Start program, was terminated from her employment for cause by CHDC. Moran employed all CHDC grievance procedures, which upheld her termination. Moran, through her union representative filed an unfair labor practice claim with the National Labor Relations Board, which denied her claim after investigation. Moran filed an action in court on her claim of wrongful termination. CHDC turned the action to its insurance carrier who appointed outside counsel to defend the action. After discovery, and investigation by outside legal counsel and discussions with plaintiff's counsel, outside counsel recommended that CHDC settle the claim. Following the advice, CHDC settled the matter. The costs for the settlement and the attorney fees are $37,427.57. HHS/ACF has offered to pay only the amount of $18,571.00. CHDC alleges that this settlement comes within the meaning of OMB Circular A-122, Attachment A, Section 3(a) and **Butler County Children's Center, Inc.**, DAB No. 1106 (1989). HHS/ACF has not conducted the analysis required by OMB Circular 110 and without analysis denied $18,856.57 of the request for $ 37,427.57 to fully cover the costs of this settlement.

2. **Karen Trejo settlement:** Karen Trejo (Trejo), a former employee of CHDC in the Head Start program was terminated from her employment for cause by CHDC. Trejo employed all CHDC grievance procedures, which decided to retain Trejo in employment provided Trejo agreed to work in a different job category than her previous job

description. CHDC counsel, meeting with Trejo's counsel, arrived at a possible settlement, however Trejo backed out of the settlement at the last minute. Trejo filed an action in court on her claim of wrongful termination. CHDC's insurance carrier appointed outside counsel to defend this action. A possible settlement has been reached but not completed. ACF has offered $3,273.00 as allowable costs in this matter. CHDC wants this matter continued until the settlement is finalized, or in the alternative for ACF to pay the amount of $49,720.68, which is the sum under consideration settlement discussions plus attorney's fees. CHDC alleges that this settlement comes within the meaning of OMB Circular A-122, Attachment A, Section 3(a) and **Butler County Children's Center, Inc.**, DAB No. 1106 (1989). HHS/ACF has not conducted the analysis required by OMB Circular 110 and without analysis denied CHDC request for $49,720.68 to cover this settlement.

C.. Paragraph 4 of page 3 dealing with the Krahling lease; "We also did not approve lease buyout costs ($60,248) associated with the Krahling lease for the Matmor site, because the site was unsuitable for habitation, as outlined in our General Counsel's letter of July 7, 2004."

1. On the transfer of the program to CDI, CHDC was instructed by HHS/ACF to assign a lease with Buren and Bernice Krahling (Krahling). CDI, unilaterally and unbeknownst to CHDC, attempted to create an assignment of the lease with Krahling. Krahling signed an assignment for only one month. CHDC contacted CDI's attorney to work out the assignment. After initial discussion, CDI thereafter did not respond to CHDC correspondence. CHDC proposed an assignment with Krahling with a copy to CDI. Krahling accepted the proposed assignment. CDI did not respond. After a period of time, CDI's attorney requested to talk directly with Krahling. Although CDI contacted Krahling, discussions were not extensive and no assignment was effected. CDI in November 2003, unilaterally and without following the procedure provided by California law which licenses and approves sites for the operation of programs such as Head Start and child care centers, abandoned the Krahling leased property. California law requires that real property sites to be used for programs such as Head Start and child care centers be approved d licensed by the California Department of Social Services. A request to this department with allegations of unsuitable habitation would have resulted in an investigation by this department. With a finding of unsuitable habitation, the landlord could then be confronted to make the premises suitable. California law does not automatically allow abandonment for reasons of not suitable habitation, however a court could be more likely approve abandonment when issues of health and safety are at issue. The Krahling lease remains in effect. **HHS/ACF has not provided the necessary funds to pay off the lease nor, has it provided resources to have CHDC work out an arrangement with Krahling on the lease or in the alternative to bring an action in the appropriate court to ratify the abandonment.** The remaining lease provisions could require, under California Landlord/tenant law, CHDC to pay of the remaining rent in the lease in the amount of approximately $60,248.00. Such action by the landlord could also result in other damages provided by law for the unilateral abandonment. HHS/ACF is obligated for its share of the lease buyout obligations which should be capitalized under generally accepted accounting principles. See **Peerless v. Commissioner**, 52 T.C. 850 (1969); **Rodeway Inns of America v. Commissioner**, 63 T.C. 414 (1974). In other words, these buyout expenditures when capitalized are part of the property asset basis, and HHS/ACF is required to reimburse for its proportionate share of these capital asset upon transfer or disposition under the CFR's.

<u>D.</u> HHS/ACF did not follow the procedures set forth in 45 CFR Part 74.90(d) in that HHS/ACF did not inform CHDC of its right to an appeal and describe the process for filing an appeal.

<u>E.</u> CHDC appeals the disapprovals by HHS/ACF set forth in its letter at paragraphs 4 and 5 on page 2.

"Disapproved ordinary closing costs were for copier and cell phone lease buyouts, as well as for indirect costs. We did not approve the two copier lease buyouts totaling $51,970.61 because ACF did not approve funds for equipment in award'. number 09CH0200/13, amendment 00.

ACF did not approve the cell phone lease buyout of $5,462.31 because CHDC did not provide documentation showing that a valid obligation existed. Based on information from the November 2002 PRISM review, ACF was advised by CHDC that the cell phone lease had been cancelled. As a result, ACF requested on July 14, 2004, that CHDC provide evidence of a valid obligation for this lease. CHDC replied In August 19, 2004 e-mail that the cell phones were needed for field use at the time the lease was executed. Since CHDC did not satisfy our request for evidence of a valid obligation, ACF did not award the cell phone buyout funds."

1. HHS/ACF disapproved the buyout of the copiers lease because "ACF did not approve funds for equipment in award number 09CH0200/13, amendment 00." However, the budget did contain an item for equipment leasing. The copiers were used in both the Head Start and Early Head Start programs. On relinquishment of the program CHDC requested CDI to accept the lease. As with the real property leases, CDI refused to accept an assignment for the lease and HHS/ACF made no effort to assist in the reassignment of the lease.

2. CHDC leased the cell phones, at the suggestion of ACF program staff, for use by the Family Specialists, many who were women, while conducting in-home interviews. These workers were out in rural areas visiting homes sometimes late and into the early evening. HHS/ACF denied this request on the basis of "CHDC did not provide documentation showing that a valid obligation existed" and "CHDC did not satisfy our request for evidence of a valid obligation." **CHDC submitted documentation In response to HHS/ACF's request**; however, neither the final determination letter nor any other correspondence from HHS/ACF addressed the documentation submitted by CHDC.

CHDC **requests a formal hearing on this matter to present witnesses as necessary.** CHDC requests that this hearing be held in the Federal Building in Sacramento, California, which is approximately thirty (30) miles from Woodland, California where the improvements are located.

//
//
//
//
//

All of the possible witnesses in this matter are within one hundred (100) miles of Sacramento, California.

Louis F. Flores, Esq. and Irma P. Cordova, Esq. will represent CHDC in this matter.

Sincerely,

Chris Paige
Interim President/CEO
California Human Development Corporation
3315 Airway Drive
Santa Rosa, CA 95403

cc: CHDC Board of Directors
Robert W. Scharf
Louis F. Flores
Irma Cordova

Attachment: ACF Final Determination Letter
Relinquishment Correspondence

10

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CALIFORNIA HUMAN DEVELOPMENT
CORPORATION,
PLAINTIFF,
vs. Case No. 05-1029C
THE UNITED STATES, (Judge Williams)
DEFENDANT.
_________________________________/

DEPOSITION OF CHRISTOPHER PAIGE
Fairfield, California
Wednesday, June 20, 2007

Reported by:
STEPHANIE D. PLASKETT
CSR No. 9799
Job No. 181575

ORIGINAL

under that grant. I wasn't responsible for it.
Q. Who was the manager for it?
A. I believe Andrew Haugh, our former CFO, was the primary manager for it.
Q. Of both the grant and the construction?
A. Correct.
It's H-A-U-G-H. You probably have heard his name already.
Q. Do you know -- well, how much money did CHDC actually spend on the expansion at the Woodland site?
A. I know it was in excess of the Program Improvement Grant. I believe the amounts were captured in the extraordinary close out budget that I submitted to ACF, and I'd have to essentially refresh my memory, but it was in excess of the Program Improvement Grant.
Q. All right. Which is the $924,000?
A. Correct. It's possible there was a modification to the 924, but I remember it began at 924.
MR. BIGLER: We're off the record.
(Off the record.)
MR. BIGLER: Back on the record.
Q. At some point, did ACF -- I'm sorry.
Did CHDC relinquish the Head Start program?
A. We did.
Q. And how did that come about?

A. In July of 2003, ACF requested a meeting with the CHDC board in San Francisco. I did not attend the meeting. In fact, ACF indicated that the management staff, in particular, the CEO -- you know, our CEO, George Ortiz, were not invited. And our -- nor was our legal counsel invited, Lou Flores.

They had a meeting in San Francisco, and that meeting was -- the Board members who attended that meeting reported on the meeting at a CHDC Board meeting that was actually held here in -- later that month, in July 2003. I attended the Board meeting, so I remember that.

And at the Board meeting, they discussed an offer -- in other words, we did not initiate the relinquishment. The relinquishment was -- or the so-called relinquishment was initiated by ACF. And as I remember, the Board members had received an offer from ACF to relinquish the Head Start program and, in return, ACF would not pursue, I'll call them potential disallowances which were contained in a draft disallowance letter, not in the initial determination or the final determination; it was just a draft disallowance letter that spoke about, I guess, you know, the potential of some disallowances.

And I believe we've provided the minutes from

that meeting, but the Board members were obviously very concerned and discussed the offer at the Board meeting. And as I remember, the consensus was that the offer needed to be clarified because they had some concerns that they felt needed to be addressed before they proceeded. And they wrote a letter to ACF requesting, you know, the clarifications.

I think that -- if not the next day or the day after, very shortly thereafter, they received a letter back from ACF, it was from Jerry Gomez and Marty Tom, which largely contained the language the Board members had -- or the CHDC Board had put in their letter of concern to ACF.

Then there was another special meeting. I should say at the first meeting, I remember the discussion quite well. I believe George was adamantly opposed to relinquishing the program on the terms that ACF had offered, but the Board requested the clarification I mentioned earlier and received back -- this letter from Jerry Gomez and Marty Tom.

And within a day or two, another meeting had occurred, and a letter had gone back to ACF, accepting the offer as described by ACF. And in the meeting and in the letter -- I believe the relinquishment date established was September 1st for a program

that we had received the necessary assurances. And, personally, I felt the whole matter would be settled rather rapidly during, you know, September, October, November. The initial time frame that was projected I believe was only like 90 days to -- you know, to complete everything.

And if you look at the -- the detail on the so-called ordinary close out budget, I only budgeted for three or four months of staff time to do it all, and, as you know, the close out went on for an entire year. Or the discussions, I should say, went on for an entire year.

Q. In the letter of July 24th, it states, "CHDC will need to coordinate closely with ACF."

A. Where?

Q. I'm reading the last sentence.

A. I understand. I see it.

Q. Okay. "CHDC will need to coordinate closely with ACF to provide sufficient details to negotiate the close out costs."

What was your understanding of what would need to be negotiated?

A. My understanding of what would need to be negotiated would be the -- both the ordinary close out costs, and I gave one example, which would be, say, my

time to prepare and work with them on a close out budget; as well as the extraordinary close out costs, which I detailed in a very detailed presentation to them, which included the Ticon lien and some other costs that -- that represented essentially our investment or value added to the building.

And I took those costs directly off our fiscal system. You've, no doubt, spoken to Kevin Flores about that, but I just did a -- a -- a -- a run on the fiscal system and asked, like, what costs are outstanding? I presented those costs in a spreadsheet. I tried to provide a short rationale for the costs, which you've probably seen, in a comment for each cost item.

And subsequent to that, in March and April of 2004, I presented a -- to ACF, a very -- two very large binders that contained not only invoices, but actually the work product that was associated with the invoice. In other words, if they had any question about work performed by, for example, Axiom Engineering, I presented it to them so that they could have the Axiom Engineering, you know, report in addition to the invoice.

Q. Did ACF pay the ordinary close out costs that you referred to?

A. Not in total.

Q. Do you recall how much they did pay?
A. They paid approximately 137,000, and I believe the -- I'd have to refresh my memory, but I believe the request was somewhere around 190, something like that. I'd have to go look at that, but, no, they did not pay all the ordinary.
Q. In this lawsuit, are you seeking any additional ordinary close out costs?
A. It occurred to me, for the following reason: That when I went back to review this and submit it to your office, it occurred to me I'd worked for 12 months on this thing, and our -- and I was in this ordinary close out budget for their projected 90 days, you know, which was essentially, you know, the standard three-month close out period.
Q. So I guess -- but my question is -- I believe it was a "yes" or "no" question. Are you seeking additional ordinary close out costs in this lawsuit?
MR. CUNDRA: Objection. For the record, in terms of, I think we've indicated, at least in general, what we're seeking in this lawsuit in terms of damages. And there are some numbers, which would include items from both categories, of what have been identified as ordinary and extraordinary.
MR. BIGLER: Well, that's what I'm asking him.

THE WITNESS: I guess my answer is yes.

MR. BIGLER: Okay.

Q. What about extraordinary -- what you previously discussed as extraordinary close out costs? Did ACF pay any of those costs?

A. I believe they did, but it was a very, very minor amount. I prepared a spreadsheet, which I believe you have, that showed exactly what -- tracked the close out award of the 137 against both of those budgets.

They paid, for example, a small portion of Bob Scharf's time that was related, in their opinion, directly to the lease assignment. He was the primary person who worked with the ACF staff and Paul Johnson on the lease assignment. And they ultimately allowed a portion of the bills that he had presented to us.

Q. Do you recall how much they did pay?

A. I would have to look at the close out award. I don't recall. It was a small portion.

MR. BIGLER: We'll mark this as -- maybe we should go back.

We'll mark this as Exhibit G.

(Exhibit G marked.)

MR. BIGLER: We're back on the record.

Q. And, sir, I'm handing you what we've marked as Exhibit G. If you could take a look at it, and I'll ask

letter in response to Ms. Rinaldo's concerns?
A. I believe the term "litigation" doesn't appear in the prior letter.
Q. Was that the only thing that was done?
A. I would have to put the two side by side, but that's my memory.
MR. CUNDRA: And for the record, objection. The documents all speak for themselves.
THE WITNESS: They -- they -- they -- it's --
MR. CUNDRA: They say what they say.
THE WITNESS: I would agree with that.
Q. BY MR. BIGLER: Did you draft this letter?
A. I probably assisted, but I did not -- it was not essentially my letter. I probably assisted with kind of the word processing, because at this point, I was heavily involved in the transition process, working with ACF and with CHDC.
Q. And the Board approved, as their motion, sending out this letter?
A. Yes.
Q. Did they have this letter during the Board meeting?
A. No.
Q. Or draft, I should say?
A. No.

would be both the ordinary and the so-called extraordinary close out costs. I'd been through hundreds of grant negotiations. I think I understand both fairness and what negotiations, you know, mean.

And I understood that there would be meetings; there would be dialogue; you know, there would be give and take; there would be back and forth; and there would be resolution, but it would be resolution within the -- you know, the framework of the agreement.

Q. Were there -- you already told us about your conference call. But were there further negotiations between the parties?

A. I would say there were, but they were minimal, in my opinion.

Q. Did you attend any of the negotiations?

A. I did.

Q. What did you attend?

A. There -- basically, the only face-to-face negotiation that I'm aware occurred in the spring '04 when I was -- I had been interim CEO for about two weeks. I don't have the exact date, but it was in April of '04 -- when the -- this whole process was going exactly nowhere.

And I called up Marty I know quite well, and I said, "We need to have a meeting. We are requesting a

agreeing with it, basically? And he assured me that accepting did not mean agreeing, that we had appeal rights.

And I also asked him for the normal -- you know, what was the rationale behind the award? Because I was very upset at the time and...

Q. And what did he tell you?

A. That he would provide the rationale, which he did in approximately mid-September. As well, he advised me that I did have appeal rights and I wasn't jeopardizing anything relating to CHDC's position by accepting the award.

Q. The rationale that you received in September, was that in a -- was that a letter?

A. It was a letter.

Q. And who was it from?

A. I believe it was from Marty, the grant officer.

Q. And what was the rationale, if you recall?

A. There were rationales, plural, I think is a better way to put it.

Q. Sure.

A. The -- on certain of the ordinary costs, he felt that they weren't either reasonable or supported or documented. The primary rationale, though, on the extraordinary costs was that they were all prior period

costs.

Q. Can you explain that to me?

A. That they were costs that predated the close out period, which was, from his point of view, September 1st, 2003 to August 31st, 2004.

So effectively, with that point of view, he ruled out probably 98% of the extraordinary -- so-called extraordinary close out budget.

Q. Was that -- would you agree with that factually, that those costs were incurred prior to September 1st, 2003?

A. I would largely agree. Some of the costs were from the current period, though. Like Bob Scharf's bill related to the lease assignment would be an example. And some of the HR settlement costs from Moran and Trejo were also in the period.

With respect to the Ticon settlement at that point, that characterization would be accurate, that it was prior period.

Except I didn't -- it was interesting. Personally, I didn't even view it as a prior period cost. And maybe I can explain why. There was a mechanics lien from Ticon, and then there was a court action to settle that. And in the current period, we entered into a settlement agreement with Ticon that I

Q. BY MR. BIGLER: What was your understanding of the -- when the close out period began?
A. September 1st, 2003, for the ordinary close out.
Q. And it ended?
A. A year later.
Q. August 31st?
A. Yeah. Typically their grants are for a year, not that it couldn't be extended, and they never -- never offered or discussed the option to extend or modify the time frame.
Q. Who at CHDC would be the primary person that tried to resolve this relinquishment dispute? Would that be you?
A. It would probably be me. And as you can tell, I'm not feeling very successful.
MR. BIGLER: Well, we'll mark this as Exhibit F.
(Exhibit F marked.)
Q. BY MR. BIGLER: Sir, I've handed you what we've marked as Exhibit F. Can you tell me whether you recognize it or not?
A. I do recognize it.
Q. And what is it?
A. I believe this is the -- the draft disallowance

your comments, some portion of the initial determination goes forward and other portions do not go forward, and that results in a final determination, which you also have a chance to respond to.

And, ultimately, the final determination, if you -- if you don't like how that turns out, you also have appeal rights to, you know, appeal the disallowance.

Ultimately, if you receive a final disallowance after all the dust has settled and appealed and everything, that would be money that would be owed back to the federal government.

I do need to comment that there were numerous program audits in this period. In fact, there was one independent audit commissioned by ACF. There were Attachment P Consolidated Audits throughout this whole period. There was never a penny questioned in all those audits.

So I looked at this as just -- I can't quite characterize it correctly -- kind of an out-of-the-blue, you know, intimidation move basically.

Q. Was there -- in October or -- approximately October of 2002, was there a report done or a review done by people at ACF of the Head Start program?

A. The review that I remember was ongoing in the

travel.

MR. BIGLER: Sure.

MR. CUNDRA: We'll make that offer.

MR. BIGLER: Sure.

MR. CUNDRA: Although when he communicates with the airlines, he says he's a frequent flyer.

THE WITNESS: I'm trying to fly less frequently.

Q. BY MR. BIGLER: Part of CHDC's agreement with -- well, strike that.

We looked earlier -- we looked at three letters between ACF and CHDC, correct?

A. Correct.

Q. And in part of that, ACF stated that they would not issue that disallowance letter that we saw the draft of, correct?

A. Right.

Q. And it's true that that disallowance letter was never issued, correct?

A. Correct.

Q. Are you familiar with the contractors that worked at the Woodland site?

A. Not really, because I didn't either select them or manage them, so...

Q. Who was the prime contractor at the site or the

charged to a close out grant, and that all these issues related to the transfer of the facility title, license, liens and other lien claims will also be negotiated and resolved in the ordinary course of the close out, because at the time -- at this point in time, we'd only had one meeting, and none of the so-called extraordinary close out items had been approved or even really discussed conceptually.

And I thought it was useful to remind them of the fact that they'd made these commitments and agreements in the -- you know, the exchange of correspondence for the program transfer, relinquishment, you know, and the close out of the grant.

Q. BY MR. BIGLER: Did you believe that this paragraph that you quoted here encapsulated ACF's commitment to CHDC?

MR. CUNDRA: Objection relative to legal issues. There are other correspondence, as you know, including the one of the 25th. And asking this witness as to what and how you put these things together for a contract is beyond his expertise.

But you can give us -- he can provide his understanding about what the agreements have been.

THE WITNESS: My understanding is that it was a pretty good summary of what we'd agreed to.

Q. BY MR. BIGLER: And if you go back to the first page of this letter of July 30th, the paragraph that I read on the record earlier, the second paragraph, the first sentence, ends with the term "negotiation process."

A. Right.

Q. What did you expect should be nego- -- or what did you believe should be negotiated?

A. I believed that we should come together and, you know, at least talk reasonably about these costs. And in my opinion, we never achieved that. We had one meeting where we largely presented, they listened, and we received a -- you know, subsequent to this letter, of course, we received the close out award that didn't support any of the costs.

And I -- my feeling at the time, and still is, is that their -- the process and their decision making wasn't consistent with the original relinquishment correspondence. There was an exchange, a deal made, and I think they reneged on the deal.

Q. What did you -- what do you believe that they should have done as part of that deal that they haven't done?

A. Well, for example, their -- at the -- I've got one large item like the -- the Ticon lien or the Ticon

but I just want to look at the date.

Correct. In other words, we had -- you know, this had followed by about a month after -- you know, the -- we received the rationale. We discussed it internally and then decided on the appeal.

Q. You referred earlier to -- and it's in some of the documentation -- the term, "fairly negotiate" --

A. Right.

Q. -- "the close out"?

A. Right.

Q. And you stated that you believed, under the agreement that you felt you had with ACF, that they should have paid for the -- some of the extraordinary -- or all of the extraordinary close out costs; is that correct?

A. Not necessarily all the extraordinary costs because, as we indicated earlier, some of them were just projections at that point. But I didn't expect that they would be virtually ruled out in toto as prior period costs. And I didn't view that as a fair treatment or fair consideration on their part, particularly in view of the correspondence that they had sent us indicating that they were, you know, going to consider those costs.

Q. Did they consider those costs?

A. Based on the correspondence that we received, there was obviously some consideration. There was certainly legal consideration. I mean, Paul Johnson wrote a very detailed rejoinder to Bob Scharf about, you know, the costs.

I believe -- if you look at the exclusions, my belief is that Marty Tom received direction from ACF staff, legal counsel, to rule them out in total. So I'm not sure -- I guess that amounts to some kind of consideration, but not the kind of consideration I'd expect based upon the relinquishment correspondence.

MR. BIGLER: I don't have any other questions.

MR. CUNDRA: Okay. Great. I don't. Perfect.

MR. BIGLER: Well, wait. I should say on the record, though, that there is -- I don't have any further questions for him today, but as we talked about, the damages have not been quantified in response to our interrogatory, and we hope to receive that in the near future before discovery closes. And at that point, we may have more questions.

MR. CUNDRA: Oh, sure.

THE WITNESS: Yeah.

MR. CUNDRA: I informed you earlier on the record that we would be making some revisions or updates, and that to the extent you need to take this

REPORTER'S CERTIFICATE

I certify that the witness in the foregoing deposition,

CHRISTOPHER PAIGE,

was by me duly sworn to testify in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was reported by me, a duly Certified Shorthand Reporter of the State of California authorized to administer oaths and affirmations, and said testimony was thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said deposition.

Dated July 6, 2007

Stephanie D. Plaskett

STEPHANIE D. PLASKETT
Certified Shorthand Reporter
State of California
Certificate No. 9799

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CALIFORNIA HUMAN DEVELOPMENT CORPORATION,
PLAINTIFF,

vs.

THE UNITED STATES,
DEFENDANT.

Case No. 05-1029C
(Judge Williams)

ORIGINAL

DEPOSITION OF JOSE A. BERNARDO
Fairfield, California
Tuesday, June 19, 2007

Reported by:
STEPHANIE D. PLASKETT
CSR No. 9799
Job No. 181574B

**going to ask you whether you recognize it.**
MR. CUNDRA: Take your time to read it.
MR. BIGLER: Mark this as K when you get a chance.
(Exhibit K marked.)
MR. BIGLER: We're back on the record.
**Q. Sir, you've had an opportunity to look at what we've marked as Exhibit J.**
**Do you recognize Exhibit J?**
A. Yes.
**Q. And what is it?**
A. It is supposed to be our close out agreement; that, on the final date, CHDC and ACF will negotiate all those disagreement, and that's what everything is there.
**Q. Okay. And you received this in response to your letter which we've marked as Exhibit I; is that correct?**
A. Yes, it is.
**Q. Did you have any discussions with Jerry Gomez or Martin Tom regarding the contents of this letter?**
A. I'm sure staff has, but not -- I didn't have -- I didn't have the -- the privilege of talking with these two person.
**Q. Okay. What was your understanding that was going to happen -- what was going to happen after you --**

**negotiations to resolve the disputes between ACF and CHDC, correct?**

A. All of the issues we have brought -- brought out to -- to the letter, all those issues were supposed to be negotiated, and that -- that's -- not only the inclusion of the close out costs, but everything that happened to the program that was borne by -- not "borne by." Poor choice of word. But was expended by CHDC. It didn't have nothing to do with, I would say the disallowance, we're talking about. The disallowance is spelled out. But the other costs that was incurred was not part of that kind of a disallowance that they're talking about in the letter. So you had more costs than that actually by -- by CHDC.

And -- well, what we're trying to say here is if, in the negotiations, these were supposedly have been argued and discussed and agreed upon, that we will have -- supposedly we would have come out clean again, that the costs incurred by CHDC would have been paid back by -- by the program, this ACF or whatever; the program, per se; whoever head the program.

**Q. Okay. But your understanding was that there would be further negotiations to discuss those disputes, correct?**

A. Yes, uh-huh.

**issued; it was -- well, I guess to use your words, it was wiped out, correct?**

A. I don't -- I don't know that.

**Q. Okay. Is there anything else that you thought that ACF had agreed to do based on these letters?**

A. Well, the only thing I can tell you is, at that moment, I felt that the young man was very sincere in what he was telling us, and evidently, I was wrong.

**Q. When you say "young man," who are you referring to?**

A. Mr. Lopez -- I mean Gomez. Not Lopez, Gomez.

**Q. And you believe that he was going to -- or that -- I'm sorry.**

**You believed that ACF was going to have further negotiations with CHDC to resolve those financial disputes?**

A. Yes.

**Q. Okay.**

MR. BIGLER: I don't have any further questions.

EXAMINATION BY MR. CUNDRA

**Q. Just to clarify that.**

**Your understanding was they were going to compensate CHDC for the costs they incurred for items that were then transferred to the new grantee?**

REPORTER'S CERTIFICATE

I certify that the witness in the foregoing deposition,

JOSE A. BERNARDO,

was by me duly sworn to testify in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was reported by me, a duly Certified Shorthand Reporter of the State of California authorized to administer oaths and affirmations, and said testimony was thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said deposition.

Dated July 2, 2007

Stephanie D. Plaskett

STEPHANIE D. PLASKETT
Certified Shorthand Reporter
State of California
Certificate No. 9799