IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CALIFORNIA HUMAN DEVELOPMENT CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 05-1029C (Judge Williams) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

In accordance with Appendix A, paragraph 14(b) of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully submits the following pretrial memorandum of contentions of fact and law.

## INTRODUCTION

In its complaint, CHDC alleges that when it voluntarily agreed to relinquish its Head Start/Early Head Start programs, the Administration for Children and Families ("ACF" or "Government") agreed to pay various previously unpaid construction and other costs related to CHDC's construction of additional Head Start facilities. Complaint, ¶ 4. CHDC now seeks in excess of $500,000 in damages plus interest, costs and attorney fees. Id.

For the reasons described below, CHDC's contentions are incorrect because there was no meeting of the minds with regard to the close out costs claimed by CHDC. Even if there was an agreement regarding close out costs, that agreement required that the costs be incurred during the closing period and related to the transfer of the Head Start/Early Head Start programs. The

Government already paid CHDC costs incurred during the closing period that were related to the transfer of the programs. Lastly, any obligation of the Government is unenforceable because the correspondence included language which, at most, required the Government to "fairly negotiate" the closing costs.

CONTENTIONS OF FACT

1. CHDC received a grant from the Government to construct a Head Start/Early Head Start facility at 626 Lincoln Street in Woodland, California (the "Lincoln site").

2. CHDC's lease with the landlord for the Lincoln site stated that "[a]ny alternations, additions or improvements to or of said Premises, including but not limited to wall covering, paneling and built-in cabinet work, but excepting movable furniture and trade fixtures, shall at once become a part of the realty and belong to Landlord and shall be surrendered with the Premises."

3. During the construction of the facility, CHDC spent funds in excess of the amount of the original grant.

4. CHDC attempted to obtain reimbursement from the Government for these excess costs, but the requests were denied for various reasons. In most cases the requests were denied because CHDC did not obtain the required prior approval prior to incurring the expenditures, not, as CHDC contends, because of budgetary constraints.

5. For example, the Government previously denied requests for funds to pay for: (1) development fees for off-site electrical power; (2) installation of a fire sprinkler system; (3) installation of a concrete pad for a playground for the children; (4) installation of a chain link fence; (5) a report of unfinished construction items necessary to obtain an occupancy permit; and

(6) funds used for hiring a construction supervisor. None of these items were included in the original construction grant and all were denied when requested because CHDC paid for these items without first obtaining the required prior approval from ACF.[1]

6. CHDC also sought payment to investigate and provide plans to correct electrical supply deficiencies as well as heating, ventilation and air conditioning ("HVAC") deficiencies.

7. CHDC also sought funds to pay a settlement that it reached with a subcontractor that placed a lien on the facility for lack of payment.[2] The lien resulted from a dispute between CHDC and a subcontractor, Ticon. CHDC withheld payment to Ticon because the electrical system installed by Ticon did not meet code requirements. CHDC had its electrical engineers assess the problem and determine the cost to correct the problem.

---

[1] CHDC argues in its Memorandum of Contentions of Law and Fact ("Pl. Memo.") that CHDC was told when it received the grant that the request to construct the building was limited to $924,000 due to budgetary constraints and that ACF told CHDC to "go ahead with the limited grant request and then do a follow-up program improvement grant in 2001." Pl. Memo. at 2, ¶10. However, none of the documents support this argument. Moreover, a simple review of CHDC's claimed unpaid expenses demonstrate that almost all items claimed are items that it could not have been aware of when it applied for the original grant. For instance, CHDC now seeks: (1) funds for installation of a fire sprinkler system "mandated by a 'post-application change in the local building code'"; (2) impact fees that CHDC claims it believed it was exempt from paying when it applied for the grant; (3) costs of bringing off-site electrical power to the site (which was actually included in the original grant); (4) inspection of electrical power deficiencies and HVAC problems that were caused by CHDC's mismanagement of the project and, therefore, could not have been foreseen when the application was completed; (5) legal fees that CHDC claims were incurred to protect title to the property and enforce the construction contract; (6) funds used to hire a "Clerk of the Works" to oversee the construction process, which was something that CHDC was expected to do as a requirement of receiving the grant; and (7) costs of litigation and settlement of a lien action placed on the property because CHDC failed to pay the contractor. Pl. Memo. at 3-4. Therefore, almost all of the costs claimed by CHDC were not things that could have been included in the original request so CHDC's claim that it was promised a supplemental grant in 2001 is simply false.

[2] CHDC also seeks additional payments related to settlements with two former employees which ACF partially reimbursed as part of the close out grant.

8. CHDC also seeks payment for impact fees that it was required to pay which it originally believed it was exempt from paying, but later determined were required to obtain the necessary permits.

9. Other expenses included the installation of a chain link fence, concrete pad and sealing and stripping of the parking lot.

10. CHDC also seeks costs incurred because it hired a "Clerk of the Works" to oversee the project. The Government denied reimbursement for this expense because CHDC again failed to obtain the required prior approval and because the original grant did not provide for retaining a "Clerk of the Works" given that it was CHDC's responsibility as a recipient of the grant to oversee the project.

11. Similarly, CHDC retained an independent contractor to provide a punch list of unfinished items that need to be corrected, but, again, CHDC failed to obtain the necessary prior approval before hiring the contractor.

12. CHDC has admitted that its contractor was unlicensed during at least part of the time that it worked on the construction project.

13. CHDC has admitted that it failed to record a notice of federal interest on the property as required by the terms of the grant (45 CFR 74.37), which would have stopped the subcontractor from placing a lien on the property.

14. In addition, all of the items claimed by CHDC were incurred prior to the relinquishment discussions between the parties and prior to the close out period.

15. In July of 2003, CHDC decided to relinquish the Head Start/Early Head Start program. In return for CHDC's agreement to relinquish the program, the Government agreed

not to issue approximately $1 million in disallowances,[3] but instead issued a close out grant covering "reasonable and necessary" close out costs. CHDC's relinquishment of the Head Start/Early Head Start program was initially discussed at a meeting between the parties. The meeting was followed by a series of letters between the CHDC and the Government.

16. In a letter dated July 23, 2003, CHDC stated that the "Board decided that further consideration and acceptance of the offer by the CHDC Board of Directors is subject to written clarification of the offer which should include a resolution of all issues, including, but not limited to, all liabilities related to the audit, mechanics liens, leases litigation, recovery of close out costs and any possible ACF action taht could negatively impact on CHDC."

17. In a letter dated July 24, 2003 and signed by Jerry Gomez and Martin Tom, the Government responded by providing additional clarification stating that:

> if CHDC formally relinquishes its grants, ACF will not issue or in any other manner pursue the disallowances . . . nor will a termination proceeding be required . . . All matters relating to the transfer of the grants will then be addressed
> in a close out period. All reasonable and necessary close out costs will be fairly negotiated and charged to a close out grant, and all issues relating to the transfer of facility title, licenses, leases, lien claims, and other transfer issues, will also be negotiated and resolved in the ordinary course of the close out.

18. On July 25, 2003, CHDC responded with a letter signed by Jose Bernardo stating that CHDC's Board of Directors voted "to relinquish the Head Start and Early Head Start grants." The letter then incorporated language from both CHDC's letter of July 23, 2003 and the Government's response of July 24, 2003:

---

[3] While disallowance procedures offer several opportunities for comment and appeal by the grantee, if the grantee receives a final disallowance, that would be money that would be owed to the Government.

> CHDC Board of Directors understands, as indicated in our letter of July 23rd, that good faith negotiations will now lead to a resolution of all issues, including, but not limited to, all liabilities related to the audit, mechanics liens, leases, litigation, recovery of close out costs and any possible ACF action that could negatively impact on CHDC. The Board also understands that as per your letter of July 24th 'All reasonable and necessary close out costs will be fairly negotiated and charged to a close out grant, and all issues related to the transfer of facility, title, licenses, lien claims and other transfer issues" will also be negotiated and resolved fairly.

19. Based upon this correspondence, CHDC relinquished the Head Start and Early Head Start programs to a new grantee and the lease for the Lincoln site was assigned to a new grantee.

20. While the assignment of the lease to the new grantee was being negotiated, the Government's attorney sent the landlord an email which stated that "[a]t the end of the lease term, one of two things would happen. If the classroom facilities are permanent and not removable, the Federal government would be entitled to recover the fair market value remaining in those facilities. If, however, the facilities are removable (I believe this is the case), they would be removed at our cost and used elsewhere or sold by Head Start."

21. After relinquishing the Head Start/Early Head Start programs, CHDC then submitted a request for ordinary closing costs of $196,939 and $484,585 in extraordinary closing costs for a total request of $681,525, which is the subject of this lawsuit.

22. Prior to acting on CHDC's request, the Government met with CHDC and exchanged numerous correspondence with CHDC in an effort to fairly negotiate a resolution to CHDC's request.

23. There is no dispute that the Government paid CHDC a total close out amount of $137,532 which includes $104,108 in ordinary close out costs and $33,424 in extraordinary close

out costs. CHDC has stated that it is not seeking additional ordinary close out costs in this suit.

## CONTENTIONS OF LAW

### I. Overview

The Court should enter judgment in the Government's favor because there was no meeting of the minds with respect to what closing costs would be paid. Even if there was a meeting of the minds, any agreement between the Government and CHDC regarding the payment of closing costs required that the costs be incurred during the closing period and relate to the transfer of the Head Start/Early Head Start programs that plaintiff voluntarily relinquished. In addition, any obligation of the Government to CHDC was further limited by language in the correspondence between the parties which only required the government to fairly negotiate the closing costs, which the Government did.

Lastly, while plaintiff has not expressly alleged a takings claim in its complaint, CHDC is not entitled to any damages pursuant to a takings claim because it entered into an agreement with the Government to voluntarily relinquish the Head Start/Early Head Start program. As a result, CHDC is limited to, at most, a breach of contract remedy.

## ARGUMENT

### I. CHDC's Contract Claim Is Meritless

#### A. There Was No Meeting Of The Minds With Respect To Closing Costs

Initially, the parties met and discussed the possibility of CHDC relinquishing the grant and, in return, the Government would not pursue a possible disallowance of approximately $1 million. After the initial meeting, on July 23, 2003, CHDC sent ACF a letter asking for clarification of the terms of the offer. On July 24, 2003, the Government responded to CHDC's

letter and provided additional clarification regarding the proposal. On July 25, 2003, CHDC responded with a letter signed by Jose Bernardo stating that CHDC's Board of Directors voted "to relinquish the Head Start and Early Head Start grants." The letter then incorporated language from both CHDC's letter of July 23, 2003 and the Government's response of July 24, 2003:

> CHDC Board of Directors understands, as indicated in our letter of July 23rd, that good faith negotiations will now lead to a resolution of all issues, including, but not limited to, all liabilities related to the audit, mechanics liens, leases, litigation, recovery of close out costs and any possible ACF action that could negatively impact on CHDC. The Board also understands that as per your letter of July 24th 'All reasonable and necessary close out costs will be fairly negotiated and charged to a close out grant, and all issues related to the transfer of facility, title, licenses, lien claims and other transfer issues' will also be negotiated and resolved fairly.

While CHDC, in its letter of July 25th, attempted to accept the Government's offer of July 24th, no meeting the minds occurred because CHDC failed to accept the offer as written by the Government, but instead attempted to add its own terms to the offer as previously stated in CHDC's letter of July 23rd. It is well settled that "[a] communicated offer creates a power to accept the offer that is made and only that offer. Any expression of assent that changes the terms of the offer in any material respect may be operative as a counter-offer; but it is not an acceptance and consummates no contract." Buesing v. United States, 47 Fed.Cl. 621, 633 (2000) (quoting *Corbin on Contracts* § 3.28 (1993)). Here, CHDC did not accept the offer stated in the Government's letter of July 24th, instead, CHDC attempted to modify the offer by including language from CHDC's letter of July 23rd. Because CHDC's acceptance did not match the offer, no meeting of the minds occurred and, thus, no contract resulted.

Even if there was a meeting of the minds, any obligation of the Government to pay

closing costs required that those costs be both related to the transfer of the grant and incurred during the close out period.

B. Plain Language Of The Parties' Correspondence Is Unambiguous

Contract interpretation is a question of law. Interstate Gen. Gov't Contractors v. Stone, 980 F.2d 1433, 1434 (Fed. Cir. 1992). Contract interpretation begins with the plain language of the agreement. Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc). If that language is "clear and unambiguous," this Court gives the terms of a contract their "plain and ordinary meaning." McAbee Const. Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996). Absent ambiguity, the Court does not resort to extrinsic evidence to aid in interpretation because doing so would cast "a long shadow of uncertainty over all transactions" and contracts. Id. Further, when interpreting a contract, the Court gives meaning to all of the contract's provisions. M.A. Mortenson Co. v. Brownlee, 363 F.3d 1203, 1206 (Fed. Cir. 2004).

To recover from the United States, plaintiff must show that it entered into either an express contract or an implied-in-fact contract with the United States. Pasco Enterprises v. United States, 13 Cl. Ct. 302, 305 (1987). Here, the parties agreed that CHDC would relinquish the Head Start/Early Head Start program and in return for the Government's agreement not to issue a draft disallowance letter. The Government also stated that it would pay "reasonable and necessary close out costs" as memorialized in a letter stating:

> All matters relating to the transfer of the grants will then be addressed in a close out period. All reasonable and necessary close out costs will be fairly negotiated and charged to a close out grant, and all issues relating to the transfer of facility title, licenses, leases, lien claims, and other transfer issues, will also be negotiated and resolved in the ordinary course of the close out.

In response to the Government's letter, on July 25, 2003, CHDC sent a letter to the Government

accepting the Government's offer as stated above. Pl. Memo. at 5.

If there is an agreement, the terms are simple and unambiguous. The terms require CHDC to relinquish the Head Start program and in return the Government will not to pursue any possible disallowances or termination proceedings. The Government also agreed that "all matters relating to the transfer of the grants will be addressed in a close out period." The letter continues by stating that "all reasonable and necessary close out costs will be fairly negotiated and charged to a close out grant, and all issues relating to the transfer of facility title, licenses, leases, lien claims and other transfer issues will also be negotiated and resolved in the ordinary course of a close out." This language makes it clear that the Government will only pay costs that are: (1) related to the "transfer of the grants" and (2) that occurred during the close out period.

The Government did what it said it would do. The Government did not issue the disallowance letter and, it negotiated and paid all reasonable costs relating to the transfer of the Head Start program. CHDC is attempting to collect monies that it spent on the Head Start program in excess of the original grant. Pl. Memo. at 2, ¶13. These additional funds were spent by CHDC out of its own funds for a variety of reasons, but most of them involve mismanagement or a failure to obtain prior approval. CHDC's claim for costs in excess of the original grant is not covered by the plain meaning of the relinquishment correspondence. CHDC's claim is therefore invalid, and the Court should enter judgment for the Government.

### 1. The Costs Claimed By CHDC Were Not Incurred During the Close Out Period

The plain language of the letter states that "matters relating to the transfer of the grants will then be addressed in a close out period." As a result, only transfer costs incurred during the close out period are covered by the close out grant.

CHDC agreed to relinquish the program in its letter of July 25, 2003. CHDC has also acknowledged that the close out period did not begin until September 1, 2003. All of the extraordinary close out costs that CHDC is seeking to recover in this lawsuit were incurred prior to relinquishment and prior to the start of the close out period. All of these costs are related to the construction of the Head Start facility and were previously denied by ACF long before CHDC relinquished the program. For example, ACF previously denied requests for funds to pay for: (1) development fees for off-site electrical power; (2) installation of a fire sprinkler system; (3) installation of a concrete pad; (4) installation of a chain link fence; (5) a report of unfinished construction items necessary to obtain an occupancy permit; and (6) funds used for hiring a construction supervisor. CHDC also sought payment to investigate and provide plans to correct electrical supply deficiencies as well as heating, ventilation and air conditioning ("HVAC") deficiencies. CHDC also sought payment of a settlement that it reached with a subcontractor that placed a lien on the facility for lack of payment. All of these extraordinary construction related costs were disapproved by ACF because all of these costs were incurred prior to the beginning of the close out period from September 1, 2003. There is nothing in the relinquishment correspondence that indicates or implies that the Government stated it would pay or even consider costs incurred outside the close out period. As any obligation to pay close out costs relating to the transfer is limited to costs incurred during the close out period and none of the costs claimed by CHDC were incurred during that period, the Court should enter judgment for the Government.

2. The Costs Claimed By CHDC Are Not <u>Related To The Transfer Of The Grants</u>

Similarly, the Government is not obligated to pay any of the extraordinary close out costs

sought by plaintiff because none of the costs are related to the transfer of the grants. The Government's letter clearly states that only costs "relating to the transfer" of the grants "and other transfer issues" will be included in the close out grant.

All of the costs sought by CHDC relate to the construction of the Head Start facility and were previously denied by ACF long before CHDC agreed to relinquish the program. These costs construction costs (including development fees for off-site electrical power; installation of a fire sprinkler system; installation of a concrete pad for a playground for the children; installation of a chain link fence; a report of unfinished construction items necessary to obtain an occupancy permit; and funds used for hiring a construction supervisor) as well plans to correct electrical supply and HVAC deficiencies, a settlement payment to a subcontractor that placed a lien on the facility for lack of payment and settlement payments to two former employees. The Government never stated it would pay any of these costs because all of these costs were incurred long before CHDC's relinquishment of the program and, as a result, none of these costs are in any way related to the transfer of the grants.

As CHDC is seeking payment of extraordinary construction costs that are not related to the transfer of the Head Start/Early Head Start programs, the Court should enter judgment for the Government.

3. At Most, The Agreement Obligated The Government To Fairly Negotiate

At most, the Government agreed that "reasonable and necessary close out costs will be fairly negotiated . . . and [a]ll matters relating to the transfer of the grants . . . and other transfer issues, will also be negotiated and resolved in the ordinary course of the close out." The inclusion of the word "negotiated" which is included in the letter in two locations illustrates that

the Government never agreed to pay any and all transfer costs, but only agreed that it would negotiate with CHDC in an attempt to resolve any issues relating to the transfer costs. See Pacific Gas & Electric Co. v. United States, 3 Cl. Ct. 329, 339 (1983), aff'd, 738 F. 2d 452 (Fed. Cir. 1984)(table) ("Extensive negotiations in which the parties demonstrate hope and intent to reach an agreement are not sufficient.") Nothing in the letter states or implies that the Government agreed to pay cost overruns and other expenses that were caused by CHDC's mismanagement and that the Government previously denied.

The framework of the letter makes clear that only costs "relating to the transfer of the grants" incurred during the "close out period" would be paid by the Government. Furthermore, CHDC cannot argue that the extraordinary close out costs are somehow covered by any alleged agreement because there is no way for the Court or anyone else to determine which extraordinary costs are covered and which are not covered. In other words, CHDC is claiming that the Government breached the alleged agreement by failing to pay all of the costs that it believed it was entitled to, but there is no way for the Court to determine which costs are covered and which are not because the letter clearly states that the costs will be "fairly negotiated," which does not provide any guidance to the Court as to which costs are covered and which are not. The inclusion of this "fairly negotiated" language makes any alleged agreement unenforceable.

Even CHDC does not contend that the Government agreed to pay all of the extraordinary construction costs that the Government previously denied, CHDC only contends that the construction costs should be "fairly negotiated." The Government met its obligation to fairly negotiate. CHDC submitted a request for ordinary closing costs of $196,939 and $484,585 in extraordinary closing costs for a total request of $681,525. Prior to issuing a decision as to

whether to pay the costs claimed by CHDC, in addition to the previous correspondence between the parties, ACF held face to face meeting with CHDC in April of 2004 to attempt to resolve these issues. Of these amounts, there is no dispute that the Government paid CHDC a total of $137,532 which includes $104,108 in ordinary close out costs and $33,424 in extraordinary close out costs. Therefore, the Government has met any obligation it had to fairly negotiate the close out costs by negotiating with CHDC and ultimately paying CHDC more than $137,000.

CHDC also argues in its memorandum that the grants officer testified at his deposition that "CHDC should be compensated for any value or improvements transferred to the Federal Government or its designees." Pl. Memo. at 6, ¶41. This is simply not the case. The grants officer in this case, Martin Tom, was asked a series of hypothetical questions at his deposition which he did his best to answer without the ability to refer to the disposition regulations. These hypotheticals had nothing to do with the specific facts of this case where any funds spent by CHDC to improve the property automatically became the property of the landlord under the terms of the lease.

II. <u>CHDC's Takings Claim Is Meritless</u>

The Takings Clause of the Fifth Amendment mandates "just compensation" when the Federal Government appropriates private property for "public use." U.S. Const. amend V; <u>Bernaugh v. United States</u>, 38 Fed. Cl. 538, 542 (1997), <u>aff'd</u>, 168 F.3d 1319 (Fed. Cir. 1998) (table). Before a party may recover compensation pursuant to the Fifth Amendment for a taking, under either a physical invasion (<u>per</u> <u>se</u>) or regulatory taking theory, it must establish a compensable property interest; <u>i.e.</u>, a specific interest in physical or intellectual property. <u>See</u> <u>Lucas v. South Carolina Coastal Council</u>, 505 U.S. 1003, 1014 (1992); <u>Kaiser Aetna v. United</u>

States, 444 U.S. 164, 179-80 (1979).

The United States Court of Appeals for the Federal Circuit and its predecessor "has cautioned against commingling takings compensation and contract damages." Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001). "In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." Hughes Communications, 271 F.3d at 1070 (quoting Sun Oil Co. v. United States, 215 Ct. Cl. 716, 769-70, 572 F.2d 786, 818 (1978)); see J.J. Henry Co. v. United States, 188 Ct. Cl. 39, 46, 411 F.2d 1246, 1249 (1969); Transpace Carriers, Inc. v. United States, 27 Fed. Cl. 269, 274 (1992); Marathon Oil Co. v. United States, 16 Cl. Ct. 332, 338-39 (1989).

Remedies for alleged infringement of any rights established contractually generally lie in contract, not the Fifth Amendment, as it is the terms of the contract that govern the parties' respective rights and obligations. Sun Oil, 215 Ct. Cl. at 769-70, 572 F.2d at 818; see Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 703 n.27 (1949) (if there is contract remedy, party cannot pursue takings claim in this Court); Sunrise Village Mobile Home Park, L.C. v. United States, 42 Fed. Cl. 392, 404 (1998) ("if the government's actions allegedly breached a contract, the appropriate remedy is a breach of contract claim, not a claim for compensation pursuant to the Takings Clause"). As noted by the Court, when a party alleges "an entitlement to compensation created by a contractual arrangement, any right to compensation depends entirely on the enforceability of that agreement." Howard v. United States, 31 Fed. Cl. 297, 315 n.14 (1994) (citing Marathon Oil Co. v. United States, 16 Cl. Ct. 332, 338- 39 (1989) (quoting Sun Oil, 215 Ct. Cl. at 770, 572 F.2d at 818).

While plaintiff does not include a takings claim in its complaint, it has alleged in

response to requests for admissions that it contends that a taking occurred when CHDC voluntarily relinquished its Head Start/Early Head Start program.[4] To the extent that plaintiff contends that it can recover under a "takings" claim, it is incorrect. Even assuming that CHDC can establish that the Head Start/Early Head Start grants qualify as a compensable property interest, the Government did not "take" CHDC's property. Rather, CHDC voluntarily entered into an agreement in which it agreed to relinquish the Head Start/Early Head Start grants in exchange for the Government's agreement not to issue a draft disallowance letter. As a result, plaintiff cannot claim that a taking occurred, but instead is limited to only the available breach of contract remedy, which we have shown above does not entitle plaintiff to any relief.

## CONCLUSION

For the foregoing reasons, and those that will be established at trial, we respectfully request the Court to find in favor of the Government and to deny CHDC's claim in total.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

[4] Plaintiff's complaint does not allege or even mention a takings claim, but in response to the Government's Second Set of Requests for Admissions, Request No. 21, plaintiff responded that it had alleged a takings claim in its complaint and also cited to the parties Joint Preliminary Status Report of March 31, 2006. However, the Joint Preliminary Status Report also does not mention a takings claim.

s/ Bryant G. Snee
BRYANT G. SNEE
Deputy Director

s/ Robert C. Bigler
ROBERT C. BIGLER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L St., NW
Washington, D.C. 20530
Tele: (202) 307-0315
Fax: (202) 514-8624

July 11, 2008

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 11th day of July 2008, a copy of the foregoing "DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Robert C. Bigler