**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CALIFORNIA HUMAN DEVELOPMENT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 05-1029C<br>(Judge Williams) |

**PLAINTIFF'S AMENDED MEMORANDUM OF CONTENTION LAW AND FACT**

Pursuant to the Court's Minute Entry, dated June 19, 2008, California Human Development Corporation (hereinafter "CHDC"), respectfully files its Amended Memorandum of Contentions of Fact and Law.

**CONTENTIONS OF FACT**

1. CHDC is a 501(c)(3) corporation that is located at 3315 Airway Drive, Santa Rose, CA 95403.

2. CHDC's principal business is to provide education, training, housing and other services to low-income individuals and families and has done so since 1967.

3. On August 30, 1999, Jim and Diane Naekel, as Landlord and CHDC as Tenant, executed a Commercial Lease located at 626 Lincoln Street in Woodland, California on which it established its headquarters.

4. At that time, CHDC operated its Head State and Early Head Start program on leased premises on another site in Woodland, California.

5. The landlord at the Head State and Early Head Start program site gave notice to CHDC that CHDC could no longer use the property as the landlord needed it for its own purposes.

6. After no other property could be found that was suitable for lease as a Head Start program facility, ACF and CHDC agreed to use the Lincoln Street site and to place a modular classroom and related facilities on CHDC's leasehold at the Lincoln Street site.

7. CHDC, a longstanding Head State and Early Head Start grantee, with support of HHS/ACF Program Improvement Grant entered into a contract to construct a modular Head Start/Early Head Start facility located at 626 Lincoln Street in Woodland, California.

8. When CHDC was first asked to submit a program improvement grant application for the Lincoln Street site, it advised ACF/HHS that the facility would likely cost $1.2 Million.

9. CHDC was told that, due to budgetary constraints in that year that the 2000 budget request had to be limited to $924,000.

10. CHDC advised ACF/HHS that the program facility could not be completed for $924,000; however, CHDC was told to go ahead with the limited grant request and then do a follow-up program improvement grant in 2001.

11. CHDC applied for a Program Improvement Grant to expand the Lincoln site for $924,000.00.

12. When CHDC requested a supplemental program improvement grant in 2001, they were told that the request was rejected due to budgetary constraints at the agency.

13. CHDC was required to use its own organization funds to complete the program building facility for use as a Head Start center.

14. Part of the costs paid for by CHDC funds included the installation of a fire sprinkler system in the building that was mandated by a post-application change in the local building code.

15. Part of the costs paid for by CHDC funds included impact fees required to be paid to the county from which CHDC understood that they were exempt because they were operating a federal program; however, the county later determined that they were not exempt.

16. Part of the costs paid for by CHDC funds included the cost of a concrete pad for the children's playground.

` 17. Part of the costs paid for by CHDC funds included installation of a chain link fence around the property for the protection of the children and the staff.

18. Part of the costs paid for by CHDC funds included the costs for bringing off-site electrical power to the site.

19. Part of the costs paid for by CHDC funds included the costs of necessary paving, sealing and stripping of the parking lot on the property.

20. Part of the costs paid for by CHDC funds included the architect's fees.

21. Part of the costs paid for by CHDC funds included the costs of inspection of electrical power deficiencies and HVAC problems and the installation of proper, upgraded HVACs for the children's classroom facilities.

22. Part of the costs paid for by CHDC funds included legal and other professional fees incurred to protect title to the property and to enforce the construction contract.

23. Part of the costs paid for by CHDC funds included the cost of a "Clerk of the Works" to oversee the progress and suitability of the construction process.

24. Part of the costs paid for by CHDC funds included the cost of an independent contractor to provide a report and a punch list of the unfinished needs for the purpose of obtaining a temporary occupancy permit.

25. Part of the costs paid for by CHDC funds included the costs of litigation and settlement of a lien action for unpaid improvement and construction costs.

26. The total costs incurred by CHDC was $1,502,932.51. Federal funds reimbursed only $1,013,900 of those costs. The balance of the costs were paid and are still being paid with CHDC funds.

27. CHDC then operated its Head State and Early Head Start program at the new Lincoln Street site after the completion of the modular facility.

28. On short notice, ACF requested a meeting for July 14, 2003 with CHDC's Board of Directors. CHDC's legal counsel and the management staff, including George Ortiz, CEO, were not invited.

29. At this meeting, CHDC was told that ACF/HHS wanted CHDC to transfer its ACF grant to another organization of ACF's choosing.

30. At this same meeting, CHDC was told that if it did not agree to transfer its ACF grant and program facilities to a new organization, ACF/HHS would issue a Million Dollar cost disallowance determination against CHDC for the entire federal costs expended on the Lincoln Street facility and take other adverse actions against CHDC.

31. On July 23, 2003, Mr. Bernardo, on behalf of the Board of Directors, formally accepted ACF's offer "subject to written clarification of the offer which should include a resolution of all issues, including, but not limited to, all liabilities related to the audit, mechanics

liens, leases, litigation, recovery of close out costs and any possible ACF action that could negatively impact on CHDC."

32. On July 24, 2003, Associate Director Gerald Gomez and Grants Officer Martin Tom wrote to Mr. Bernardo giving additional assurances relating to the program transfer relinquishment and transfer and specifically stating that "if CHDC formally relinquishes its grants . . . all reasonable and necessary close out cost will be fairly negotiated and charged to a close out grant, and all issued realign to the transfer of facility title, licenses, leases, lien claims and other transfer issues, will also be negotiated and resolved in the ordinary course of the close out."

33. On July 25, 2003, Mr. Bernardo replied in a letter to Mr. Gomez expressing CHDC's understanding and reliance of what was told to the CHDC Board of Directors July 14, 2003 meeting with the ACF and Gerald Gomez and Martin Tom's July 24, 2003 letter. On behalf of the Board, Mr. Bernardo accepted ACF's offer for a "resolution of all issues, including, but not limited to, all liabilities related to the audit, mechanics liens, leases, litigation, recovery of close out costs, and any possible ACT action that could negatively impact CHDC."

34. CHDC then submitted two "close out" budgets, as instructed by ACF. The first budget was for the "ordinary budget" close out costs detailing estimated costs associated with staff time and other expenses necessary to close out the grant. The second budget was the "extraordinary budget" which included costs incurred by CHDC prior to the close out period primarily associated with the building construction and with building construction liens.

35. At the beginning of the close out period, ACF and CHDC began negotiating the assignment of CHDC's long term lease for the Head Start facility in Woodland to ACF's new

grantee. The CHDC lease was finally assigned to the interim Head Start grantee, CDI, in January 2004.

36. The negotiations for the Lease Assignment lasted over 4 (four) months; however, it did not interfere with the operations of the Head Start Program since ACF and CDI, with permission of CHDC, had exclusive use of the Head Start premises beginning September 1, 2003, while negotiations for the lease assignment and payment of the contractual closeout costs continued.

37. On July 7, 2004, Mr. Johnson, counsel for ACF, wrote a letter to Mr. Scharf, counsel for CHDC at the time, and Mr. Gomez, stating that the Lincoln Street improvements were "fixtures," not movable property, and thus the ownership of such improvements belonged to the Naekels and would reverted to the Naekels at the end of the lease term. This was Mr. Johnson's stated reason for disallowing CHDC's proportional share of the costs (approximately $400,000) of the new Lincoln Street modular classroom and related facilities.

38. On August 27, 2004, ACF issued its final decision and did not award any funds to CHDC for CHDC's proportional share of the costs for Lincoln Street facilities that it was required to transfer to ACF's new interim grantee along with the assignment of its leasehold interest in the Lincoln Street facilities. The final closeout amount paid to CHDC was $137,532.00, with did not include any award for CHDC's proportional share of the costs for Lincoln Street facilities or any award for the itemized "extraordinary closeout costs" related to the Lincoln Street facilities.

39. On September 22, 2004, HHS/ACF explained its reasoning for disallowing any proportional cost monthly to CHCD for the facilities it assigned to ACF's new grantee, as stated in Mr. Johnson's July 7, 2004 letter to Mr. Scharf. Specifically, Mr. Johnson stated that "CHDC

elected to spend its own money [for the classroom facility], knowing that under the terms of the lease it did not own the facility and that all improvements would revert to the Naekels at the end of the lease term. In essence, CHDC chose to spend its own money on improvements that belonged to the landlord]."

40. On October 5, 2004, Mr. Johnson, counsel for ACF, emailed Jim Naekel informing him (directly contrary to the advice he gave to CHDC and ACF) that "the classroom facility was built entirely with Head Start grant funds, . . . the Lincoln Street facilities were removable," and not "fixtures," that and that they could be removed by the owner (the government) at any time "at our cost and used elsewhere or sold by Head Start."

41. The Grant Officer testified at his deposition that the regulations outline who is eligible to a proportional share and CHDC should be compensated for any value or improvements transferred to the Federal Government or its designees.

42. Paul Johnson, the author of the July 24, 2003 "relinquishment or else" letter testified at his deposition that he was not aware of any audit or monitoring visit report that would be needed to allow a cost disallowance letter to be issued (or threatened to be issued) by ACF or that any such $1 Million disallowance had ever been approved or submitted to the necessary ACF officials for approval.

43. An e-mail redacted for Mr. Johnson's or another ACF attorney disclosed that the $1 Million disallowance letter was initially drafted by Mr. Gomez, who had no jurisdiction or authority to draft disallowance letters, and that he was told by a Grant Officer that the alleged procurement violations set forth in the draft letter were improper and could not be justified.

44. CHDC has sued for recovery of all of the "ordinary budget" and "extraordinary budget" cost disallowances and disapprovals.

45. CHDC also alleges that the government acted in bad faith in using unauthorized and unapproved "audit disallowances" to coerce it into relinquishing its grants and that internal communications at ACF confirmed that the alleged "audit disallowances" were fabricated and contrary to the agency's own regulations and procedures for the purpose of coercion with no intent that they ever be "officially" issued. This conduct was in breach of its contract and duties to CHDC.

**<u>CONTENTIONS OF LAW</u>**

1. 28 U.S.C. § 1491(1)
2. 28 U.S.C. § 1491(1)(2)
3. 28 U.S.C. § 1346(a)(2)
4. Contract Disputes Act of 1978 § 6
5. Contract Disputes Act of 1978 § 10.
6. 41 U.S.C. § 605
7. 41 U.S.C. § 609
8. 45 CFR 74.31
9. 45 CFR 74.32
10. 45 CFR 74.33
11. 45 CFR 74.34
12. 45 CFR 74.35
13. 45 CFR 74.36
14. 45 CFR 74.37
15. 45 CFR 74.71

16. 45 CFR 74.72

17. Equal Access to Justice Act

18. 42 USC 4654(c)

19. Fifth Amendment of the United States Constitution

20. *Almota Farmers Elevator & Warehouse Co. v. U.S.*, 409 U.S. 470 (1973)

21. Restatement (Second) of Trusts §176

22. *Department of the Interior v. Klammath Water Users Protective Association*, 532 U.S. 1, 14, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001).

23. *U.S. v. White Mountain Apache Tribe*, 123 S.Ct. 1126, 537 U.S. 465, 155 L.Ed.2d 40 (2003).

24. Restatement (Second) of Trusts §244

25. *Drozd v. INS*, 155 F.3d 81, 90 (C.A.2 (N.Y.). 1998).

26. *Linkous v. U.S.*, 142 F.3d 271, 277-89 (C.A.5 (Tex) 1998).

27. *Frillz, Inc. v. Lader*, 104 F.3d 515, 518 (C.A.1 (Mass.) 1997), cert. denied, 118 S.Ct. 59 (1997).

28. Kenneth Culp Davis & Richard J. Pierce, Jr., 2 Administrative Law Treatise § § 13.1 at 232 (3d ed. 1994).

29. *Dantran Inc. v. U.S. Department of Labor*, 171 F.3d 58 (C.A.1 (Me.) 1999).

30. 49 CFR Part 74 Appendix A

31. 29 CFR 3

32. 29 CFR 5, § 5.1

33. 29 CFR 5, § 5.5

34. 29 CFR Part 5, §5.6

DATE: August 8, 2008

Respectfully submitted,

/s/ Steven D. Cundra

Steven D. Cundra (D.C. Bar No. 374074)
Roetzel & Andress, LPA
1300 Eye Street, N.W.
Suite 400 East
Washington, D.C. 2005
Telephone: (202) 625-0660
Facsimile: (202) 338-6340
*Counsel for Plaintiff, California Human Development Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of August, 2008, I electronically filed Plaintiff's Amended Contentions of Fact and Law and a copy of the foregoing was served via the Court's CM/ECF to all parties of record.

/s/ Steven D. Cundra

Steven D. Cundra (D.C. Bar No. 374074)
Roetzel & Andress, LPA
1300 Eye Street, N.W.
Suite 400 East
Washington, D.C. 2005
Telephone: (202) 625-0660
Facsimile: (202) 338-6340