# In the United States Court of Federal Claims

### No. 05-1029C

### (Filed: June 5, 2009)

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * *
                                    *
CALIFORNIA HUMAN DEVELOPMENT         *    Breach of Contract; Agreement
CORPORATION,                         *    to Negotiate in Good Faith; Head
              Plaintiff,             *    Start Grant; 42 U.S.C. §§ 9831,
                                     *    9833; 45 C.F.R. § 74.32(c);
      v.                             *    45 C.F.R. § 16; OMB Circular
                                     *    A-122.
THE UNITED STATES,                   *
                                     *
              Defendant.             *
                                     *
* * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

Steven D. Cundra, Roetzel & Andress, LPA, Washington, D.C., for Plaintiffs.

Robert C. Bigler, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

---

## POST-TRIAL OPINION

---

**WILLIAMS**, Judge

Plaintiff, California Human Development Corporation ("CHDC"), claims that the Government breached an agreement to engage in good-faith negotiations in awarding close-out costs associated with a Head Start grant it relinquished.[1]  Plaintiff seeks damages of $400,256.71, representing the costs incurred in connection with its purchase of a modular facility and leasehold

---

[1] Plaintiff had a federal grant to run a Head Start/ Early Head Start ("HS/EHS") educational facility in Woodland, California.  Head Start is a federal program created under the Head Start Act, 42 U.S.C. § 9831, et seq. designed to "promote the school readiness of low-income children by enhancing their cognitive, social, and emotional development . . . through the provision to low-income children and their families of health, educational, nutritional, social, and other services that are determined, based on family needs assessments, to be necessary." 42 U.S.C. § 9831.  Under the Head Start Act, the Secretary of the Department of Heath and Human Services ("HHS") is responsible for administering Head Start grants.  See 42 U.S.C. § 9833.

improvements -- costs which exceeded its grant.  This matter comes before the Court after a trial on liability and damages.

The disputed close-out costs constitute overruns of the grant amount which Plaintiff expended in connection with the modular facility, including construction consulting fees, litigation costs and improvements to the leased premises, as well as settlement costs related to Plaintiff's disputes with former employees.  Plaintiff has not established entitlement to these costs under its contract.  The extent of the parties' agreement here was limited.  In exchange for the Government foregoing a claim for some $1 million in disallowances of funds expended under the grant, Plaintiff voluntarily relinquished its Head Start grant, and the Government agreed to negotiate the grant close-out costs with Plaintiff.  Because Plaintiff did not prove that the Government failed to negotiate in good faith in denying these claimed costs, it has not established a breach of contract.  As such, the Court enters judgment for Defendant on liability.

## <u>Findings of Fact</u> [2]

Plaintiff CHDC is a 501(c)(3) charitable, tax-exempt organization founded in 1967 and located in Santa Rosa, California.  Tr. at 113-14.  CHDC provides a variety of educational and other social programs to low-income residents of Northern California.  Id.  Plaintiff serves 15,000 clients a year and operates on an overall annual budget of $12 million.  Tr. at 114.  Approximately 50 percent of CHDC's budget is federally funded while the rest is drawn from state and community sources.  Id.  As a Head Start grantee, Plaintiff does not depend exclusively on federal funding for operating its facilities.

## <u>The Naekel Lease</u>

On August 30, 1999, Plaintiff entered into a ten-year, renewable commercial lease (the "Lease") with Jim and Diane Naekel (the "Naekels") for property located at 450 Cottonwood Street in Woodland, California, with the intention of establishing an HS/EHS program site there.  JX 1.[3] At that time, Plaintiff already operated HS/EHS programs at other sites in California.  Tr. at 137. Plaintiff's lease on its previous site was expiring and would not be renewed.  Id.

The Naekel Lease described the Cottonwood Street site as "3 acres of usable land and approximately 8,908 square feet of rentable floor area."  JX 1 at 4.  Under the "Premises" clause, the Lease stated: "The Outdoor Play Area is currently vacant and it is the Tenant's responsibility to make improvements to it including fencing and play equipment . . . .  There is a vacant space adjacent to

---

[2] These findings of fact are based upon the record developed during a four-day trial in August 2008.

[3] The record also refers to this property as 726 West Lincoln Avenue and 626 West Lincoln Avenue.  The property is located at the intersection of Cottonwood Street and West Lincoln Avenue. Tr. at 132-33.

the outdoor play area and it is the Tenant's responsibility to make classroom improvements to it including fencing . . . ." Id. The Lease also included a clause titled "Alterations and Additions," which stated: "[a]ny alternations, additions or improvements to or of said Premises, including but not limited to wall covering, paneling and built-in cabinet work, but excepting movable furniture and trade fixtures, shall at once become a part of the realty and belong to Landlord and shall be surrendered with the Premises." JX 1 at 8.

**Program Improvement Grant To Purchase A Modular Unit**

In May 1999, CHDC presented a program improvement proposal to the Government, requesting a grant to build an HS/EHS facility on the new Cottonwood Street site. JX 44 at 42.[4] This proposal was denied in October 1999 as incomplete. Id. Plaintiff resubmitted its proposal the following year, and this time it was approved. JX 48 at 3. On September 7, 2000, HHS' Administration for Children and Families ("ACF") awarded Plaintiff a discretionary grant award of $924,000 for "Facilities/Construction" to purchase a pre-existing modular unit to be transported to the Cottonwood Street site. JX 33 at 2.[5] The grant provided in its "Remarks" section:

> Cost[s] under the line item 'Facilities/Construction' are to be used as described in the grantee's application [6] for the following: Facility Purchase Amount $924,000; Major Renovation Amount $0; and Construction Amount $0. This grant awards FY 2000 One-Time Only Program Improvement funds in the amount of $924,000 for one modular located at . . . 450 Cottonwood Street. Expenditures of these funds for purposes other than those specified, without written approval from the Regional Office may be cause for disallowance of such costs. See attached approved budget detail of costs.

Id. at 2-3. The referenced budget attached to the grant, detailed the approved costs as follows:

| | |
|---|---|
| Base Building Purchase Price | $814,975 |
| Professional Fees | 8,000 |
| Moving Expenses | 6,000 |

---

[4]  The referenced pages of Joint Exhibit 44 contain the declaration of CHDC's Chief Financial Officer ("CFO") Andrew J. Haugh dated June 8, 2002. See Tr. at 264.

[5]  The pertinent HHS regulation defines a modular unit as "a portable prefabricated structure made at another location and moved to a site for use by a Head Start grantee to carry out a Head Start program." 45 C.F.R. § 1309.3. According to 45 C.F.R. § 1309.34, the costs of installation of the modular, such as public utility hook-ups and site surveys, are payable with grant funds if HHS has approved purchase of the modular unit.

[6]  Plaintiff's grant application is not part of the record.

3

| | |
|---|---|
| Transportation Costs | 16,500 |
| Taxes | 53,585 |
| Insurance | 8,940 |
| Rights of way/land rentals | 8,000 |
| Public Utility Hook Ups | 8,000 |
| | |
| TOTAL | $924,000 |

Id. at 4.  The budget period for the grant was from July 1, 2000 to June 30, 2001.  Id. at 2.  The grant expressly stated that no costs encompassed in the facility/purchase amount of $924,000 were to be used either for "major renovations" or "construction."  Id.; see Tr. at 131-32.  Finally, the grant contained a "Special Condition," requiring the grantee to record a notice of federal interest in the property in the appropriate local government records, but this condition applied to "building purchases only."  JX 33 at 5.  Plaintiff never recorded a notice of federal interest.  JX 33 at 1; JX 91; JX 108 at 5.

**Contract With West Coast Relocatables, Inc.**

CHDC selected West Coast Relocatables, Inc. ("WCR") to be the grant contractor based upon a competition with one other bidder.  Tr. at 136-37; see also JX 44 at 43.  CHDC President and CEO George L. Ortiz signed a contract with WCR on December 8, 2000, to procure a modular unit for the "Base Building Price" of $848,900.  JX 149 at 3, 5.  The modular unit was described as a "168' x 60' steel rigid frame Head Start Facility Building . . . set and connected on a concrete pier and perimeter foundation . . . ."  Id. at 5.  The price included the building engineering and foundation design, and the modular unit contained classrooms, restrooms, a kitchen and a ducted heating ventilation and air conditioning ("HVAC") system, as well as interior and exterior finishes.  Id. at 4-6.  The terms and conditions of the contract specified that the contract price did not include "any site work unless otherwise noted . . . any plant or site inspection costs or approval fees, as may be required for City and County approval of the project . . . any provisions for the installation, extension of, or making utility connections past 5' outside the building perimeter . . . ."  Id. at 4.  On June 12, 2000, prior to the grant award, Plaintiff had entered into a contract with WCR to make improvements to existing structures on the Cottonwood Street site for $75,785.  JX 44 at 26, 29.  Plaintiff also had signed a contract with Harris Is Handyman Services ("Harris") on July 2, 2000, agreeing to pay $29,513 to have Harris improve existing structures on the site.  Id. at 37-38.

**Contractor And Licensing Problems**

Although WCR's work on the modular facility was slated to begin in February 2001, commencement of the work was delayed because CHDC was not able to obtain the necessary construction permit from the City of Woodland.  JX 44 at 44; JX 48 at 3.  The Woodland Fire Department had informed Plaintiff that by May 2001, the modular facility needed to include a sprinkler system in order to be granted a construction permit.  JX 44 at 44.  HHS Financial Operations Specialist, Paulene Graham, notified CHDC's CFO, Mr. Haugh, that the Government

4

"would not fund any more money for the project, as HHS was not responsible for WCR's mistakes." Id. Nevertheless, Mr. Haugh applied for funding for a sprinkler system in a 2001 program improvement proposal. Id. CHDC received its construction permit from the City of Woodland on August 19, 2001. JX 48 at 3. On December 10, 2001, ACF approved $35,000 in new grant money to install a sprinkler system. JX 17.

When construction on the modular facility eventually began in August 2001, much of the work was performed by Ticon Construction ("Ticon") -- WCR's subcontractor -- because, as CHDC discovered, WCR's contractor's license had been suspended. JX 7 at 5.[7] Plaintiff never had a contract with Ticon and issued checks payable to WCR and Ticon jointly. Tr. at 262; JX 44 at 14. As CFO Haugh explained in a letter to the agency dated August 14, 2001:

> [I] discovered last week that our current contractor, [WCR] lost its Contractor's license in February 2001. The reason is due to an outstanding judgment for unpaid contract services. WCR has assured me that this is not a problem. They are currently subcontracting the remainder of the work to Ticon Construction [which] has an active contract license.

JX 7 at 5. CHDC's August 14, 2001 letter also stated that the project was "presently $63,979 over budget." Id. Mr. Haugh stated that he would "search elsewhere for the balance of the budget overruns . . . ." Id. One-half of this amount related to the Woodland Code requirement "that all buildings over 5000 square feet be furnished with a water sprinkler system." Id.

## Construction Defects And Budget Overruns

Plaintiff began to discover flaws in the quality of the construction on the modular facility soon after its contractors commenced work. CHDC decided to hire a number of other construction contractors to identify and recommend solutions to these problems. Tr. at 218-24. CHDC's CFO Haugh informed HHS' Financial Operation Specialist, Paulene Graham, on August 31, 2001: "I will be procuring the services of an independent contractor to report to me weekly on the project progress and scheduling." JX 7 at 6.

In August 2001, CHDC officials were informed of a "serious problem"-- that "electrical service was not going to be adequate for the building." JX 44 at 45. The cost to fix this problem was estimated to range between $10,000 and $20,000. Id. In September 2001, CHDC hired a local contractor, Dave Buchignani, to be the "Clerk of the Works," or the construction "project manager." JX 44 at 46. Mr. Buchignani "gave progress reports . . . on scheduling, workmanship, and percentage [of] completion . . . ." Id. In December 2001, Mr. Buchignani informed Mr. Haugh that the HVAC system was "less than what was called for in [WCR's] original design." Id.

---

[7] WCR regained its license in September 2001. JX 8; JX 48 at 3.

On February 8, 2002, the Government informed CHDC that it was denying CHDC's request for reimbursement of $8,424.57 paid to Mr. Buchignani for construction oversight, stating "using Head Start operating funds to finish the construction is not an option, nor are there additional funds available for this project . . . ." JX 19.

On March 12, 2002, CHDC informed the Government that CHDC had withheld a $135,000 payment from Ticon because the lighting did not meet the licensing requirement, and CHDC's electrical engineers had estimated remedial costs at $60,000. JX 22.

On April 6, 2002, CHDC Chairman Jose Bernardo informed ACF that CHDC was required to pay $58,480.14 in "impact fees" to the City of Woodland and requested reimbursement. JX 24. CHDC had believed it was exempt from these fees, but the county later determined that Plaintiff was not exempt. Tr. at 142. ACF denied this request. JX 28.[8]

On May 7, 2002, CHDC advised ACF of "serious problems with the contractor" and informed ACF that CHDC hired the "mechanical firm of Walsh and Forester and the electrical firm of Axiom Engineering to assess the work done by the contractors, [WCR] and Ticon Construction." JX 27. The letter elaborated that "[o]ne of the issues of concern was the heating ventilation and air conditioning system (HVAC). Walsh and Forester determined the roof units were of insufficient capacity to assure appropriate air exchange within the building." Id. CHDC also announced that it had hired attorney Robert Scharf "who specializes in building construction to advise us on our legal options." Id. On June 12, 2002, another CHDC attorney, Louis Flores, advised CHDC that, based on the assessments of Mr. Buchignani and electrical engineers, Phillip A. Huff and Ernest Heine, the facility required tens of thousands of dollars in corrective action for electrical problems. JX 31.

Plaintiff withheld payments to Ticon as a result of the construction deficiencies. JX 22; JX 150 at 19. On March 26, 2002, Ticon recorded a mechanics' lien against CHDC in the amount of $172,823.63. JX 150 at 19. CHDC eventually settled with Ticon for $100,800. JX 150 at 46. Attorneys Flores and Scharf represented CHDC in the settlement proceeding. JX 150 at 3,5. CHDC also filed suit against WCR for its construction failures and obtained a consent judgment in the amount of $385,000 against WCR. Tr. at 243-44; JX 99 at 5.[9]

In addition to the impact fees and sprinkler system, the project required other expenditures to obtain local and state licensing. Tr. at 138, 140-41; JX 20 at 1. Specifically, CHDC spent $4,204 to install playground fencing, which it stated was required to satisfy state licensing requirements, $2,869 for parking lot striping to satisfy the City of Woodland's licensing requirements, and $1,500 of non-grant money to install a "concrete pad"around the playground. JX 32 at 2; JX 134 at 5; JX

---

[8] Plaintiff does not seek to recover the impact fees from the Government in this action. Pl.'s Post Hr'g Br. at 29-30; Tr. at 216-17.

[9] As of the trial in this action in August 2008, CHDC had been unable to collect that judgment. Tr. at 244.

113 at 3.  However, ACF had previously advised Plaintiff that the Government did not authorize CHDC to use any HS/EHS grant funds to purchase a playground.  JX 29; JX 10.

**Program Deficiencies**

Independent auditor Moss Adams LLP conducted a financial audit of CHDC for the fiscal year ending June 30, 2001.  JX 21 at 4.  The auditor analyzed CHDC's expenditures of its HS/EHS grants, including the $924,000 program improvement grant, and expressed an "unqualified opinion" that "[n]o reportable conditions were disclosed" and "no instances of noncompliance" identified. JX 21 at 8.  The auditor's report stated: "[o]ur consideration of the internal control over compliance would not necessarily disclose all matters in the internal control that might be material weaknesses." JX 21 at 7.

However, between August 13 and 17, 2001, ACF conducted an on-site review of CHDC's Early Head Start programs and prepared a report identifying numerous project deficiencies, including "serious mismanagement of funds."  JX 11 at 16.  As a result of this review, ACF assigned CHDC "high risk" status, meaning that in the event that the programs "continued to have uncorrected deficiencies beyond one year from the date of the receipt of this letter, [it would] be issued . . . a letter stating [ACF's] intent to terminate [CHDC's] Head Start/ Early Head Start grant."  Id. at 4. As a result of the "high risk" designation, CHDC also was required to seek specific prior approval for all draw-downs of Government funds.  JX 13.

A Head Start Review Report dated November 4, 2002, likewise highlighted various "findings requiring corrective action."  JX 43 at 2.  These findings included staffing and supply deficiencies and "inadequate management systems," which "negatively affected the ability of staff to carry out their responsibilities."  Id. at 1.  A "Deficiency Follow-Up Review" on June 18, 2003, identified continuing concerns with CHDC's HS/EHS programs, including problems with Plaintiff's management, concerns over child health and safety, and allegations of child abuse by staff.  JX 50 at 1-5, 24-26.

**Disallowance And Relinquishment**

By the fall of 2002, ACF had formed the opinion that CHDC had improperly expended more than $430,000 in grant money and ACF decided to seek "disallowance," or recovery, of these funds. JX 38; JX 42.  The Government announced two bases for this proposed disallowance: that ACF made improper payments of $356,976 to Ticon, with whom it did not have a contract, and that Plaintiff payed $79,089 to WCR and Harris prior to grant approval and charged that sum to the grant. JX 42.[10]

_____

[10]   CHDC's contract for $848,000 was with WCR, but because WCR lost its license,  Ticon did much of the construction.  The basis for the disallowance was that, under applicable regulations, Ticon needed to have submitted a competitive bid for the work and to have signed a contract with CHDC.

On October 24, 2002, ACF notified CHDC of its intent to seek disallowance and offered that "[w]ithin 30 days of the date of this letter, CHDC may provide documentation showing that the costs in question were not charged to the program improvement grant, or provide justification . . . that the charges were proper and complied with all terms and conditions of the grant and all applicable regulations." JX 42 at 1.[11]

On December 5, 2002, CHDC responded that payments to Ticon were not improper, since all checks were payable to WCR as well, and pre-award costs were allowable under federal regulations. JX 44 at 1, 4, 14-22. On January 29, 2003, ACF was "still considering whether to disallow these costs," and ACF Grants Officer Martin Tom requested that CHDC prepare a detailed summary of its construction expenditures under the grant, "showing what particular work was . . . performed by WCR under CHDC's contract with WCR, and what particular work was performed by Ticon under WCR's contract with Ticon." JX 46 at 1. CHDC responded to ACF on March 14, 2003, but did not include the requested summary of construction expenditures. JX 48. On May 6, 2003, Mr. Tom wrote again, stating that CHDC had "failed to provide the information requested," which was "entirely unacceptable . . . . ACF views CHDC's actions as a material violation of the terms and conditions of the Head Start grant," and gave CHDC one final opportunity to explain its expenditures. JX 49 at 1.

By July 2003, the Government had decided that CHDC should cease to be a HS/EHS grantee and should turn over its facilities to an appropriate third party. Tr. at 575-76; JX 54; Tr. at 75-78. At a July 14 meeting between ACF and CHDC's Board, ACF advised CHDC that it wanted CHDC to relinquish its grants. Tr. at 76-84. At the same meeting, members of CHDC's Board were given a new draft disallowance letter proposing over $1 million in cost disallowances, and they were told that the disallowance letter would be issued if CHDC did not agree to relinquish its grants. JX 56; JX 106. The new disallowance letter called for disallowances of $286,118.34 for unauthorized payments to Ticon, $127,273.35 for unauthorized pre-award construction costs, $471,548.74 for payments to WCR and nearly $140,000 for other miscellaneous expenditures. JX 106 at 1-5.

CHDC held a special Board meeting on July 21, 2003, to discuss the Government's proposal not to issue the disallowance in exchange for CHDC's relinquishment of its grants. JX 56. According to meeting minutes, CHDC Board members Yolanda Rinaldo and Harvey Aytch summarized the situation as follows:

---

[11]  Before ACF sent the October 24, 2002 letter to CHDC, ACF Grants Officer Martin Tom wrote an internal e-mail to other ACF officials on September 30, 2002, stating that CHDC's unallowable costs were the basis for the disallowance, but pointed out "some weaknesses in our case [for disallowance]," namely that "ACF was aware of the deficient contract between CHDC and WCR in 12/00 and ha[d] not raised the concern; that ACF knew since 8/01 that there was an inappropriate contract between WCR and Ticon due to loss of license by the primary contractor . . . ." JX 38 at 1, 2.

> CHDC did not pass [a recent program] review based strictly on HR issues. We have unqualified and unlicensed staff. We had two allegations of child abuse, and the state reviewers substantiated at least one of them. So ACF's position is why are these staff members still working for us. Management structure is unstable . . . . Some qualifications were overstated . . . . The ACF offer is that –if CHDC agrees to relinquish the program they would not issue the disallowance letter, and the report – the recent Program Review – would be filed and not issued. ACF would also cover CHDC's closing and transition costs for the program.

JX 56 at 2. The Board voted to:

> consider the ACF proposed options outlined at the July 14 meeting as a basis for settlement, subject to further and written clarification of a resolution of liabilities related to the audit, mechanics liens, leases, litigation, close-out costs and ACF actions that could impact other CHDC grants.

Id. at 4. The meeting was followed by a series of letters between CHDC and the Government. JXs 58, 61, 62 and 64; Tr. at 85.[12]

In a letter dated July 23, 2003, to Associate Director of HHS/ACF's Children and Youth Development Unit, Jerry Gomez, Plaintiff stated:

> [t]he Board of Directors of the [CHDC] met on July 22nd 2003 and discussed the options outlined orally by HHS/ACF at the meeting on July 14th as a basis for settlement. These options as conveyed at this meeting were that CHDC would agree to relinquish the Head Start and Early Head Start Grants and in return ACF/HHS would release CHDC from the potential liabilities of $1,023,530.57 as outlined in your draft Final Determination . . . the Board decided that further consideration and acceptance of the offer by the CHDC Board of Directors is subject to written clarification of the offer which should include a resolution of all issues, including, but not limited to, all liabilities related to the audit, mechanics liens, leases, litigation, recovery of close-out costs and any possible ACF action that could negatively impact on CHDC.

JX 58. In a letter dated July 24, 2003, and signed by Mr. Gomez and Grants Officer, Mr. Tom, the Government responded, stating:

---

[12] The Court quotes pertinent portions of these letters, as they form the alleged contract.

if CHDC formally relinquishes its grants, ACF will not issue or in any other manner pursue the disallowances . . . nor will a termination proceeding be required.  In accordance with our standard procedure, after CHDC's formal relinquishment has been received and accepted by ACF, all matters relating to the transfer of the grants will then be addressed in a close out period. All reasonable and necessary close out costs will be fairly negotiated and charged to a close out grant, and all issues relating to the transfer of facility title, licenses, leases, lien claims, and other transfer issues, will also be negotiated and resolved in the ordinary course of the close out.

JX 61.  On July 25, 2003, Plaintiff responded that Plaintiff's Board of Directors voted "to relinquish the Head Start and Early Head Start grants."  The letter further stated:

CHDC Board of Directors understands, as indicated in our letter of July 23rd, that good faith negotiations will now lead to a resolution of all issues, including, but not limited to, all liabilities related to the audit, mechanics liens, leases, litigation, recovery of close out costs and any possible ACF action that could negatively impact on CHDC. The Board also understands that as per your letter of July 24th "All reasonable and necessary close out costs will be fairly negotiated and charged to a close out grant, and all issues related to the transfer of facility, title, licenses, lien claims and other transfer issues" will also be negotiated and resolved fairly.

JX 62.  Later that same day -- July 25 -- the Government transmitted the following letter to Plaintiff:

We accept the [CHDC] Board of Directors' decision to relinquish the Head Start and Early Head Start grants, communicated in your letter of July 25, 2003.  We will be in contact to schedule a meeting to discuss the transition of the programs and closeout of the grants.

JX 64.  This letter was signed by "Jan Len for Jerry Gomez."  Ms. Len was the Head Start regional program manager and Associate Director Gomez's supervisor.  Tr. at 1009.

After CHDC agreed to relinquish its grants, Mr. Tom and Mr. Gomez wrote to CHDC on August 15, 2003, advising Plaintiff of close-out procedures.  The letter directed CHDC's attention to the property disposition regulations in 45 C.F.R. §§ 74.32-37.  JX 69 at 1.

In the fall of 2003, ACF and CHDC began negotiating the assignment of CHDC's Lease to a third party, interim HS/EHS grantee, Community Development Institute ("CDI").  JXs 70, 71, 73, 82.  On November 13, 2003, Mr. Tom advised CHDC that close-out negotiations could not take place until the Lease assignment had been completed "because assignment of the lease is a necessary

10

part of CHDC's relinquishment of the grant. . . . " JX 83. The Naekel Lease was assigned to CDI in January 2004. Tr. at 159. However, in the interim, beginning September 1, 2003, CDI took physical possession of the property and began running HS/EHS programs. Tr. at 159, 835; JX 99 at 5.

## Close-Out Costs Were Negotiated and Awarded In Part

Plaintiff submitted two close-out budgets to the Government on September 9, 2003 -- one listing $102,184.30 in ordinary or "routine" close-out costs, the other listing $746,742.94 in "extraordinary" close-out costs relating to the building improvements and litigation. JX 74. Negotiations were delayed until March 2004, while the parties negotiated assignment of the Lease. Between March and August 2004, Mr. Tom and CHDC Deputy Chief Executive Officer, Christopher Paige, corresponded a number of times to discuss close-out costs. JXs 94, 96, 112, 113, 117, 118, 119 and 123. ACF and CHDC also held a meeting on April 22, 2004, to discuss the close-out budget. Tr. at 205, 1282-83.

On July 23, 2004, ACF provided CHDC with a preliminary decision on the requested close-out costs and allowed CHDC to comment on it. JX 112; Tr. at 246-47. The draft decision awarded $90,593 in ordinary close-out costs and $5,850 in extraordinary costs, for attorneys' fees related to the Lease assignment. JX 112. The Government's draft stated that the Government would not award any construction-related costs, citing a July 7, 2004 letter from HHS' attorney Paul Johnson to Plaintiff's attorneys, Messrs. Scharf and Flores, as its basis for that decision. Id.; JX 108. Mr. Johnson's letter stated:

> the construction was done pursuant to a contract with an unlicensed
> contractor [WCR], and the work was performed by a subcontractor
> (Ticon) who had no contract with CHDC. As you know, this was
> contrary to federal regulations and the terms of CHDC's grant, and
> the resulting prospect of a disallowance of the entire amount was a
> significant factor in CHDC's decision to relinquish the grant.

JX 108 at 3.

After further correspondence between the parties, the Government issued its final close-out award on August 27, 2004. JX 132; see JX 113. The final award was $137,532 -- an increase from the $96,443 suggested in the draft award. Compare JX 132 with JX 112. The August 27, 2004 close-out award provided:

11

**Ordinary Close-Out Costs**

| | |
|---|---|
| Wage and fringe | $50,206 |
| Occupancy | 6,924 |
| Postage | 945 |
| Communications | 1,378 |
| Insurance | 1,140 |
| Audit | 30,000 |
| Health insurance | 13,515 |

**Extraordinary Close-Out Costs**

| | |
|---|---|
| Attorney fees –relinquishment/ lease assignment | 16,030 |
| Settlement – Trejo | 0 |
| Attorney – Trejo | 3,273 |
| Settlement/Attorney–Moran | 5,641 |
| | 12,930 |
| Deduction for Property Tax | 4,450 |
| **Total Approved Budget** | **$137,532** |

JX 132 at 7 (emphasis in original).  The close-out award denied $387,450.82 in extraordinary close-out costs, including $141,647 for the Ticon lien settlement and $20,000 for a fair market value appraisal.  Id.  Mr. Tom explained that "ACF did not approve extraordinary construction-related costs connected with the [Cottonwood Street] facility. . . .  All of these costs were prior period costs which may only be assigned to the period in which the cost was incurred . . . ."  JX 132 at 3.  Mr. Tom stated that ACF paid nothing for the Ticon lien settlement "as this cost pertains to CHDC violations of the terms and conditions of the grant."  Id.  Finally, ACF did not approve $20,000 for an appraisal of the facility because "[a]n appraisal is not necessary given that CHDC did not own the facility . . . ."  Id.  In the earlier July 7, 2004 letter to Plaintiff's attorneys, Mr. Johnson elaborated on this point:

> CHDC did not own the improvements transferred with the lease, so there is no real property "taking" in the first instance.  If CHDC were the fee owner of the property and improvements in question, it would have a right to compensation under 45 C.F.R. § 74.32[(c)](3) if its ownership interest were taken.  But that is not the case here.  Under the Naekel lease, all improvements belong to the Naekels and revert to them at the end of the lease term.

JX 108 at 3.

**Elements of Plaintiff's Claimed Damages**

Plaintiff seeks the following damages totaling $400,256.71:

| | |
|---|---:|
| Lease "run out" cost of the copiers | $ 34,472.40 |
| Axiom Engineering as electrical consultant for HVAC system | 10,609.30 |
| Dave Buchignani, the "Clerk of the Works" | 19,929.88 |
| Ernest Heine as electrical consultant for HVAC system | 4,622.00 |
| Phillip Huff Engineering as electrical consultant | 750.00 |
| Ticon construction invoice | 35,857.00 |
| Walsh Construction final review of building | 8,490.00 |
| Playground installation and equipment | 1,500.00 |
| Playground fence | 4,204.00 |
| Parking striping | 2,869.00 |
| Ticon's mechanic's lien settlement | 141,647.00 |
| Mediation costs associated with the Ticon settlement | 700.00 |
| Attorney Lou Flores for litigation costs relating to Ticon | 29,386.18 |
| Attorney Robert Scharf for litigation costs relating to Ticon | 49,135.07 |
| Settlement of employment dispute with former employee Lilia Moran | 11,727.00 |
| Settlement of employment dispute with former employee Karen Trejo | 44,359.00 |

Pl.'s Post Hr'g Br. at 29-30.[13]

## Discussion

## The Contract Was Limited to An Agreement To Negotiate In Good Faith

Plaintiff claims the Government breached a contract to negotiate its grant close-out costs in good faith.  The Government claims no contract was formed.

To form an agreement that is binding on the Government, four requirements must be met: (1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract. Anderson v. United States, 344 F.3d 1343, 1353 (Fed. Cir. 2003); D&N Bank v. United States, 331 F.3d 1374, 1378 (Fed. Cir. 2003); Total Med. Mgmt., Inc. v. United States, 104 F.3d 1314, 1319 (Fed. Cir. 1997).

Here, the parties' correspondence between July 24 and 25, 2003, evidenced both mutuality of intent to contract and unambiguous offer and acceptance.

In its July 24, 2003 letter, the Government made the following offer to CHDC:

> if CHDC formally relinquishes its grants, ACF will not issue or in
> any other manner pursue the disallowances . . . nor will a termination
> proceeding be required.  In accordance with our standard procedure,
> after CHDC's formal relinquishment has been received and accepted
> by ACF, all matters relating to the transfer of the grants will then be
> addressed in a close out period. All reasonable and necessary close-
> out costs will be fairly negotiated and charged to a close out grant,
> and all issues relating to the transfer of facility title, licenses, leases,
> lien claims, and other transfer issues, will also be negotiated and
> resolved in the ordinary course of the close out.

JX 61.

On July 25, 2003, Plaintiff responded that its Board of Directors voted "to relinquish the Head Start and Early Head Start grants" and accepted the Government's offer that close-out costs and all transfer issues would be negotiated.  JX 62.  Plaintiff's response added a counter-offer that "good faith negotiations will now lead to a resolution of all issues, including, but not limited to, all

---

[13] In its Post Hearing Reply Brief, Plaintiff states that it transposed the names of the former employees in its damages chart, so that its $11,727 claim is associated with Karen Trejo, and its $44,359 claim with Lilia Moran.  Pl.'s Post Hr'g Reply Br. at 29.  Plaintiff also acknowledges that it overlooked a $12,930 payment by Defendant toward the Moran settlement.

liabilities related to the audit, mechanics liens, leases, litigation, recovery of close-out costs and any possible ACF action that could negatively impact on CHDC." Id.

Later on July 25, 2003, the Government responded to Plaintiff's counteroffer -- by writing "[w]e accept the [CHDC] Board of Directors' decision to relinquish the Head Start and Early Head Start grants, communicated in your letter of July 25, 2003." JX 64. Thus, the Government accepted Plaintiff's counter-offer to negotiate fairly both costs related to the transfer and closeout of the grants and broader issues -- all issues between the parties and "any possible ACF action that could negatively impact on CHDC." JX 62.

There was consideration by both parties for this agreement. In exchange for CHDC relinquishing its Head Start grant, the Government agreed to forego issuing the disallowance letter and to negotiate the close-out costs and all outstanding issues in good faith. Id. The Government agreed to give up a potential recovery of a disallowance of over $1 million and received a voluntary relinquishment of Plaintiff's grants -- which avoided the cost and burden of a potential termination of Plaintiff's grant. Plaintiff avoided the disallowance proceeding and potential liability of some $1 million, and potential termination of its Head Start grant. Both parties obtained the benefit of parting ways informally and negotiating, instead of litigating, close-out costs, transfer, and other issues stemming from their grant relationship.

Finally, Plaintiff also has demonstrated that the Government representative who ratified the agreement had actual authority to bind the United States. See Trauma Serv. Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997). The Government argues that even if Head Start Regional Program Manager Jan Len, who signed the Government's July 25, 2003 acceptance, had attempted to accept the terms of Plaintiff's counter-offer, she had no authority to bind the Government to such a contract because neither she, nor Mr. Gomez, on whose behalf she signed, was a grants officer with the requisite authority. Def.'s Post Trial Br. at 10. There were competing accounts from Government officials about whether Ms. Len had such authority.[14] However, there was no dispute that Mr. Tom as the Grants Officer had actual authority to bind the Government to a contract with Plaintiff regarding close-out costs, and he ratified the agreement by accepting the agreement, carrying out the negotiations and close-out procedures and awarding Plaintiff close-out costs. See JX 91, 96, 112, 132; Tr. at 1281-84. Mr. Tom as Grants Officer was responsible for "all the business related transactions that come under the award" and had the authority to "ultimately . . . make the final closeout award that came from the budget review." Tr. at 1268, 1281.

To establish ratification of a contract by a government agency, a party must show that an individual in the agency with contracting authority had "actual or constructive knowledge" and "demonstrated acceptance" of the contract. Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429, 1433-44 (Fed. Cir. 1998); see also Aboo v. United States, 86 Fed. Cl. 618, 629

---

[14] Although Ms. Len and Mr. Johnson believed that Ms. Len had actual authority, Mr. Gomez, for whom Ms. Len signed, testified that neither he nor Ms. Len had authority. Compare Tr. at 1011-12 and Tr. at 917 with Tr. at 1174-75.

(2009).  In this case, Mr. Tom not only had actual knowledge of the Government's agreement but was responsible for negotiating and implementing this agreement, and clearly accepted it.

**Plaintiff Has Not Demonstrated A Breach of Contract**

Plaintiff claims that the Government breached its contract to negotiate fairly in refusing to reimburse additional close-out costs.  However, the parties' agreement here was extremely limited. The Government agreed to negotiate with Plaintiff over claimed close-out costs and outstanding issues in good faith -- it did not agree to compensate Plaintiff for any particular close-out costs or resolve any outstanding issues in any particular way.  As the Federal Circuit recognized in North Star Steel Company v. United States, 477 F.3d 1324, 1332 (Fed. Cir. 2007), "a provision which calls upon the parties to a contract to agree in the future on a specified point or contract term, often referred to as an 'agreement to agree,' imposes an obligation on the parties to negotiate in good faith." (citing Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991)); see also Gardner, Kamy & Assocs. v. Jackson, 369 F.3d 1318, 1322 (Fed. Cir. 2004); City of Takoma v. United States, 31 F. 3d 1130, 1132 (Fed. Cir. 1994).  As the Court further recognized, a breach of this type of contract would occur if one of the parties failed to negotiate in good faith, citing as an example an agency's "non-disclosure during negotiations of information in its possession, or to which it had access, that was pertinent . . . ."  North Star, 477 F.3d at 1333.

In the instant case, Plaintiff has failed to demonstrate any type of improper tactics or conduct during the course of negotiations that would suggest the Government failed to negotiate in good faith.  In contrast, there were numerous back-and-forth letters and a meeting in which the parties discussed the propriety of certain closeout costs.  Further, the Government initially offered Plaintiff $96,443 in a preliminary award decision, but raised this amount in response to Plaintiff's negotiations to $137,532 -- increasing its closeout award by nearly 43 percent from its initial negotiating position.  This does not indicate a failure to negotiate in good faith.  On the contrary, it indicates the type of give and take characteristic of good faith negotiations.  As the Seventh Circuit has recognized, "the duty to negotiate in good faith, while not including the duty to agree, does require an active participation in the deliberations, a sincere effort to overcome obstacles or differences between the parties, and a duty to respond to a good faith proposal put forth by the other party."  United States v. Greyhound Corp., 508 F.2d 529, 536 (7th Cir. 1974).  These indicia of good faith negotiations were met here.

The gravamen of Plaintiff's complaint here lies not with the negotiation process but with the negotiation result.  In this vein, the context in which this agreement occurred is important.  Plaintiff is claiming as a discretionary grantee that it is owed more money under its grant than the face amount of the grant.  While there might be some circumstance where a grantee that overspends its discretionary grant may be reimbursed, Plaintiff has not demonstrated such circumstance here.

Plaintiff argues that its costs must be reimbursed because these costs would be "allowable" under Office of Management and Budget ("OMB") Circular A-122, Cost Principles for Non-Profit Organizations.  See, e.g., Tr. at 20-21, 433-34, 1022-23; JXs 119, 120, 123, 124.  In administering

16

its Head Start grants, HHS has adopted the principles set forth in OMB Circular A-122 which determine what costs a grantee may properly charge to its grant. Although Circular A-122 provides guidance on what direct and indirect costs are allowable or allocable to a grant, nothing in the Circular requires the Government to compensate a grantee for funds spent in excess of a discretionary fixed grant award.[15] See Cmty. Relations-Social Dev. Comm'n in Milwaukee County v. United States, 8 Cl. Ct. 723, 727 (1985), (allowing certain indirect costs but stating "[i]t cannot be demonstrated that [HHS's predecessor] ever agreed to pay to plaintiff any sum beyond the amount stated on each award.").

Invoking OMB Circular A-122, CHDC seeks $34,472.40 for costs incurred in terminating its leases on copier machines. Plaintiff asserts that "Defendant's normal closeout procedures require the agency to pay for all rental costs under unexpired leases incurred by the prior grantee by reason of the relinquishment and closeout of the grant" and cites OMB Circular A-122, Attachment B, §52(d). Pl.'s Post Hr'g Reply Br. at 22-23. That section reads, in relevant part:

> 52. Termination costs. Termination of awards generally give rise to the incurrence of costs, or the need for special treatment of costs, which would not have arisen had the award not been terminated. Cost principles covering these items are set forth below.

_____

[15] OMB Circular A-122, Attachment A, A(2) on "Factors affecting allowability of costs" reads:

> To be allowable under an award, costs must meet the following general criteria:
>
> a. Be reasonable for the performance of the award and be allocable thereto under these principles.
> b. Conform to any limitations or exclusions set forth in these principles or in the award as to types or amount of cost items.
> c. Be consistent with policies and procedures that apply uniformly to both federally-financed and other activities of the organization.
> d. Be accorded consistent treatment.
> e. Be determined in accordance with generally accepted accounting principles (GAAP).
> f. Not be included as a cost or used to meet cost sharing or matching requirements of any other federally-financed program in either the current or a prior period.
> g. Be adequately documented.

17

. . . .

> d. Rental costs. Rental costs under unexpired leases are generally
> allowable where clearly shown to have been reasonably necessary for
> the performance of the terminated award less the residual value of
> such leases, if (i) the amount of such rental claimed does not exceed
> the reasonable use value of the property leased for the period of the
> award and such further period as may be reasonable, and (ii) the
> organization makes all reasonable efforts to terminate, assign, settle,
> or otherwise reduce the cost of such lease. . . .

OMB Circular A-122, Attachment B, §52(d). Plaintiff has not demonstrated that Circular A-122 entitles it to compensation for the copier leases. Plaintiff has not "clearly shown" that its copier leases were "reasonably necessary" for the performance of its grant, as Section 52(d) dictates. CHDC never obtained approval for these leases in the first place, and the Government never agreed to provide funding for copier leases. The fact that rental costs under unexpired leases may be allowable does not require the Government to reimburse such costs here.

Plaintiff also invokes Circular A-122 in claiming $43,216 for settlement payments and litigation costs incurred in disputes with two former employees. CHDC states that "Defendant clearly acknowledges the obligation to pay for the legal and settlement costs . . . as it has made partial payments on legal fees and settlement costs for both cases. The only issue then is why only partial payment, and not full payment, was made." Pl.'s Post Hr'g Reply Br. at 29-30. However, Plaintiff has not demonstrated why it is entitled to full reimbursement for such costs. The fact that the Government reimbursed part of CHDC's claimed employee costs does not constitute a legal basis for awarding full recovery.

The costs Plaintiff is claiming are clearly beyond the scope of the original grant, which was limited to the purchase of a modular unit and discrete budgeted items. The language of the grant was clear -- it was a "one-time only" facility purchase grant for "one modular" with no funding for major renovations or construction. Plaintiff, in contracting out the construction associated with acquiring that unit, encountered numerous problems with its contractors and was forced to hire additional contractors -- replacements and consultants -- to secure completion of the unit. However, Plaintiff has not established that the Government is obligated to reimburse it for the grant overruns occasioned by its construction decisions. Such is not required by "good faith" negotiating -- especially in the context of a discretionary grant. It is well established that grants are in reality gifts or gratuities to the recipient. As the Court of Claims recognized in D.R. Smalley & Sons, Inc. v. United States, 178 Ct. Cl. 593, 597-98, 372 F.2d 505, 507 (1967), "[t]he National Government makes many hundreds of grants each year to the various states, to municipalities, to schools and colleges and to other public organizations and agencies for many kinds of public work . . . . These grants are in reality gifts or gratuities." As such, nothing in the grant imposed on the Government any additional obligation to increase the grant's funding, or imposed on the Government any risk for increased project costs. See generally, Paul G. Dembling and Malcom S. Mason, Essentials of Grant

Law Practice, ix (American Law Institute 1991) ("We give plain warning against the tempting fools' gold of thinking of grants as a kind of procurement."). As the Court of Claims recognized in City of Manassas Park v. United States, 224 Ct. Cl. 515, 520, 633 F.2d 181, 183 (1980), "[t]hey say they want an 'equitable adjustment' in the grant agreement. But this term, familiar in litigation founded on the standard government [contract] disputes clause, not here involved, is inappropriate here."

Plaintiff is in essence asking to recoup costs which are nothing more than overruns of its grant award. The costs were clearly not authorized within the four corners of the grant, and the Government told Plaintiff in no uncertain terms that it would not fund these costs during performance. The grant expressly provided that expenditure of its funds "for purposes other than those specified, without written approval from the Regional Office may be cause for disallowance of such costs." JX 33 at 2-3. Here, consistent with the terms of the grant, the Government advised Plaintiff on multiple occasions that it would not fund costs which exceeded the amount of the grant. As early as August 13, 2002, Grants Officer Tom warned Plaintiff:

> Your agency's repeated and continuing practices of charging costs and seeking retroactive approval clearly reflects a lack of internal management controls, and a lack of Board oversight in your agency . . . . will not authorize reallocations from other budget categories and/or authorize new funds for additional costs for this facility project beyond what has already been approved and awarded.

JX 35 at 3. In a letter to CHDC dated August 16, 2004, Mr. Tom stated: "ACF funded the facility . . . at 100% of the requested budget. CHDC stated in various letters that it would fund any cost overruns." JX 123 at 3. Mr. Johnson conveyed the same position in his July 7, 2004 letter to Plaintiff's attorneys:

> CHDC applied for and received a grant of some $924,000 to produce a completed project, but because of cost overruns and mismanagement, the project ended up costing more than was originally requested and more than ACF approved . . . . ACF had no obligation to fund any of the additional amounts in the first place . . . .

JX 108 at 4; see also Tr. at 1141.

It was not the Government's fault, responsibility, or risk, that Plaintiff's contractor had its license suspended, that Plaintiff had to engage in litigation with its subcontractor and that there were serious construction problems which Plaintiff believed required hiring a Clerk of the Works, and engineering, electrical, and HVAC consultants, or that there were litigation and settlement costs resulting from these problems. Against this factual backdrop, it is extremely difficult for Plaintiff to demonstrate that the Government failed to negotiate in good faith by not awarding it additional reimbursement. Plaintiff's legal burden is substantial as well. Under Federal Circuit precedent,

19

Plaintiff must meet a "high burden of proof necessary to overcome the presumption of good faith" on the part of government officials. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (requiring "clear and convincing evidence" to show that a government official acted in bad faith).

Plaintiff's major argument to prove the absence of good faith negotiations seems to be that HHS counsel, Mr. Johnson, advising Grants Officer, Mr. Tom, already had formed the legal opinion that Plaintiff would not be entitled to compensation for the facility improvements before the Government agreed to negotiate with Plaintiff -- thus making his promise to negotiate meaningless. Pl.'s Post Hr'g Br. at 7, ¶29. In essence, Plaintiff argues that counsel had prejudged a portion of CHDC's claim before coming to the bargaining table, making the negotiation process an exercise in going through the motions. However, the record does not support this allegation.

Mr. Johnson's legal opinion was that under the pertinent regulation, 45 C.F.R. § 74.32(c)(3), CHDC could not be compensated for improvements it made to the modular unit and property because, under CHDC's Lease, all improvements belonged to the landlord, the Naekels, and Plaintiff therefore lacked any ownership interest in the property and improvements. JX 108 at 3. However, this legal position was first articulated by Mr. Johnson almost a year after the Government agreed to negotiate, in the July 7, 2004 correspondence to Plaintiff's attorneys Messrs. Scharf and Flores.[16]

Although Plaintiff alleges that Mr. Johnson formed this opinion before he agreed to negotiate these improvement costs, Plaintiff points to no evidence that shows Mr. Johnson had predetermined that CHDC was not entitled to compensation when the Government agreed to negotiate in its July 25, 2003 letter. In any event, the fact that counsel entered a negotiation armed with a legal opinion supporting his client's negotiating position is not indicative of an unwillingness to negotiate. Plaintiff has not proffered any evidence to suggest that Mr. Johnson was so entrenched in his views that he was unwilling to compromise.

Plaintiff also takes issue with the timing of the negotiations, stating they did not begin until February 2004, seven months after the relinquishment of the grants. Pl.'s Post Hr'g Reply Br. at 10-11. However, the record indicates that the parties had to negotiate assignment of the Lease before negotiating close-out costs to insure continuity of Head Start service. In an email dated November

---

[16] In that letter Mr. Johnson stated:

> CHDC did not own the improvements . . . . If CHDC were the fee owner of the property and improvements in question, it would have a right to compensation under 45 C.F.R. § 74.32[(c)](3) if its ownership interest were taken. But that is not the case here. Under the Naekel lease, all improvements belong to the Naekels and revert to them at the end of the lease term.

JX 108 at 3.

13, 2003, ACF advised CHDC that "the close out cannot proceed until the assignment is complete, because the assignment of the lease is a necessary part of CHDC's relinquishment of the grant . . . ." JX 83. On December 16, 2003, CHDC forwarded CHDC's close-out estimates "in the hopes we can move forward with discussion and approval for some of these costs." JX 84.[17] As of January 15, 2004, ACF was reviewing the budget CHDC emailed dated January 5, 2004, and asking CHDC to provide further information on a variety of costs. JX 90 at 1-2. Moreover, the record reflects that the parties engaged in extensive negotiations before the Government issued the final close-out award on August 27, 2004, and these negotiations began as early as August of 2003. As Plaintiff acknowledges, "[f]rom August 2003 until July/August 2004 CHDC supplied ACF with at least six (6) updated close out budgets before Grant Officer Tom issued his determination." Pl.'s Post Hr'g Br. at 8-9, ¶35 (emphasis added). The parties exchanged numerous letters relating to Plaintiff's claimed costs between March and August 2004. See, e.g., JXs 94, 96, 112, 113, 117, 118, 119 and 123. The parties also held a meeting on April 22, 2004, to discuss the close-out budget -- which involved discussion of the two binders of information that CHDC brought to the meeting. Tr. at 205, 1282-83. In sum, although the close-out negotiations did last over a year, the record does not establish that the Government improperly stalled or obstructed the negotiation process. It was reasonable for the Government to insist on securing the assignment of the Lease as its first priority to insure program continuity, and once the Lease assignment was effected, the negotiation of close-out costs continued in earnest with exchange of budgets and correspondence.

Plaintiff also argues that the testimony of Mr. Paige, CHDC's deputy CEO, about the April 22, 2004 meeting evidences that the Government failed to negotiate. Mr. Paige testified: "we talked for a bit, they listened, there wasn't really much of a reaction except the request from Paul Johnson to Bob Scharf [to submit in writing legal arguments about Plaintiff's proportional interest in the property]." Pl.'s Post Hr'g Reply Br. at 11-13 (quoting Tr. at 164-166). If anything, this testimony reflects that the Government was willing to consider Plaintiff's legal position on its claimed costs. Unlike in Aviation Contractor Employees, 945 F.2d at 1572, where the Court found that the Government failed to negotiate in good faith because it did not negotiate at all, here the Government did negotiate and awarded Plaintiff $137,532 in close-out costs.

Plaintiff further suggests that Mr. Johnson evidenced bad faith by contradicting his own position on who owned the modular facility. In his July 7, 2004 letter to Plaintiff's attorneys, Mr. Johnson claimed that the Naekels owned improvements or permanent changes to the property. JX 108 at 3 ("Under the Naekel lease, all improvements belong to the Naekels and revert to them at the end of the lease term."). However, in an October 5, 2004 email to Mr. Naekel, Mr. Johnson wrote that a "Federal Interest" in the property "arises because the classroom facility was built entirely with Head Start grant funds." JX 133. The email continues: "If the classroom facilities are permanent

_____

[17] On January 16, 2004, CHDC wrote to HHS Regional Administrator Sharon Fujii to notify her of delays with the close-out and to request that Ms. Fujii "review and interven[e] to take the necessary and appropriate action to insure that this close out is fairly negotiated." JX 88 at 1. However, the record reflects that at the time this letter was written, negotiations were under way. See JX 90.

21

and not removable, the Federal government would be entitled to recover any fair market value remaining in those facilities. If, however, the facilities are removable (I believe this is the case), they would be removed at our cost and used elsewhere or sold by Head Start." Id.

While Mr. Johnson's opinion does seem superficially contradictory, it is of no moment in assessing the bona fides of the Government's negotiating position vis-a-vis Plaintiff. Whether the Government or the Naekels owned the modular at any given point in time, it is clear that Mr. Johnson believed that Plaintiff had no property interest in the structure. Moreover, it appears that either of Mr. Johnson's potential scenarios could have transpired -- the modular structure could have been moved and utilized by the Government's Head Start grantee at another site or maintained on the Naekel's property and utilized by the interim or replacement grantee there. In sum, Mr. Johnson's negotiating stance with Plaintiff did not exhibit bad faith. See Am-Pro, 281 F.3d at 1240 ("showing a government official acted in bad faith is intended to be very difficult").

Plaintiff also argues that the Government acted in bad faith prior to the agreement in inducing Plaintiff to relinquish its grants. Plaintiff contends that the Government lacked a basis for issuing the draft disallowance letter and that the draft disallowance was used solely to intimidate Plaintiff into relinquishing its HS/EHS grants. See Pl.'s Post Hr'g Br. at 25-27. Although Plaintiff intimates that the draft disallowance was unwarranted, it did not establish that the stated grounds of disallowance were factually or legally erroneous. According to ACF, Plaintiff expended grant funds prematurely and inappropriately -- paying unauthorized pre-award costs, paying Ticon without having a contract and WCR, an unlicensed contractor. CHDC never persuasively refuted these grounds for disallowance, and they remain unresolved. So too, there is evidence supporting the Government's desire for relinquishment. CHDC was assigned a "high risk" rating due to program deficiencies and "did not pass the review based strictly on HR issues," it had "unqualified and unlicensed staff," at least one substantiated allegation of child abuse, and an unstable management structure. JX 56 at 2.

Had Plaintiff determined that the potential disallowance was unmeritorious, it could have taken legal recourse to challenge the disallowance before HHS' Departmental Appeals Board ("DAB") under HHS regulations. 45 C.F.R. Section 16 governs appeal procedures for Head Start grantees. See 45 C.F.R. § 16 App. A(C)(a)(1)("The Board reviews the following types of final written decisions in disputes arising in any HHS program authorizing the award of direct, discretionary project grants . . . . A disallowance or other determination denying payment of an amount claimed under an award, or requiring return or set-off of funds already received."); see generally Salt Lake Cmty. Action Program, Inc. v. Shalala, 11 F.3d 1084, 1089-91 (D.C. Cir. 1993) (holding that cost disallowances do not constitute "terminations" under the Head Start Act and that cost disallowances are to be appealed to the DAB). So too, if Plaintiff did not want to relinquish its grants voluntarily, it did not have to do so, but it would have run the risk that the Government could have decided to terminate its status as a Head Start grantee or decline to renew its grant. See generally Action for Boston Cmty. Dev. v. Shalala, 983 F. Supp. 222, 242 (D. Mass 1997).

**Plaintiff Has Not Proven That HHS Regulations Require Additional Reimbursement**[18]

Finally, Plaintiff claims that it is entitled to compensation for its "proportional interest" in the modular unit and improvements to the surrounding property under two provisions of 45 C.F.R. § 74, HHS's "Uniform Administrative Requirements for Awards and Subawards to Institutions of Higher Education, Hospitals, Other Nonprofit Organizations, and Commercial Organizations." Pl.'s Post Hr'g Br. at 15-21. Specifically, Plaintiff cites 45 C.F.R. §§ 74.32(c)(3) and 74.34(g) in claiming that the Government must provide compensation for the portion of the value of the facility equaling the percentage of Plaintiff's investment in the facility. Id.; Tr. at 27-28, 125-26, 480-81, 495-97.[19]

45 C.F.R. § 74.32(c)(3), titled "Real property," reads in relevant part:

> (c) When the real property is no longer needed as provided in paragraphs (a) and (b) of this section, the recipient shall request disposition instructions from the HHS awarding agency or its successor. The HHS awarding agency must provide one or more of the following disposition instructions:
>
> . . . .
>
> (3) The recipient may be directed to transfer title to the property to the Federal Government or to an eligible third party provided that, in such cases, the recipient shall be entitled to compensation for its attributable percentage of the current fair market value of the property.

Plaintiff argues that it spent $400,256 on the modular facility and related expenditures and is entitled to a corresponding proportional interest in the current fair market value of the property. Pl.'s Post Hr'g Br. at 15-21. The Government argues that the disposition regulation in 45 C.F.R. §74.32(c)(3) is inapplicable because "the property is not being disposed of." Def.'s Post Trial Br. at 16. The Government avers that under the language of the regulation, grantees are entitled to an "attributable percentage" only "when the property is no longer needed" for the "authorized purpose of the project," Id. (quoting 45 C.F.R. §74.32(a)-(c)), and here the facility continued to be used for HS/EHS programs. Id. The Government is correct. Paragraph 74.34(c)(3) by its terms is triggered when "the real property is no longer needed as provided in paragraphs (a) and (b) of this section." The referenced paragraphs a and b provide:

---

[18]   Plaintiff invokes the Government's alleged violation of regulations as evidence of the Government's breach of its contract to negotiate in good faith, not as a separate cause of action. See Pl.'s Post Hr'g Br. at 11 (clarifying that it has filed "a one count breach of contract claim against ACF").

[19]   Section 74.34(g) governs a grantee's retention of equipment which is inapplicable here.

> (a) Title to real property shall vest in the recipient subject to the condition that the recipient shall use the real property for the authorized purpose of the project as long as it is needed and shall not encumber the property without approval of the HHS awarding agency.
>
> (b) The recipient shall obtain written approval from the HHS awarding agency for the use of real property in other federally-sponsored projects when the recipient determines that the property is no longer needed for the purpose of the original project . . . .

These paragraphs contemplate that title to the property only vests in the grant recipient on the condition that the recipient is using the property "for the authorized purpose of the project as long as it is needed." Here, CHDC is no longer the "recipient" using the property, and CHDC has not determined that the property is no longer needed for the original project. In contrast, CHDC has relinquished its grant, but the project continues, and the interim grantee is using this property for the HS/EHS project in CHDC's stead. As such, the regulation is inapplicable.

Even if the Court were to find that the disposition regulations are applicable and that Plaintiff had an ownership interest in the property notwithstanding the Naekel Lease, Plaintiff has not demonstrated entitlement to its requested damages.[20] The regulation Plaintiff invokes, 45 C.F.R. § 74.32(c)(3), states that if the grant recipient is directed to transfer title to property, "the recipient shall be entitled to compensation for its attributable percentage of the <u>current fair market value of the property</u>." (emphasis added). Plaintiff has not offered evidence of the current fair market value of the property. The Supreme Court has defined "fair market value" as "what a willing buyer would pay in cash to a willing seller." <u>Almota Farmers Elevator and Warehouse Co. v. United States</u>, 409 U.S. 470, 474 (1973) (quoting <u>United States v. Miller</u>, 317 U.S. 369, 374 (1943)). "The market value of . . . a piece of property is the price which it might be expected to bring if offered for sale in a fair market . . . such a price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser . . . ." <u>BFP v. Resolution Trust Corp.</u>, 511 U.S. 531, 537-38 (1994) (quoting <u>Black's Law Dictionary</u> at 971 (6th ed. 1990)). Plaintiff admits that it did not secure an appraisal of the property, but blames this on the Government, stating that "ACF refused to authorize an

---

[20] The Government argues that if the disposition regulations apply to Plaintiff's relinquishment and transfer of its grants, Plaintiff cannot be compensated for a proportional share of the value of the facility because it "did not own a property interest in any improvements made to the site." Def's Post Trial Br. at 16. Rather, in the Government's view, under the Lease any improvements provided by CHDC belonged to the landlord and not CHDC. <u>Id.</u> at 16-17. The Government cites the provision of the Naekel Lease, that "'[a]ny alternations, additions or improvements to or of said Premises, including but not limited to wall covering, paneling and built-in cabinet work, but excepting movable furniture and trade fixtures, shall at once become a part of the realty and belong to Landlord and shall be surrendered with the Premises.'" <u>Id.</u> (quoting JX 1 at 8).

appraisal." Pl.'s Post Hr'g Br. at 28.  However, CHDC has the burden of proving that it has added to the value of the property and that the money CHDC spent on the modular increased the fair market value of the building.

Recognizing that it cannot prove the fair market value of the modular, Plaintiff asserts that it is entitled to recover a different measure of damages -- its costs rather than its attributable percentage of the modular facility's fair market value.  Pl.'s Post Hr'g Br. at 28.  Aside from the fact that the regulation does not authorize simply awarding a grant recipient all of the costs it expended on property in performing a grant-assisted project, Plaintiff has not demonstrated that the costs it expended added value to the property.  As former CHDC Board member Ms. Rinaldo testified:

> Q      . . . I'm pointing simply that there were serious problems with the building, construction-related problems with the heating and ventilation system and with the electrical supply; is that correct?
>
> A      That's correct.
>
> Q      And those problems led CHDC to spend money with these engineering firms that assessed the work and provided reports as to what correct -- I'm sorry -- corrective action was needed; is that correct?
>
> A      Yes.

Tr. at 99-100.  See also JX 27 ("[W]e are having some very serious problems with the contractor we hired . . . .  One of the issues of concern was the heating ventilation and air conditioning system (HVAC))."  As explained above, Plaintiff's expenditures resulted from problems with its construction contractors -- requiring it to hire multiple consultants and a "Clerk of the Works" and a replacement contractor and to engage in litigation.  Plaintiff has not demonstrated that these expenditures added value to the structure.  Because Plaintiff has not proven either the "current fair market value" of the property or that it added any value to the property, Plaintiff is not entitled to compensation under the regulations.[21]

---

[21]   To the extent Plaintiff is claiming the Government should compensate it for the benefit the Government received from these improvements, this Court does not possess subject-matter jurisdiction under the Tucker Act to adjudicate equitable claims of unjust enrichment.  See Trauma Serv. Group v. United States, 104 F.3d 1321, 1324-25 (Fed. Cir. 1997) (quoting Hercules, Inc. v. United States, 516 U.S. 417, 423 (1996)).

## **Conclusion**

 Plaintiff has not demonstrated that the Government breached its contract.  The Clerk of Court is directed to enter judgment for Defendant.


      <u>s/Mary Ellen Coster Williams</u>
      **MARY ELLEN COSTER WILLIAMS**
      **Judge**